# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| United States of America,<br><br>          Plaintiff,<br><br>vs.<br><br>Jacques Anton Lanier,<br><br>          Defendant. | 2:19-cr-00327-GMN-VCF-1<br><br>**Report and Recommendation to Deny Motion to Suppress (ECF No. 261)** |

Defendant Jacques Anton Lanier has now filed a motion to suppress. ECF No. 261. I previously held an evidentiary hearing in this case on Lanier's motion to dismiss the indictment. ECF No. 167. Although motions to suppress were due in December of 2021, the government notes that it produced additional discovery in May of 2023 ECF No. 265. I have accordingly considered the motion to suppress on the merits. I recommend that the motion to suppress be denied.[1]

---

[1] I issue this report and recommendation without holding another evidentiary hearing. "The Fourth Amendment requires that a hearing be held" if "the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). Since I find that the alleged omissions in this case were not necessary to the finding of probable cause, a hearing is not necessary.

1

## I. Background

The government charged Lanier with eight counts of Coercion and Enticement, one count of Tampering with a Witness, four counts of Sex Trafficking of Children, one of Travel with Intent to Engage in Illicit Sexual Conduct, and one count of Transfer of Obscene Material to a Minor, and one count of Sexual Exploitation of Children. ECF No. 243. This case allegedly started when a concerned citizen (CC1) contacted the Las Vegas Metropolitan Police Department and referred law enforcement to another concerned citizen (CC2). ECF Nos. 261 and 265. CC2 is a 20-year-old girl who reported to law enforcement that she observed sexual messages between Lanier (who was 48 years old at the time) and multiple underage girls on Lanier's Facebook account. ECF No. 262-4.

According to law enforcement, Lanier asked CC2 to create a business Facebook page for him. *Id.* Lanier allegedly signed into his personal Facebook on CC2's computer—he left the personal Facebook account logged in and gave CC2 his account log-in information so that she could link it to the Facebook business page. *Id.* When CC2 linked the accounts she allegedly observed the communications between Lanier and the underage girls. *Id.*

Law enforcement asserted that CC2 captured screenshots of the messages, and that those screenshots were forwarded to Las Vegas Metropolitan Police Department Detective Justine Gatus of the Innocence Lost Task Force. ECF No. 261. The defendant alleges that his private investigator interviewed two witnesses that the defendant believes could be CC2. *Id.* The witnesses told the investigator that when they discovered the messages, they initially reached out to T.C., an LVMPD officer that they knew from their church. *Id.* T.C. stopped by their residence and reviewed the Facebook account and messages. *Id.* The witnesses told the private investigator that T.C. told them that an LVMPD detective would contact them. *Id.* The witnesses told the private investigator that

Detective Gatus showed up at their residence. *Id.* The witnesses told the investigator that Detective Gatus looked at CC2's laptop and searched Lanier's alleged Facebook account while the witnesses watched. *Id.* The witnesses told the investigator that they gave Detective Gatus the log-in information to the account. *Id.* The investigator reported that the witnesses denied ever taking screenshots of the Facebook messages. *Id.*

The parties also do not agree about the identity of CC1. The government states that CC1 is CC2's mother. ECF No. 265-1. Lanier alleges that according to his private investigation, CC1 is probably T.C., the LVMPD officer that CC2 knew from her church. The defendant argues in his motion to suppress that assuming, *arguendo*, that the Facebook messages at issue are attributable to him, Lanier had a reasonable expectation of privacy in the private Facebook messages. ECF No. 261. He also argues that Detective Gatus's warrantless search of the private messages exceeded the scope of CC2's search. *Id.*

Lanier also argues that, alternatively, CC2 and/or her mother became agents of the government when Detective Gatus participated in and encouraged the search of the private messages. *Id.* Lanier argues that Detective Gatus and FBI Special Agent Mollica, intentionally and knowingly, made false statements and misleading omissions in their search warrant affidavits. *Id.* S.A. Mollica intentionally misled the magistrate by claiming that Detective Gatus "positively identified" Mr. Lanier as the person shown in a photograph contained within the private Facebook messages. *Id.* Lanier also argues that the false statements and misleading omissions were material to the magistrate's probable cause finding. *Id.* The defendant argues that the evidence obtained as a direct result of the illegal searches as well as evidence that is found to be a derivative of the illegal searches must be suppressed. *Id.*

The government argues in its opposition that Lanier has not established that he has standing to challenge any purported search of the Facebook accounts. ECF No. 265. The government also argues that assuming Lanier does take ownership of the Facebook accounts and establishes his privacy interest in them, Lanier's Fourth Amendment rights were not violated because (1) Lanier gave access to his Facebook accounts to CC-2 who allowed investigators access to them (third-party consent); and (2) CC-2 conducted her own private search and the investigators did not exceed the scope of that search (private search exception). *Id.*

The government also argues that Lanier has not established grounds for an evidentiary hearing. *Id.* The government argues that T.C. was not CC-1 or an advisor. *Id.* The government argues that SA Mollica properly summarized Detective Gatus's initial investigation and he was not required to include the initial CC-2 screenshots in his subsequent affidavits. *Id.* The government argues that SA Mollica correctly stated that Detective Gatus positively identified Lanier. *Id.* The government argues in the alternative that the evidence is admissible as inevitable discovery. *Id.* The defendant filed a reply further supporting his arguments.

**II.     Discussion**

The Fourth Amendment confers the right for people to "be secure in their persons, houses, papers and effects, against unreasonable searches and seizures…" U.S. Const. amend. IV. The Warrants Clause of the Fourth Amendment requires that "no warrants shall issue, but upon probable cause" U.S. Const. amend. IV. Probable cause "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). Though the Fourth Amendment does not specifically preclude admission of evidence obtained in violation of its provisions, the courts have established "an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139-40 (2009).

### a. Lanier has not established he has standing to challenge any purported search of the Facebook accounts.

"[A] person seeking to exclude evidence allegedly obtained in violation of the fourth amendment must have standing to challenge the illegal conduct that led to the discovery of the evidence." *United States v. Pulliam*, 405 F.3d 782, 786 (9th Cir. 2005). To have standing, a defendant must have a reasonable expectation of privacy in the area searched or seized. *United States v. Sarkisian*, 197 F.3d 966, 986 (9th Cir. 1999). "To demonstrate this, the defendant[] must manifest a subjective expectation of privacy in the area searched, and their expectation must be one that society would recognize as objectively reasonable." *Id*. It is the defendant's burden to establish that, under the totality of the circumstances, he has standing—that is, that the search or seizure violated the defendant's legitimate expectation of privacy. *Id.* "We note that though the failure to allege ownership of the items seized, by itself, could not bar standing to challenge the search, it is a factor to be considered." *Sarkisian*, 197 F.3d 966, 987 (citing cases). When a person has no ownership interest in the place or thing searched, he must have a reasonable expectation of privacy to claim a violation of his Fourth Amendment rights. *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1187 (9th Cir. 2015).

Lanier argues, *arguendo*, that if it was his Facebook account, then he would have a reasonable expectation of privacy in the Facebook messages. Lanier has the burden to show that he has standing on this threshold issue. Lanier, however, does not claim ownership of the Facebook account or make any kind of a showing that he had a reasonable expectation of privacy in the Facebook messages. See *United States v. Singleton*, 987 F.2d 1444, 1449 (9th Cir. 1993) (demonstration of a legitimate expectation of privacy is a threshold standing requirement that must first be established to seek suppression). Lanier has not carried his burden of demonstrating

through evidence that he did have a reasonable expectation of privacy in the digital account or messages in the account. Lanier has failed to establish he has standing over the Facebook accounts because he refuses to claim ownership of them. This reason alone is enough to deny Lanier's motion to suppress in its entirety since standing is a threshold issue.

### b. Lanier's Fourth Amendment rights were not violated.

Even if Lanier took ownership of the Facebook accounts and established a privacy interest in them, Lanier's Fourth Amendment rights were not violated.

### i. CC-2 consented to the search.

"[C]onsent is a recognized exception to the Fourth Amendment's protection." *United States v. Arreguin*, 735 F.3d 1168, 1174–75 (9th Cir. 2013) (internal citations and quotation marks omitted). If consent comes from a third party, the government must demonstrate the third party had "shared use and joint access to or control over a searched area." *Id.* (quoting *United States v. Welch*, 4 F.3d 761, 764 (9th Cir. 1993)). The Court need only determine that the third party "possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). Common authority is "joint access or control for most purposes." *Id.* at 171 n. 7.

Even if the third party does not have joint access or control for most purposes, "a defendant may assume the risk that the third party will at times exceed the scope of authorized access, as that is defined in precise and narrow terms." *United States v. Sledge*, 650 F.2d 1075, 1080 n. 10 (9th Cir. 1981); *see also United States v. Gulma*, 563 F.2d 386, 389 (9th Cir. 1977) (defendant who gave co-conspirator key to motel room containing heroin assumed the risk that co-conspirator would consent to a search of the room); *United States v. Murphy*, 506 F.2d 529, 530 (9th Cir. 1974) (per curiam) (holding that individual who was not a lessee, but who had custody of a key,

and was given limited access to a warehouse on occasion had "sufficient dominion over the premises to enable him to grant the necessary consent"). "A third party's consent to the search of another's belongings is valid if the consenting party has either actual or apparent authority to give consent." *United States v. Ruiz*, 428 F.3d 877, 880 (9th Cir. 2005) (citing *United States v. Davis*, 332 F.3d 1163, 1169 (9th Cir. 2003)).

     CC-2 had actual authority to access the Facebook accounts. Even if she did not, she had apparent authority, because from an objective standard, Detective Gatus reasonably believed that CC-2 had actual authority to grant consent to search the Facebook account. CC-2 had actual authority because Lanier (1) provided CC-2 with the username and password to his personal Facebook account and (2) granted the shared use and joint access to the subject Facebook accounts. Lanier also left CC-2's residence knowing that CC-2 had the username and password to the accounts and that CC-2 was going to continue her access of the accounts later that day. Like the key in *Murphy*, CC-2 had the "key" to the Facebook accounts by knowing the username and password. The username and password gave CC-2 the "sufficient dominion" over the account "to enable [her] to grant the necessary consent." *Murphy*, 506 F.2d at 530. By giving CC-2 the username and password to his account, Lanier assumed the risk that CC-2 would access other parts of the account. Such risk also encompasses CC-2's ability to allow law enforcement the same level of unfettered access that she had.

     Even if there was no actual authority, "[u]nder the apparent authority doctrine, a search is valid if the government proves that the officers who conducted it reasonably believed that the person from whom they obtained consent had the actual authority to grant that consent." *Arreguin*, 735 F.3d at 1174 (internal citations and quotation marks omitted). "Apparent authority is measured by an objective standard of reasonableness and requires an examination of the actual consent as

7

well as the surrounding circumstances." *Id.* (citations omitted). In assessing whether an officer's belief was objectively reasonable, the court considers "the facts available to the officer at the moment." *Id.* (citation omitted) (emphasis in original).

The Ninth Circuit has established a three-part test to determine whether a third party has apparent authority to consent to a search:

> First, did the searching officer believe some untrue fact that was then used to assess the extent of the consent-giver's use of and access to or control over the area searched? Second, was it under the circumstances objectively reasonable to believe that the fact was true? Finally, assuming the truth of the reasonably believed but untrue fact, would the consent-giver have had actual authority?

*Ruiz*, 428 F.3d at 880–81 (quoting *United States v. Dearing*, 9 F.3d 1428, 1429-30 (9th Cir.1993)).

Measured from an objective standard, Detective Gatus reasonably believed that CC-2 had actual authority to grant consent to search the Facebook account. Detective Gatus believed CC-2 had permission to access the Facebook accounts. This belief was objectively reasonable because CC-2 had the username and password to grant her access to the accounts, and CC-2 explained to Detective Gatus the circumstances in which she was granted access (including that Lanier had provided CC-2 with the login information and allowed her continued access to his accounts after he left her presence). Assuming CC-2 did have permission to access the accounts, CC-2 would have had the actual authority to consent to the search because she had dominion over the account.

Detective Gatus's reasonable belief that CC-2 had authority to grant Detective Gatus access to the Facebook accounts was bolstered by the fact that CC-2 was logged into the subject Facebook accounts on her personal computer, CC-2 showed her personal computer to Detective Gatus, and CC-2 directed Detective Gatus to the portions of the Facebook accounts that CC-2

8

found to be concerning. This access was in addition to the username and password that CC-2 provided to Detective Gatus.

CC-2 had the actual and apparent authority to consent to Detective Gatus's seizure and use of the screenshots that CC-2 personally took. CC-2 explained to Detective Gatus that she took the screenshots after Lanier granted her access to his personal account, and CC-2 voluntarily emailed those screenshots to Detective Gatus. CC-2 was thus the owner of the screenshots who consented to Detective Gatus's search and seizure of those screenshots.

Lanier argues in the alternative that Detective Gatus took the screenshots herself, not CC-2. The record, however, reflects that Detective Gatus could not have taken the screenshots herself. Detective Gatus arrived at CC-2's residence on October 23, 2017, at approximately 7 p.m., but the screenshots have timestamps that show that at least 17 of the 40 screenshots were taken on October 23, 2017 between 9:57 a.m. and 10:10 a.m. See ECF Nos. 261 at 12; 265 at 19, 265-11 at 7, 11, 14, and 15. CC-2 had the actual and apparent authority to consent to Detective Gatus's seizure and use of the screenshots. Detective Gatus then used CC-2's screenshots in drafting her affidavit in support of a search warrant of Lanier's Facebook accounts.

CC-2 had the actual and apparent authority to consent to Detective Gatus's search of the Facebook accounts based on Lanier giving CC-2 his username and password and granting CC-2 that access. And at a bare minimum, CC-2 had the actual and apparent authority to consent to the seizure of the screenshots CC-2 personally took of the Facebook accounts. Detective Gatus's use of the screenshots did not violate Lanier's Fourth Amendment rights.

    ii. **The Private Search Exception applies.**

The Fourth Amendment is not violated when a law enforcement officer accepts and uses evidence that a private party discovers pursuant to her own private search, even if that private

9

search was unlawful. *United States v. Phillips*, 32 F.4th 865, 867 (9th Cir. 2022), cert. denied, 143 S. Ct. 467 (2022) (citing to *Burdeau v. McDowell*, 256 U.S. 465, 475–76, 41 (1921); *Coolidge v. New Hampshire*, 403 U.S. 443, 485–90 (1971)); *see also*, *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). "This rule is based on the principle that '[t]he Fourth Amendment['s] protection against unlawful searches and seizures ... applies to governmental action' and 'was not intended to be a limitation upon other than governmental agencies.'" *Id.* (quoting *Burdeau*, 256 U.S. at 475). The Fourth Amendment regulates only governmental action; it does not protect against intrusive conduct by private individuals acting in a private capacity. *Jacobsen*, 466 U.S. at 113.

In *Jacobsen*, FedEx employees opened a package, saw it contained a white powdery substance, repacked the materials, and alerted the DEA. 466 U.S. at 111. When the DEA received the package, an agent reopened it, removed its contents without obtaining a warrant, and found that the white powder it contained was cocaine. *Id.* at 111–12. The Supreme Court held that the FedEx employees' earlier private search and their decision to alert law enforcement to their findings made the agent's warrantless search permissible. *Id.* at 119-20. The Court explained that "the legality of the governmental search must be tested by the scope of the antecedent private search." *Id*. at 116. The Court continued, "it hardly infringed respondents' privacy for the agent to reexamine the contents of the open package" because "the Federal Express employees had just examined the package and had, of their own accord, invited the federal agent to ... view[ ] its contents." *Id*. at 119.

The Ninth Circuit later held that "Jacobsen establishes that, where a private party notifies law enforcement of its private search, a state 'agent's [subsequent] search is permissible, and constitutional, to the extent that it mimic[s the earlier] private search.'" *Phillips*, 32 F.4th at 867 (quoting *United States v. Bowman*, 215 F.3d 951, 956, 963 (9th Cir. 2000)). CC-2 2 met with

Detective Gatus, described her observations, and showed Detective Gatus concerning things on Lanier's Facebook. Detective Gatus obtained screenshots of the account. Detective Gatus's review of Lanier's Facebook page was limited to what CC-2 reviewed in CC-2's private search. There is no Fourth Amendment violation.

### 1. CC-2 was a private actor – not a government actor.

A private search or seizure may implicate the Fourth Amendment where the private party acts "as an agent of the Government or with the participation or knowledge of any governmental official." *Jacobsen*, 466 U.S. at 114. (internal quotation marks and citation omitted).

> A defendant challenging a search conducted by a private party bears the burden of showing the search was governmental action. Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities, a question that can only be resolved in light of all the circumstances.

*United States v. Rosenow*, 50 F.4th 715, 728–29 (9th Cir. 2022), cert. denied, 143 S. Ct. 786 (2023) (internal quotation marks and citations omitted).

The record shows that CC-2 took the screenshots in the morning prior to her meeting with Detective Gatus. Detective Gatus arrived at approximately 7 p.m. Detective Gatus could not have directed CC-2 to take the screenshots and Detective Gatus did not take the screenshots herself. By the time Detective Gatus arrived on October 23, 2017, CC-2 had already conducted her private search of Lanier's Facebook accounts, had already made her observations, and had already taken the screenshots (as evidenced by the timestamps on the screenshots). None of CC-2's conduct was directed by law enforcement, in connection with law enforcement, or with the knowledge of law enforcement.

Lanier claims that T.C. initiated law enforcement conduct. There is nothing in the record to

show that T.C., who allegedly works at the airport (ECF No. 265 at 20), acted in his capacity as a law enforcement officer when he met with CC-2. T.C. was not on duty and was not responding to a call for service. The record demonstrates that CC-2, a private citizen, acted on her own, without any direction from any law enforcement officer. There is nothing to show that CC-2 acted as a government agent.

### 2. Detective Gatus's search did not exceed the scope of CC-2's search.

Lanier's claim that Detective Gatus exceeded the scope of CC-2's private search is not based on any facts or evidence. CC-2 showed Detective Gatus the Facebook messages on her own computer. CC-2 provided Detective Gatus with access to the Facebook account that CC-2 had previously searched. Detective Gatus reviewed what CC-2 had opened for her, which CC-2 had previously searched.

Even if Detective Gatus's review of Lanier's Facebook account exceeded the scope of CC-2's private search, the initial state search warrant for Lanier's Facebook account was based on CC-2's private search and did not include anything outside the scope of that private search. Detective Gatus provided a short summary of how she came into possession of the screenshots.[2] ECF Nos. 262-1 and 265-11 at 668-69.

Detective Gatus typed out word-for-word messages that CC-2 captured in the screenshots and provided to Detective Gatus. ECF No. 262-1. In between the typed messages, Detective Gatus included the results of her records check in which she identified the victims, to include their dates

---

[2] Lanier points out that the search warrant contains an inconsistency regarding one of the dates, when Detective Gatus mentions that Lanier met with CC-2 on October 7th. The government admits that this was a scrivener's error. ECF No. 265 at 21. This typo has no bearing on the probable cause analysis because the October 7th date is irrelevant.

of birth and ages. *Id.* Detective Gatus summarized additional screenshots and pictures that CC-2 captured regarding the images Lanier sent of himself and of the unknown younger male. *Id.* at 670. Detective Gatus then included a summary of the records check she completed on Lanier, her observations of his mugshots, and the comparison of Lanier's mug shots to the image that the concerned citizens identified as Lanier from the Facebook account. *Id.* Detective Gatus does not include additional information from the Facebook account beyond what CC-2 showed her.

Lanier asserts that the screenshots were taken by law enforcement or at the behest of law enforcement while law enforcement was at CC2's residence. ECF No. 261 at 14. The record shows that the screenshots were taken on October 23, 2017, starting at approximately 9:57 a.m. and continuing through on or about 10:10 a.m. – all several hours prior to law enforcement arriving or initiating an investigation. The IP logins show that Detective Gatus did not sign into Lanier's account—there was no additional login after CC-2's login at her home prior to Detective Gatus's search warrant based on the screenshots taken by CC-2. ECF Nos. 262-12 at 1848 and 265-4. Lanier has not met his burden to prove that CC-2's conduct was governmental action or that law enforcement exceeded the limits of the private search. CC-2 searched the Facebook account and showed it to the detective, who then utilized only this limited information to obtain a search warrant for Lanier's private Facebook account.

### c. Lanier is not entitled to a Franks hearing.

Under *Franks v. Delaware*, 438 U.S. 154 (1978), a hearing is warranted where the defendant intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Id.* at 155–56. Under Franks, a defendant must first make a substantial preliminary showing that (1) "the affiant officer intentionally or recklessly made false or misleading statements or omissions in support of the warrant," and (2) "that the false or misleading

statement or omission was material, i.e., necessary to finding probable cause." *United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017) (citation, alteration, and internal quotation marks omitted). "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Franks*, 438 U.S. at 171.

"Misstatements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes probable cause." *United States v. Smith*, 588 F.2d 737, 740 (9th Cir. 1978). The defendant must overcome "a presumption of validity with respect to the affidavit supporting the search warrant." *Franks*, 438 U.S. at 171. Additionally, the defendant must show that the statement in question is "necessary to the finding of probable cause." *Id.* at 156. In *United States v. DiCesare*, 765 F.2d 890, *amended*, 777 F.2d 543 (9th Cir. 1985), the Ninth Circuit outlined the five requirements a defendant must meet to be entitled to a *Franks* hearing:

> (1) the defendant must allege specifically which portions of the warrant affidavit are claimed to be false; (2) the defendant must contend that the false statements or omissions were deliberately or recklessly made; (3) a detailed offer of proof, including affidavits, must accompany the allegations; (4) the veracity of only the affiant must be challenged; and (5) the challenged statements must be necessary to find probable cause.

765 F.2d at 894-95.

A defendant may also challenge a warrant "when it contains deliberate or reckless omissions of facts that tend to mislead." *United States v. Stanert*, 762 F.2d 775, 780–81 *amended*, 769 F.2d 1410 (9th Cir. 1985). To be entitled to an evidentiary hearing on the matter, "the defendant [must] make a substantial showing that the affiant intentionally or recklessly omitted

facts required to prevent technically true statements in the affidavit from being misleading." *Id.* at 781. As is the case with affirmative information, a misleading omission must be done deliberately or recklessly. *Id.* The omitted facts must also be material to the finding of probable cause—the omitted facts, when included in the affidavit, must "cast doubt on the existence of probable cause." *United States v. Johns*, 948 F.2d 599, 606–07 (9th Cir. 1991) (quoting *United States v. Dennis,* 625 F.2d 782, 791 (8th Cir. 1980)).

The affidavit need not be an exhaustive account of all information related to the case. Rather, the affiant "need only show facts adequate to support a finding of probable cause." *Id.* at 606. The Supreme Court has held that affidavits in support of a warrant "must be tested in a commonsense and realistic fashion," and need only include "sufficient underlying circumstances to enable a judge to perform his detached function and not serve as a mere rubber stamp." *United States v. Ventresca*, 380 U.S. 102, 108-109 (1965).

"Probable cause…is not a high bar[.]" *Kaley v. United States*, 571 U.S. 320, 338 (2014). Whether probable cause existed to issue the warrant is examined under the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213 (1983). To find probable cause, the magistrate judge need only find that there is a "fair probability" that the search will reveal "evidence of a crime." *Gates*, 462 U.S. at 238. "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Ventresca*, 380 U.S. at 109 (1965).

A defendant is not entitled to an evidentiary hearing "merely because [he] wants one." *United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000) (quoting *United States v. Harris*, 914 F.2d 927, 933 (7th Cir. 1990)). "An evidentiary hearing on a motion to suppress need be held only

when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist." *Howell*, 231 F.3d at 620; *see also United States v. King*, No. 3:10-cr-00455-WHA, 2010 WL 4226728, at *5 (N.D. Cal. Oct. 21, 2010), *aff'd*, 471 F. App'x 723 (9th Cir. 2012) ("The desire for a fishing expedition does not create a material issue of fact.").

### d. T.C. was not the "advisor" or "CC-1", and any mention of T.C. in the affidavits was immaterial and irrelevant.

Lanier has not met his burden to show that T.C. was the person who "alerted" Detective Gatus to CC-2 or was the initial tipster. Even if T.C. were the initial tipster, it is irrelevant to the assessment of probable cause. No matter who told Detective Gatus to go speak with CC-1 and CC-2, the basis for probable cause in the affidavits was the information provided by CC-2 in the form of the screenshots and the observations made by CC-2. The probable cause assessment as nothing to do with who called in the tip to LVMPD.

### e. SA Mollica properly summarized Detective Gatus's initial investigation and he was not required to include the initial CC-2 screenshots in his subsequent affidavits.

Lanier has not made a substantial preliminary showing that SA Mollica intentionally or recklessly made false or misleading statements or omissions in support of the warrant and that the false or misleading statement or omission was material. SA Mollica's summary of Detective Gatus's initial investigation and the screenshots provided to Detective Gatus were summaries. Lanier does not assert that the summaries were false but argues that SA Mollica should have included additional details of Detective Gatus's initial investigative steps and the screenshots in the federal warrant affidavits. ECF No. 261 at 16. Instead of including the screenshots from CC-2, SA Mollica summarized the steps taken that led to the initial search warrant on Lanier's Facebook.

ECF No. 262-4 at 839. SA Mollica summarized the Facebook records received from the search warrant Detective Gatus obtained. Any inclusion of the word-for-word screenshots that Detective Gatus initially included would have been duplicative, unnecessary, and irrelevant because SA Mollica included portions of the messages from the actual Facebook records. The inclusion of any further details of Detective Gatus's initial investigation and the screenshots would not have had any bearing on the probable cause outlined by SA Mollica in each of his federal affidavits. The affidavits do not need to be exhaustive of every detail of the investigation; the affidavits simply need to contain probable cause. *Johns*, 948 F.2d at 606. Lanier argues that SA Mollica omitted Detective Gatus's initial investigation because he was covering up a warrantless search. CC-2's conduct was lawful, Detective Gatus's conduct was lawful, and SA Mollica had nothing to cover up.

       **f.  SA Mollica properly summarized Detective Gatus's initial investigation and he was not required to include the initial CC-2 screenshots in his subsequent affidavits.**

Lanier's argument—that SA Mollica's terminology of "positively identified Lanier" differs from Detective Gatus's terminology of "believed to be Lanier"—is semantic, not substantive. The legal and factual significance of both phrases is the same: identification, i.e., that the male depicted in the Facebook pictures was Lanier. Lanier cites to no evidence suggesting that the putative discrepancy was deliberately or recklessly intended to deceive the Court. Even if there is a difference between the two phrases, and that SA Mollica "deliberately or recklessly" made it, Lanier has not shown that the statement affected the probable cause determination of the search warrant. Even if I modified the phrase to read "believed to be" rather than "positively identified" into the federal search warrant affidavits, all the search warrants still are supported by probable cause.

Lanier argues that law enforcement investigators in this case acted unlawfully, tried to cover up their unlawful acts, and then lied to the issuing courts about their investigation in his attempts to argue these alleged false statements and omissions were material. ECF No. 261 at 18-20. Lanier alleges that his private investigator talked to the concerned citizens, and they denied taking the screenshots. When SA Mollica spoke with the concerned citizens, they reviewed the screenshots and identified them. ECF Nos. 265-1 through 265-3 and 265-10. CC-2 described the Gyazo application, how her computer had it installed, how it worked on her computer, when and how she took the screenshots, and that she emailed them to Detective Gatus. ECF No. 265-1. CC-2 located the original email she sent on October 23, 2017, at 8:14 p.m. and provided that to SA Mollica. ECF Nos. 265-1 and 265-11. Lanier provides no evidence that Detective Gatus took the screenshots, that she signed into Lanier's Facebook account, or that she exceeded the scope of CC-2's private search. The search warrant affidavits were true and accurate summaries of the investigation (except for the immaterial typographical error of a 7 instead of a 23).

Law enforcement did not need to include every detail of the investigation to establish probable cause in their affidavits supporting the search warrants. None of the alleged omitted information is material information related to the finding of probable cause. Lanier has not met his burden to warrant a *Franks* hearing.

### g. Alternatively, the evidence is admissible as inevitable discovery.

Assuming *arguendo* CC-2's search and the use of CC-2's screenshots is determined to be a violation of the Fourth Amendment, the evidence obtained from Lanier's Facebooks, cell phone, car, and tablet, and all derivative evidence, is still admissible because the recovery and seizure of the evidence was inevitable.

"The inevitable discovery doctrine is an exception to the exclusionary rule."

> *United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir. 1986). The doctrine permits the government to rely on evidence that ultimately would have been discovered absent a constitutional violation. *Nix v. Williams*, 467 U.S. 431, 443, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984). "The purpose of the inevitable discovery rule is to block setting aside convictions that would have been obtained without police misconduct." *Id.* at 443 n.4. As the Court explained, "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means [,] . . . then the deterrence rationale [for the exclusionary rule] has so little basis that the evidence should be received." Id. at 444 (footnote omitted).

*United States v. Ruckes*, 586 F.3d 713, 718 (9th Cir. 2009).

On December 19, 2017, Victim 12 reported that she was a victim of a sexual assault by Lanier. ECF No. 265 at 28. She described that Lanier reached out to her on a Facebook account with the name "John Dupree." Investigators located that Facebook account (Lanier's personal Facebook account) and would have inevitably obtained a search warrant based on the information provided by Victim 12. Victim 12 described the Facebook account, the sexually explicit messages Lanier sent to her, the sexual pictures Lanier coerced her to take and send to him, the offer of money for sexual encounters, and how Lanier persuaded Victim 12 to meet in person – all of which occurred on Lanier's personal Facebook account. It was through Facebook that Victim 12 was lured from her home into Lanier's Lexus to be driven to Lanier's house where Lanier sexually assaulted her. When Lanier was arrested for the sexual assault of Victim 12, he was in his Lexus and had his cell phone on him.

I find that even without the initial screenshots taken by CC-2, investigators had probable cause to obtain, and would have obtained, a search warrant for Lanier's Facebook accounts, Lanier's cell phone and Lanier's car when they investigated the sexual assault reported by Victim 12. After obtaining the Facebook records, investigators would have thereafter sought a search warrant for the tablet. The search warrant for Lanier's cell phone (ECF No. 262-5), Lanier's Lexus

(Defense Exhibit F), and the tablet (Defense Exhibit G) included Victim 12's sexual assault report. ECF Nos. 262-5 through 265-7. All the evidence in this case would have been inevitably discovered after Victim 12 reported Lanier's sexual assault of her. The evidence here is admissible as inevitable discovery.

ACCORDINGLY,

I RECOMMEND that defendant Jacques Anton Lanier's motion to suppress (ECF No. 261) be DENIED.

DATED this 16th day of November 2023.

_____
CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE