# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 2:19-cr-00327-GMN-VCF |
| vs. | ) | |
| | ) | **ORDER DENYING DEFENDANT'S** |
| JACQUES ANTON LANIER, | ) | **MOTION TO SUPPRESS** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Pending before the Court is the Report and Recommendation ("R&R") of United States Magistrate Judge Cam Ferenbach, (ECF No. 269), recommending that the Court deny Defendant Jacques Anton Lanier's Motion to Suppress, (ECF No. 261). Defendant timely filed an Objection, (ECF No. 271), to which the Government filed a Response, (ECF No. 277).

For the reasons discussed below, the Court **ADOPTS** the Report and Recommendation, **DENIES** Defendant's Motion to Suppress, and **OVERRULES** the Objection.

## I. <u>BACKGROUND</u>

Following the discovery of Facebook Messenger communications that were alleged to have occurred between Defendant and underage females, Defendant was indicted for eight counts of Coercion and Enticement in violation of 18 U.S.C. § 2422(b), one count of Tampering with a Witness, Victim, or an Informant in violation of 18 U.S.C. § 1512(b), four counts of Sex Trafficking of Children in violation of 18 U.S.C. § 1591(a) and (b)(2), one count of Travel with Intent to Engage in Illicit Sexual Conduct in violation of 18 U.S.C. § 2423(b), one count of Transfer of Obscene Material to a Minor in violation of 18 U.S.C. § 1470, and one count of Sexual Exploitation of a Child in violation of 18 U.S.C. § 2251(a). (Superseding

///

Indictment, ECF No. 243).  The specific facts underlying the discovery of these communications and law enforcement's subsequent actions are outlined below.

In October 2017, Defendant, who was then 48 years old, asked a concerned citizen (CC2)[1] to assist him in creating a business account on Facebook. (FBI Summ. Report CC2 Interview at 2, Ex. 1 to Gov. Resp., ECF No. 265-1).  On October 23, 2017, Defendant went to CC2's residence, where he gave CC2 the login information for his personal Facebook account. (*Id.*, Ex. 1 to Gov. Resp.).  Defendant's personal Facebook account used the name "John Dupree." (*Id.*, Ex. 1 to Gov. Resp.).  CC2 logged into Defendant's Facebook account on her personal computer and proceeded to create and link Defendant's business account to his personal account. (*Id.*, Ex. 1 to Gov. Resp.); (CC2 Identified Screenshots at 1, 38, Ex. 3 to Gov. Resp., ECF No. 265-3).  Upon linking the accounts, CC2 observed that notifications from young girls started "flooding in." (FBI Summ. Report CC2 Interview at 2, Ex. 1 to Gov. Resp.).  CC2 remained signed into Defendant's Facebook account on her personal computer after Defendant left CC2's residence. (*Id.*, Ex. 1 to Gov. Resp.).  The parties dispute what occurred next.  The Court summarizes each party's version of what transpired below.

## A. Government's Version of the October Encounter

### 1. Law Enforcement Learns of Defendant's Alleged Conduct

According to the Government, after Defendant left CC2's residence, CC2 took approximately 40 screenshots of Defendant's messages with underage girls, utilizing an application called "Gyazo," with at least 17 screenshots taken at or before 10:01 a.m. (*Id.* at 2–4, Ex. 1 to Gov. Resp.); (CC2 Identified Screenshots at 2, 14, 25, 34, 38, Ex. 3 to Gov. Resp.).  The Government avers CC2 then showed these messages to her parent ("CC1"). (FBI Summ. Report CC2 Interview at 2, Ex. 1 to Gov. Resp.).

---

[1] CC2 is a 20-year-old who knew Defendant through their church, City of Refuge Church of God in Christ. (FBI Summ. Report CC2 Interview at 2, Ex. 1 to Gov. Resp., ECF No. 265-1).

CC1 called a parishioner at her church ("TC") who served as a Las Vegas Metropolitan Police Department ("LVMPD") officer assigned to the airport. (FBI Summ. Report TC Interview at 2, Ex. 6 to Gov. Resp., ECF No. 265-6). TC went to CC2 and CC1's residence later that day, where CC2 showed TC the messages she observed on Defendant's Facebook accounts. (*Id.*, Ex. 6 to Gov. Resp.); (FBI Summ. Report CC1 Interview at 3, Ex. 2 to Gov. Resp., ECF No. 265-2). TC told CC1 and CC2 to contact the North Las Vegas Police Department ("NLVPD") but did not otherwise take any investigative steps in his capacity as a law enforcement officer. (FBI Summ. Report TC Interview at 1–2, Ex. 6 to Gov. Resp.).

CC1 and CC2 contacted law enforcement, and LVMPD Justine Gatus ("Detective Gatus") of the Innocence Lost Task Force was assigned to investigate. (FBI Summ. Report CC2 Interview at 2–3, Ex. 1 to Gov. Resp.). Detective Gatus arrived at CC1 and CC2's residence around 7:00 p.m. that day. (*Id.* at 3, Ex. 1 to Gov. Resp.); (LVMPD Folder Note at 2, Ex. 7 to Gov. Resp., ECF No. 265-7). CC2 remained logged into Defendant's Facebook accounts on her computer and showed Detective Gatus Defendant's communications with underage girls. (FBI Summ. Report CC2 Interview at 3, Ex. 1 to Gov. Resp.). Detective Gatus did not sign into Defendant's Facebook accounts. (Facebook IP Login, Ex. 4 to Gov. Resp., ECF No. 265-4). CC2 forwarded the screenshots she took earlier in the day to Detective Gatus. (*See* CC2 Emails at 2, Ex. 11 to Gov. Resp., ECF No. 265-11) (documenting an email sent from CC2 to Detective Gatus on October 23, 2017, at 8:14 p.m.). Detective Gatus began preparing a search warrant application based on this information.

### 2. Search Warrant Applications

#### i. *Detective Gatus Search Warrant Application*

Detective Gatus submitted a search warrant application for Defendant's personal Facebook account that used the name John Dupree. (Detective Gatus Search Warrant Aff. at 2, Ex. A to Mot. Suppress, ECF No. 262-1). Detective Gatus stated that she learned about

Defendant's Facebook account on October 23[2] after CC2 "advised" her that she took screenshots of Defendant's conversation with underage girls.[3] (*Id.* at 3–4, Ex. A to Mot. Suppress).  Detective Gatus met with CC2, who showed Detective Gatus the screenshots, which included photographs of messages that Defendant sent to underage girls. (*Id.* at 4–7, Ex. A to Mot. Suppress).  Detective Gatus explained that after reviewing Defendant's criminal history and mugshots, she "believe[d] this to be the same person from the photographs shown by the citizen." (*Id.* at 7, Ex. A to Mot. Suppress).  A state court judge reviewed and authorized Detective Gatus's search warrant.

### ii.    *Special Agent James Mollica Search Warrant Application*

FBI Special Agent James Mollica ("Special Agent Mollica") separately prepared a federal search warrant for a pen register trap and trace device and GPS tracking of Defendant's personal Facebook account. (Special Agent Mollica Search Warrant Application, Ex. D to Mot. Suppress, ECF No. 262-4).  Special Agent Mollica recounted that LVMPD received a "tip from" CC1, who explained that CC2 observed Facebook communications between Defendant and underage girls on her computer.[4] (*Id.* ¶ 27, Ex. D to Mot. Suppress).  Special Agent Mollica stated that Detective Gatus, after meeting with CC2 and being forwarded the communications, "positively identified" Defendant as the man in the Facebook communications. (*Id.* ¶ 28, Ex. D to Mot. Suppress).  A federal magistrate judge reviewed and authorized Special Agent Mollica's search warrant.

These search warrants allowed the Government to obtain Defendant's Facebook business records and other information which led to the identification of multiple underage girls

---

[2] Detective Gatus averred that Defendant signed into CC2's personal computer on October 7, (*id.* at 3, Ex. A to Mot. Suppress), but the Government maintains this was a typographical error for October 23. (Gov. Resp. 21:22–23, 27:15–17, ECF No. 265)

[3] Detective Gatus's search warrant application did not mention TC. (*See generally id.*, Ex. A to Mot. Suppress).

[4] Special Agent Mollica also stated that Defendant utilized CC2's personal computer on October 7 rather than October 23. (*Id.* ¶ 27, Ex. D to Mot. Suppress).

the Government asserts Defendant victimized.  According to Defendant, however, the evidence obtained from these search warrants should be suppressed because the search warrants contain material misrepresentations and omissions. (*See generally* Mot. Suppress, ECF No. 261).

### B. Defendant's Version of the October Encounter

Defendant's contentions are primarily based on the affidavit of Cynthia Jeffries ("Jeffries"), a private investigator he hired.  Jeffries states that in May and July of 2023, she interviewed TC[5] and CC2. (Jeffries Aff. ¶ 6, Ex. I to Mot. Suppress, ECF No. 262-9).  CC2 allegedly informed Jeffries that in October 2017, she contacted TC concerning a Facebook account and private Facebook messages she had "gained access to." (Jeffries Aff. ¶ 6, Ex. I to Mot. Suppress).  TC came to CC2's residence, reviewed the Facebook account and messages, and told CC2 a LVMPD detective would contact her. (*Id.* ¶ 7, Ex. I to Mot. Suppress).  CC2 explained that Detective Gatus later arrived at her residence and requested CC2 provide her with the login information for the Facebook account. (*Id.* ¶¶ 9–10, 13, Ex. I to Mot. Suppress). Detective Gatus proceeded to "t[ake] control" of CC2's laptop, sign into the Facebook account, and "scroll through the Facebook messages on the Facebook account." (*Id.* ¶¶ 11–12, Ex. I to Mot. Suppress).  According to Jeffries, CC2 and TC stated they never provided screenshots of the Facebook communications nor took any screenshots of the communications. (*Id.* ¶¶ 14–15, Ex. I to Mot. Suppress).  CC2 and TC declined to provide affidavits in support of Jeffries' affidavit. (*Id.* ¶ 17, Ex. I to Mot. Suppress).

///

///

///

///

---

[5] Defendant maintains that Detective Gatus and Special Agent Mollica misrepresented that CC1 is CC2's mother when in fact TC is CC1. (Mot. Suppress 7:10–13, ECF No. 261).  For clarity, the Court does not refer to TC as CC1, but notes Defendant's objection to CC1's identity.

### C. Events Following the October Encounter

In December 2017, a 15-year-old girl ("Victim 12") reported that she was a victim of sexual assault by an adult male later identified as Defendant. (NLVMPD Dec. 2017 Arrest Report at 2, Ex. 18 to Gov. Resp., ECF No. 265-18).  Victim 12 told investigators that Defendant reached out to her through Facebook under the name "John Dupree."[6] (NLVMPD Dec. 2017 Arrest Report at 2, Ex. 18 to Gov. Resp.).  Victim 12 described the Facebook account, the sexual pictures Defendant coerced her to take and send him, and his offer of money for sexual encounters. (*Id.* at 3–4, Ex. 18 to Gov. Resp.).  Defendant ultimately persuaded Victim 12 to meet in person, and sexually assaulted her. (*Id.* at 3, Ex. 18 to Gov. Resp.).

NVLPD later arrested Defendant on state charges related to the sexual assault of Victim 12.  (*Id.*, Ex. 18 to Gov. Resp.).  At the time of Defendant' arrest, Defendant was inside his car and had his cell phone on his person. (*Id.*, Ex. 18 to Gov. Resp.).  NLVPD obtained additional search warrants based on Detective Gatus's investigation and the NLVPD investigation regarding the sexual assault of Victim 12, including for: (1) the phone located on Defendant's person at the time of his arrest; (2) the vehicle he was arrested in; and (3) an iPad tablet previously owned by Defendant. (Search Warrant Application, Ex. G to Mot. Suppress, ECF No. 262-7).

### D. The Magistrate Judge's R&R

In his Motion to Suppress and Reply, Defendant argues the Court "should address the Government's actions without the need to discuss nor make a determination regarding [Defendant's] 'standing' to challenge the Government's actions[,]" (Reply 7:13–16, ECF No. 266).  He also asks the Court to exclude evidence stemming from Detective Gatus and Special

---

[6] Defendant's personal Facebook account also utilized the vanity name "John Dupree." (*See generally* CC2 Identified Screenshots at 38, Ex. 3 to Gov. Resp.).

Agent Mollica's search warrants because (1) CC2 did not have the actual or apparent authority to display the contents of the Facebook accounts to law enforcement; (2) CC2 acted as a government agent when they took and forwarded screenshots of the Facebook communications; (3) Detective Gatus exceeded the scope of CC2's private search; and (4) Detective Gatus and Special Agent Mollica knowingly made false statements and misleading omissions in the search warrant affidavits such that a *Franks* hearing was warranted, and that all evidence thereafter derived should be suppress. (*See generally* Mot. Suppress, ECF No. 261).

The Magistrate Judge issued a R&R determining that Defendant lacked standing to challenge the evidence stemming from the search warrants. (R&R 5:1–6:4). Even assuming Defendant had standing, however, the Magistrate Judge did not find a Fourth Amendment violation in this case. (R&R 6:5–20:3). Specifically, the Magistrate Judge found that (1) CC2 had the actual and apparent authority to display and copy the Facebook accounts' content to law enforcement; (2) that CC2 acted as a private actor rather than a government actor in conducting her search; (3) that Detective Gatus did not exceed the scope of CC2's private search; (4) that Detective Gatus and Special Agent Mollica did not knowingly make false statements and misleading omissions in their search warrant affidavits; (5) and even if the entirety of the proceeding findings were in error, all the evidence identified by Defendant would still be admissible under the inevitable discovery doctrine. (*See generally* R&R). Accordingly, the Magistrate Judge recommended denying Defendant's Motion to Suppress without conducting a *Franks* hearing. (*Id.*). Defendant filed the present Objection, (ECF No. 271), which the Court discusses below.

## II.   __LEGAL STANDARD__

Local Rule IB 3-2 states that "any party may file specific written objections to the findings and recommendations of a magistrate judge made pursuant to Local Rule IB 1-4." 28 U.S.C. § 636(b)(1)(B); D. Nev. R. IB 3-2. Upon the filing of such objections, the Court must

make a *de novo* determination of those portions of the Report and Recommendation to which objections are made. *Id.* The Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. 28 U.S.C. § 636(b)(1); D. Nev. IB 3-2(b). Accordingly, the Court will conduct a *de novo* review of the portions of the Magistrate Judge's Report and Recommendation to which objections were made.

## III.   DISCUSSION

Defendant challenges the Magistrate Judge's findings regarding (1) whether Defendant has standing to suppress the search of the Facebook accounts; (2) whether CC2 has the actual or apparent authority to display and copy the Facebook accounts' contents to law enforcement; (3) whether CC2 was a private or governmental actor when she viewed and copied the contents of the Facebook accounts; (4) whether Detective Gatus's search exceeded the scope of CC2's antecedent search; (5) whether Defendant is entitled to a *Franks* hearing; and (6) whether the contents of the Facebook account would have been inevitably discovered by law enforcement. (*See generally* Obj.). The Court begins by examining Defendant's standing arguments.

### A.   Defendant Has Not Established Standing to Challenge the Search of the Facebook Accounts

"[A] person seeking to exclude evidence allegedly obtained in violation of the fourth amendment must have standing to challenge the illegal conduct that led to the discovery of the evidence." *United States v. Pulliam*, 405 F.3d 782, 786 (9th Cir. 2005). To have standing, a defendant must have a reasonable expectation of privacy in the area searched or seized. *United States v. Sarkisian*, 197 F.3d 966, 986 (9th Cir. 1999). "To demonstrate this, the defendant[] must manifest a subjective expectation of privacy in the area searched, and their expectation must be one that society would recognize as objectively reasonable." *Id.* It is the defendant's burden to establish that, under the totality of the circumstances, he has standing—that is, that the search or seizure violated the defendant's legitimate expectation of privacy. *Id.* Although

"the failure to allege ownership of the items seized, by itself, could not bar standing to challenge the search, it is a factor to be considered." *Id.* at 987 (citing cases).  When a person has no ownership interest in the place or thing searched, he must have a reasonable expectation of privacy to claim a violation of his Fourth Amendment rights. *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1187 (9th Cir. 2015).

The Magistrate Judge found that Defendant failed to establish that he had standing over the Facebook accounts because he did not claim "ownership of the Facebook account or make any kind of a showing that he had a reasonable expectation of privacy in the Facebook messages." (R&R 5:20–22, ECF No. 269).  Relying primarily on *United States v. Issacs*, 708 F.2d 1365 (9th Cir. 1983), Defendant argues that the Government cannot charge Defendant with ownership of the Facebook accounts while also asserting that he does not have standing to challenge the search of the same accounts. (Obj. 6:21–8:24).  Instead, Defendant maintains that the Court should find he has standing over the Facebook accounts by assuming without deciding he is the owner of the accounts.[7] (*Id.*).

In *Issacs*, Secret Service Agents obtained a warrant to search the defendant's residence for rent receipts and counterfeit Federal Reserve notes. 708 F.2d at 1366.  While searching the

---

[7] Defendant additionally contends that the Court "should address the Government's actions without the need to discuss nor make a determination regarding [Defendant's] 'standing' to challenge the Government's actions." (Reply 7:13–16, ECF No. 266); (*see also* Obj. 8:13–20) (reiterating the court should assume Defendant has standing).  Defendant correctly notes that courts have assumed, without deciding, that a criminal defendant has standing to challenge a search when, as here, a suppression motion can more readily be resolved on the merits. *See, e.g., United States v. Bychak*, No. 18-cr-4683, 2022 WL 1524736, at *4 (S.D. Cal. May 12, 2022) (finding that defendant lacked standing but assuming that defendant had standing to alternatively deny defendant's motion on the merits); *United States v. Bazar*, No. 15-cr-499, 2015 WL 6396011, at *1 (S.D. Cal. Oct. 21, 2015) (same).  But courts make this assumption only when they ultimately deny a motion to suppress on the merits because to invoke the protections of the Fourth Amendment, a defendant must show that he had reasonable expectation of privacy in the areas searched. *United States v. Nerber*, 222 F.3d 597, 599 (9th Cir. 2000).  A district court cannot defer on determining standing and grant a motion to suppress because standing is a threshold issue a court must determine before proceeding with any Fourth Amendment analysis. *See United States v. Singleton*, 987 F.2d 1444, 1449 (9th Cir. 1993) (noting that a demonstration of a legitimate expectation of privacy is a threshold requirement to seek suppression).  In short, Defendant's argument ignores that it his burden of establishing standing before the Court examines the merits of his claim. *See Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).

apartment, agents discovered firearms, drug paraphernalia, methaqualone, and cocaine. *Id.* Agents also uncovered a safe inside a closet, the combination to which the defendant gave them. *Id.* Inside the safe, agents found six journals bound together with a rubber band. *Id.* An agent flipped through the journals and came across notations in one journal which appeared to record drug transactions. *Id.*

The defendant was charged with passing counterfeit notes in violation of 18 U.S.C. § 472, possession with intent to distribute methaqualone and cocaine in violation of 21 U.S.C. § 841(a)(1), and use of a gun to commit the crimes charged in violation of 18 U.S.C. § 924(c)(1). *Id.* The defendant moved to suppress the journals seized by agents, which the district court granted in part and denied in part. *Id.* The defendant later disclaimed ownership of possession of the journals at trial and was convicted on two counts of possession with intent to distribute methaqualone and cocaine in violation of 21 U.S.C. § 841(a)(1). *Id.* On appeal, he argued that the district court erred in denying his motion to suppress certain journals seized during the search of his apartment. *Id.* at 1366–67. The government argued that the defendant lacked standing to object to the search, relying on his disclaimer of the ownership or possession of the journals at trial. *Id.* at 1367.

The Ninth Circuit disagreed with the government's position, stating that the government could not "argue possession but deny expectation of privacy where the circumstances make such positions necessarily inconsistent." *Id.* at 1368. The Ninth Circuit proceeded to provide a non-exhaustive list of situations in which the government may argue possession but deny an expectation of privacy, including that:

> The government may properly contend that a defendant owned drugs which, moments before the challenged search, he had placed in his girlfriend's purse, in which he had no legitimate expectation of privacy. It may argue that checks found in the apartment of another in which a defendant had no legitimate expectation of privacy belonged to the defendant. It may properly seek to introduce evidence seized from a room with which a defendant had no connection beyond mere presence and thus no legitimate expectation of privacy. And it may argue that a

defendant once possessed an item but, by abandoning it, subsequently renounced any expectation of privacy in it.

*Id.* at 1368 (internal citations omitted).  In contrast to these circumstances, however, the Ninth Circuit explained that the government improperly sought to rely on the defendant's disavowal of ownership at trial to defeat "his right to contest the lawfulness of the search at the same time it introduces the journal as evidence of his guilt." *Id.*  In reaching this conclusion, the *Issacs* court observed that the government could not "dispute that [the defendant] had a legitimate expectation of privacy in the safe itself," and more broadly, in his apartment. *Id.*

 *Issacs* is distinguishable from this case.  Unlike the defendant in *Issacs*, Defendant does not have a clear expectation of privacy in the space invaded and the items seized without claiming ownership of the Facebook accounts.  In *Issacs*, the defendant had a cognizable privacy interest in his apartment and safe, even if he disclaimed ownership or possession of the journals seized within that space.  In contrast, the underlying Facebook communications Defendant seeks to suppress were found in CC2's residence on her personal computer. (FBI Summ. Report CC2 Interview at 2–3, Ex. 1 to Gov. Resp.); (CC2 Emails at 2, Ex. 11 to Gov. Resp., ECF No. 265-11).  The *Issacs* court specifically stated the government could argue possession but deny that there was any expectation of privacy where there were "[items] found in the apartment of another in which a defendant had no legitimate expectation of privacy" or "evidence seized from a room with which a defendant had no connection beyond mere presence and thus no legitimate expectation of privacy." 708 F.2d at 1368.  Outside of Defendant's ownership of the Facebook accounts, there are no facts demonstrating he had an expectation of privacy in the space invaded or items seized, and it is not necessarily inconsistent for the Government to contest that Defendant has not established standing.

 Defendant's failure to allege ownership strongly weighs against finding a reasonable expectation of privacy in the Facebook accounts. *See Bazar*, 2015 WL 6396011, at *1

(determining the defendant lacked standing to challenge the search of email and Facebook accounts when "the defendant d[id] not formally claim ownership of the account" nor "assert that he has a reasonable expectation of privacy in the information on the Facebook page"); *see also United States v. Almaleh*, No. 17-cr-25, 2022 WL 602069, at *14 (S.D.N.Y. Feb. 28, 2022) (finding the defendant lacked standing to challenge an email warrant where "nowhere in the defendants' motion to suppress d[id] he assert a legitimate expectation of privacy, nor does he claim to own the account"). And Defendant has not otherwise demonstrated by sworn evidence that he has a legitimate expectation of privacy in the Facebook accounts.[8] Absent any claim of ownership or other evidence demonstrating a reasonable expectation of privacy, Defendant lacks standing over the Facebook accounts. Even if Defendant took ownership of the Facebook accounts and established a privacy interest in them, his Fourth Amendment rights were not violated.

### B. CC2 Had the Actual and Apparent Authority to Display the Facebook Account to Law Enforcement

"Consent is a recognized exception to the Fourth Amendment's protection." *United States v. Arreguin*, 735 F.3d 1168, 1174–75 (9th Cir. 2013) (internal citations and quotation marks omitted). Third party consent may justify a warrantless search if the third party "possesses common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). Common

---

[8] Even if Defendant claimed ownership of the Facebook accounts, the Court has serious concerns regarding whether he had a legitimate expectation of privacy in those accounts based on the record. Defendant voluntarily, albeit perhaps not intentionally, made the Facebook communications available when he provided CC2 with his Facebook username and password and allowed her to sign in to the account on their personal computer. In so doing, Defendant bore the risk CC2 would turn those communications over to law enforcement. *See Smith v. Maryland*, 442 U.S. 735, 743–44 (1979) (writing that the Supreme Court "consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties"); *Hoffa v. United States*, 385 U.S. 293, 302 (1966) ("Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's belief that a person to whom he voluntarily confides his wrongdoing will not reveal.").

authority may be actual or apparent, *United States v. Ruiz*, 428 F.3d 877, 880 (9th Cir. 2005), and the government carries the burden of proving the third party had the requisite common authority. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).

A party has actual authority to consent to a search if either "the owner . . . has expressly authorized the third party to give consent or if the third party has mutual use . . . and joint access or control . . . ." *United States v. Davis*, 332 F.3d 1163, 1169 (9th Cir.2003) (quoting *United States v. Fultz*, 146 F.3d 1102, 1104 (9th Cir. 1998). In determining whether a third party has sufficient "joint access or control" the Supreme Court has held that such third-party consent is determined by "mutual use of the property by persons generally having joint access or control for most purposes" over the quarters or objects to be searched. *Matlock*, 415 U.S. at 171 n.7.

A third party has apparent authority if (1) the officer determined the third-party's ability to consent based on an untrue fact, (2) the officer's belief was objectively reasonable, and (3) the third party would have had authority if the fact had been true. *Ruiz*, 428 F.3d at 880 (citing *United States v. Dearing*, 9 F.3d 1428, 1429–30 (9th Cir. 1993)). The apparent authority doctrine applies "only to reasonable mistakes of fact, not to mistakes of law." *Id.* (citing *United States v. Welch*, 4 F.3d 761, 764–65 (9th Cir. 1993)).

The Magistrate Judge found that CC2 had actual and apparent authority to consent to the search of the Facebook accounts because Defendant gave CC2 his Facebook account information and left CC2's residence knowing she had his account information and was going to continue accessing the account. (R&R 6:9–9:21). Defendant argues that the Magistrate Judge erred in his findings[9] because CC2's "possession of a password is not, itself, dispositive

---

[9] Defendant seemingly infers that the Magistrate Judge found CC2 lacked actual authority "as the [R&R] focuse[d] solely on the reasonableness of [Detective] Gatus's belief that [CC2] would consent to a search." (*Id.* 10:12–15). Defendant's contention, however, ignores that the Magistrate Judge explicitly stated that CC2 "had actual authority to access the Facebook accounts[,]" (R&R 7:6), and repeatedly expressed that there was both

of any permission or access being conferred" because she "could easily have stolen and/or hacked the password and gained access to the Facebook messages and accounts in question." (Obj. 10:26–28).  Defendant maintains the "origins of [CC2]'s access [is] a fact at issue that remains to be decided." (*Id.* 10:26–28).  The Court begins by examining Defendant's contention that a genuine dispute of fact remains as to how CC2 gained access to the Facebook account.

### 1. The Manner in Which CC2 Gained Access to the Facebook Accounts & Their Ability to Take Screenshots of the Account

Defendant's disagreement with how CC2 gained access to his personal Facebook account, and for that matter, the Government's version of the October encounter, is based solely on the assertions in the Jeffries affidavit. (*See generally* Obj.).  But the Court finds that the assertions and underlying statements in the Jeffries affidavit neither create an issue of fact in dispute nor undermine the factual sequence supported by the record.

First, the Jeffries affidavit is purportedly based on her interview with CC1 and CC2, but CC1 and CC2 "declined" to provide affidavits corroborating the version of the October encounter set forth in the Jeffries affidavit. (Jeffries Aff. ¶ 17, Ex. I to Mot. Suppress).  Moreover, the Government "requested the evidence and notes upon which the Jeffries affidavit is based, but [Defendant] refused to produce anything other than the affidavit itself." (R&R 27:6–7).  It is curious and more than a little suspect that CC1 and CC2 declined to provide affidavits to verify the assertions in the Jeffries affidavit, and that Defendant refused to produce the evidence upon which the Jeffries affidavit is predicated.

Second, several of the assertions in the Jeffries affidavit fail to rebut the Government's version of what occurred or are expressly belied by the record.  For example, the Government

---

actual and apparent authority. (*Id.* 7:20–21, 9:3–7).  Contrary to Defendant's argument, the Magistrate Judge found CC2 had actual authority to consent to the search of the Facebook accounts.

avers that Defendant went to CC2's residence, where he gave CC2 his personal Facebook login information. (FBI Summ. Report CC2 Interview at 2, Ex. 1 to Gov. Resp.).  In response, Defendant maintains that the "origins of [CC2]'s access [is] a fact at issue that remains to be decided[,]" based on the assertions in the Jeffries affidavit. (Obj. 10:26–28).  The issue, however, is that the statements in the Jeffries affidavit fail to directly rebut the Government's version of what occurred.  Instead, it vaguely asserts that CC1 and CC2 contacted TC, "who they knew from their church, concerning a Facebook account and private Facebook messages that [CC2] had gained access to." (Jeffries Aff. ¶ 6, Ex. I to Mot. Suppress).  In other words, the Jeffries affidavit does not proffer a counter-version of how CC2 gained access to the Facebook accounts.  And this assertion is not irreconcilable with the Government's version of what occurred.  Both explain how CC2 gained access to the Facebook accounts, the sole difference being the Government provides greater detail on the process by which she obtained the login information.  In short, Defendant's contention that CC2 hacked into the Facebook accounts is inconsistent with the statements in the Jeffries affidavit, and there is nothing in the record to support the contention that CC2 hacked into the account. *See United States v. King*, No. 3:10-cr-00455, 2010 WL 4226728, at *5 (N.D. Cal. Oct. 21, 2010), *aff'd*, 471 F. App'x 723 (9th Cir. 2012) ("The desire for a fishing expedition does not create a material issue of fact.").

Moreover, several of the assertions in the Jeffries affidavit are expressly belied by the record.  Specifically, Jeffries asserted that CC2 and TC explained they never provided screenshots of the Facebook communications to Detective Gatus or took any screenshots of the communications. (Jeffries Aff. ¶¶ 14–15, Ex. I to Mot. Suppress).  But the record includes an email CC2 sent to Detective Gatus that included screenshots she took of Defendant's Facebook messages. (*See* CC2 Emails at 2, Ex. 11 to Gov. Resp.)  Significantly, the screenshots have timestamps showing they were taken *before* Detective Gatus arrived at CC2's residence. (*See generally id.*).  And the Facebook IP Login history for these accounts shows there was no

additional login after CC2 accessed the account at her home until Detective Gatus's obtained her search warrant. (Facebook IP Login at 1, Ex. 4 to Gov. Resp.).  This directly supports the Government's assertion that CC2 displayed the screenshots to Detective Gatus before sending them to her. *See United States v. Burley*, No. 21-cr-00198, 2023 WL 3792641, at *4 (N.D. Cal. June 2, 2023) (explaining that "[t]here [was] no reason to doubt the specific and direct evidence of" submitted, especially when the evidence was "backed by logs.").

   On balance, the assertions in the Jeffries affidavit either fail to create a dispute of fact with the Government's version or lack sufficient indicia of accuracy and reliability to warrant credibility when compared to the specific evidence offered by the Government.  The Court next examines whether the record shows CC2 had the actual and apparent authority to display the Facebook account to law enforcement.

### 2.  Actual and Apparent Authority

#### a.  Actual Authority

   A party has actual authority to consent to a search if either "the owner . . . has expressly authorized the third party give consent or if the third party has mutual use . . . and joint access or control . . . ." *Ruiz*, 428 F.3d at 880 (quoting *Fultz*, 146 F.3d at 1104).  In resolving whether CC2 had the actual authority to display the Facebook accounts to law enforcement, the Court finds the United States District Court for the District of Hawaii's order in *United States v. Patrakis* to be informative. 297 F. Supp. 3d 1123 (D. Haw. 2017).

   In *Patrakis*, a third-party witness met with local police to report child abuse. *Id.* at 1125. The witness accessed the defendant's DropCam account for his video home surveillance through the internet and played the video content showing the alleged child abuse to law enforcement. *Id.*  The witness explained that the defendant gave her the username and password for his DropCam account, and that he gave her permission to view the online content. *Id.*  The defendant denied giving the witness permission to access his DropCam account. *Id.*  The

witness copied the online videos onto two CDs and a thumb drive, and gave them to the police.
*Id.* at 1125–26.  After reviewing the video content, law enforcement entered the defendant's
residence without a warrant and recovered various items leading to his arrest. *Id.* at 1126.  The
defendant filed a motion to suppress, arguing that the witness did not have actual or apparent
authority to access and display the DropCam video content to law enforcement. *Id.* at 1127.

The *Patrakis* court disagreed, finding that despite the defendant testifying that he did not
give permission to the witness to access his DropCam account, the government established that
the witness had actual authority to display and copy the DropCam account's contents. *Id.*  The
court focused on the fact that the witness "stated that she had Defendant's permission to access
the DropCam account; she stated that she was Defendant's close friend; she possessed both the
username and password [to the DropCam account]; and she was able to access Defendant's
DropCam account in the officers' presence." *Id.*  Even acknowledging that the defendant
testified he did not give the witness permission, the court found that, on balance, the
government established the witness had actual authority. *Id.*

Like the witness in *Patrakis*, CC2 had actual authority to access the Facebook accounts.
Defendant had a specific account which required a username and password; without the
required information, no one could access the Facebook accounts' content.  "Metaphorically
speaking, Defendant installed a door and lock on his [Facebook] account[s]." *Id.*  Because
Defendant voluntarily gave CC2 the account[s'] username and password, however, she "had his
key to unlock the door and access the account[s'] content." *Id.*  Furthermore, Defendant left
CC2's residence knowing that CC2 had signed into his Facebook accounts on her personal
computer, had his username and password, and would continue accessing the accounts later that
day. (FBI Summ. Report CC2 Interview at 2–3, Ex. 1 to Gov. Resp.).  By giving CC2 the
"username and password to his account, [Defendant] assumed the risk that CC2 would access
other parts of the accounts" and "allow law enforcement the same level of unfettered access

that she had." (R&R 7:16–19).  In sum, the record shows CC2 had the authority to display and copy the Facebook accounts contents because she had mutual use and control over the account.

### b.   Apparent Authority

Alternatively, even if CC2 lacked actual authority, reliable evidence exists for a finding that CC2 had apparent authority.   As stated, a third party has apparent authority if (1) the officer determined the third-party's ability to consent based on an untrue fact, (2) the officer's belief was objectively reasonable, and (3) the third party would have had authority if the fact had been true. *Ruiz*, 428 F.3d at 880 (citing *Dearing*, 9 F.3d at 1429–30).   The apparent authority doctrine applies "only to reasonable mistakes of fact, not to mistakes of law." *Id.* (citing *Welch*, 4 F.3d at 764–65).  The Court again finds *Patrakis* instructive.

In finding the third-party witness had apparent authority, the *Patrakis* court noted that "police officers testified that the witness said she was Defendant's friend; Defendant gave her permission to access his DropCam account; they questioned her as to how and why she was given permission; they believed her representation; and she was successfully able to retrieve the DropCam account with a username and password." 297 F. Supp. 3d at 1128.

Here, CC2's encounter with Detective Gatus bore many of the indicia supporting a finding of apparent authority laid out in *Patrakis*.  Like the witness in *Patrakis*, CC2 had the username and password to the subject Facebook accounts, explained to Detective Gatus the circumstances in which she was granted access, and logged into the Facebook accounts on her personal computer. (FBI Summ. Report CC2 Interview at 2–3, Ex. 1 to Gov. Resp.).  Moreover, CC2 directed Detective Gatus to the relevant portions of the Facebook accounts that CC2 found concerning, and voluntarily sent the screenshots to her. (*Id.* at 2–3, Ex. 1 to Gov. Resp.); (CC2 Emails at 2, Ex. 11 to Gov. Resp.).  Considering these facts, it was objectively reasonable for Detective Gatus to believe CC2, despite not owning the Facebook account, had actual authority to consent to display the Facebook accounts and the search and seizure of the screenshots she

1    personally took.  Accordingly, the Court finds CC2 had the actual and apparent authority to

2    display and copy the Facebook accounts to law enforcement.

3       **C. The Private Search Doctrine Applies**

4          The Supreme Court has long held that the Fourth Amendment is not violated when a law

5    enforcement officer accepts and uses evidence that a private party discovers pursuant to its own

6    private search, even if that private search was unlawful. *See Burdeau v. McDowell*, 256 U.S.

7    465, 475–76 (1921); *Coolidge v. New Hampshire*, 403 U.S. 443, 485–90 (1971).  This rule is

8    based on the principle that "[t]he Fourth Amendment['s] protection against unlawful searches

9    and seizures . . . applies to governmental action" and "was not intended to be a limitation upon

10   [actors] other than governmental agencies." *Burdeau*, 256 U.S. at 475.  However, "the Fourth

11   Amendment does prohibit unreasonable intrusions by private individuals who are acting as

12   government instruments or agents." *United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994).

13         The Magistrate Judge also found that there was no Fourth Amendment violation because

14   CC2 was a private rather than governmental actor when she searched Defendant's Facebook

15   accounts, and that Detective Gatus's review of the Facebook accounts did not exceed the scope

16   of CC2's private search. (R&R 9:22–13:18).  Defendant objects to both findings.  The Court

17   first examines whether CC2 was a private actor when she searched Defendant's Facebook

18   accounts.

19      **1.  CC2 Was a Private Rather than Governmental Actor**

20         Defendant argues CC2 was a government actor because she consulted with TC, a law

21   enforcement officer, prior to contacting LVMPD. (Obj. 12:5–13:26).  Defendant further argues

22   that CC2 acted as a government agent because even if CC2 took the screenshots, they were

23   taken at the behest of law enforcement to assist in LVMPD's investigation. (*Id.*).

24         "A defendant challenging a search conducted by a private party bears the burden of

25   showing the search was governmental action." *United States v. Young*, 153 F.3d 1079, 1080

(9th Cir. 1998) (per curiam).  "Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities, a question that can only be resolved in light of all the circumstances." *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 614–15 (1989) (internal quotation marks and citations omitted).

The Court disagrees with Defendant's contention that CC2 was a governmental actor because she contacted TC.  While it is true that TC was then a LVMPD officer assigned to the airport, (Resp. 20:3–15), the record does not support Defendant's contention that TC acted in his capacity as a law enforcement officer when he met with CC2.  Instead, TC was off duty and was not responding to a call for service when he went to CC1 and CC2's residence. (FBI Summ. Report TC Interview at 1–2, Ex. 6 to Gov. Resp.).  "There is no authority cited that stands for the proposition that every interaction between an off-duty police officer and a possible crime requires the police officer to intervene as a police officer." *United States v. Abney*, No. 03-cr-60, 2003 WL 22047842, at *4 (S.D.N.Y. Aug. 29, 2003); *see also United States v. Moniz*, 14 F. Supp. 2d 1194, 1197 (D. Haw. 1998) ("[T]he mere fact that an off-duty police officer conducts a search to find evidence of a crime does not render a search government action . . . .").  And here, the extent of TC's conduct and advice to CC1 and CC2 was directing them to call the police. (FBI Summ. Report TC Interview at 1–2, Ex. 6 to Gov. Resp.).  Thus, this is not a case where the inception and execution of CC2's search stemmed from TC's direction. *See United States v. Walther*, 652 F.2d 788, 791 (9th Cir. 1981) ("While a certain degree of governmental participation is necessary before a private citizen is transformed into an agent of the state, de minimis or incidental contacts between the citizen and law  enforcement agents prior to or during the course of a search or seizure will not subject the search to fourth amendment scrutiny.").

///

Moreover, the Court also disagrees with Defendant's contention that even if CC2 took the screenshots,[10] they were taken at the behest of law enforcement to assist in LVMPD's investigation.  The record shows that CC2 viewed and took screenshots of the Facebook accounts *before* contacting TC and *before* Detective Gatus arrived at their house.  The inception and execution of CC2's search stemmed from their action, not from TC or law enforcement. *See United States v. Serrano*, 651 F. Supp. 3d 1192, 1204 (S.D. Cal. 2023) (finding a third-party was not a government actor where the "inception and execution of the search stemmed from private action, not that of the government").  And law enforcement "could not have known or acquiesced to any conduct they were unaware of." *United States v. Ditirro*, No. 2:16-cr-00216, 2017 WL 6029685, at *3 (D. Nev. Apr. 17, 2017); *see also United States v. Katsu Toyofuku*, No. 14-cr-00032, 2016 WL 7106514, at *10 (D. Haw. Dec. 5, 2016) (determining that the private actors could not have been acting as instruments or agents of the government where the private parties conducted the search before contacting the Honolulu Police Department).

It is Defendant's burden to show CC2 acted as a government instrument or agent. *Young*, 153 F.3d at 1080.  Defendant has neither offered evidence showing CC2 acted as a government instrument or agent, nor rebutted the Government's evidence CC2 was not a government instrument or agent.  Having determined CC2 was a private actor, the Court next examines whether Detective Gatus's search exceeded the scope of CC2's private search.

**2. Detective Gatus's Search Did Not Exceed the Scope of CC2's Private Search**

Defendant next argues that Detective Gatus's search exceeded the scope of CC2's private search because Detective Gatus conducted her own review of the Facebook accounts independent from what CC2 had already observed. (Obj. 12:5–13:26).  Two recent Ninth Circuit decisions applying the private search doctrine are instructive.

---

[10] For the reasons set forth above, the record shows CC2 did take the screenshots.

In *United States v. Wilson*, Google used a proprietary hashing technology to locate four images of apparent child pornography attached to emails in the defendant's email account. 13 F.4th 961, 964 (9th Cir. 2021). No one at Google looked at the images before Google submitted the information to law enforcement, but law enforcement later viewed these images. *Id.* The Ninth Circuit limited its analysis to the private-search doctrine, assuming, as the parties did, that the law enforcement agent's subsequent review of the images qualified as a Fourth Amendment search. *Id.* at 967. The Court held that the agent's review of the images was unconstitutional because "the government agent viewed Wilson's email attachments even though no Google employee — or other person — had done so." *Id.* at 971–72. Thus, the agent's search was impermissibly broader than the antecedent private search. *Id.*

The Ninth Circuit reached a different conclusion in *United States v. Phillips*. 32 F.4th 865 (9th Cir. 2022). There, the defendant's former girlfriend suspected he was interested in child pornography. *Id.* at 866. While the defendant was in a residential treatment program for alcoholism, she figured out the password on his computer. *Id.* She viewed several files that contained what she believed was child pornography, before taking his computer to the police station. *Id.* at 866–67. The detective asked to view only those files she had viewed, and confirmed it was pornography. *Id.* at 867. The detective obtained a search warrant and recovered hundreds of files. *Id.* The defendant was indicted and moved to suppress, claiming his former girlfriend was acting as an agent of the police when she showed them the pornography. *Id.* The Ninth Circuit found that even if the defendant's girlfriend acted as a state agent, the government's search was permissible because it did not exceed the scope of the private one. *Id.* at 968. Considering *Wilson* and *Phillips*, the issue before the Court is whether Detective Gatus's search exceeded the scope of CC2's antecedent private search, applying the private-search doctrine.

///

Here, the Court finds that the Government's search was permissible because it did not exceed the bounds of CC2's initial search. Defendant's position that Detective Gatus exceeded the scope of CC2's private search is not supported by the record. *See Dow Chem. Co. v. United States*, 476 U.S. 227, 239 n.5 (1986) ("Fourth Amendment cases must be decided on the facts of each case, not by extravagant generalizations."). Instead, the record shows CC2 provided Detective Gatus with access to the Facebook accounts on her personal computer, that Detective Gatus reviewed the communications CC2 opened for her, and that CC2 later sent Detective Gatus the screenshots of the communications she took of her volition. (FBI Summ. Report CC2 Interview at 2–3, Ex. 1 to Gov. Resp.); (CC2 Emails at 2, Ex. 11 to Gov. Resp.). And Detective Gatus "typed out word-for-word [the] messages" that CC2 captured in her screenshots. (R&R 12:19–20). In sum, the record does not show Detective Gatus' search exceeded the scope of CC2's private search. *See Wilson*, 13 F.4th at 968.

Even if Detective Gatus inadvertently saw more of Defendant's communications than CC2 saw in her private search, the Ninth Circuit has observed "that 'only the information attributable to that additional 'search' would require suppression,' not the information the private individual already uncovered." *Phillips*, 32 F.4th at 869 n.1 (quoting *United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 87–88 (2d Cir. 2002) (Sotomayor, J.) (emphasis omitted). At a minimum, CC2's private search included the screenshots she took of the Facebook account. And here, Detective Gatus's "initial state search warrant for [Defendant's] Facebook account was based on [CC2]'s private search and did not include anything outside the scope of that private search." (R&R 12:14–15). Thus, the suppression of information from any purported additional search would not prevent the issuance of the state search warrant and the information ultimately derived from this warrant. Accordingly, the Court finds CC2 was a private actor and that the probable cause supporting the search warrants was based on information derived from CC2's private search.

**E.  Defendant is Not Entitled to a *Franks* Hearing**

In *Franks v. Delaware*, the United States Supreme Court held that a defendant could challenge a warrant affidavit by showing that (1) the affiant recklessly or intentionally included false statements in the affidavit, and (2) the false statements were necessary to finding probable cause. 438 U.S. at 155–56.  The Ninth Circuit extended *Franks* to cover situations in which the affiant intentionally or recklessly omitted material facts from the affidavit. *United States v. Meling*, 47 F.3d 1546, 1553 (9th Cir. 1995).  The movant bears the burden of proof and must make a substantial showing to support both elements. *See United States v. Garcia–Cruz*, 978 F.2d 537, 540 (9th Cir. 1992).

The Ninth Circuit has identified five requirements that a defendant must satisfy before he is entitled to a *Franks* hearing: "(1) the defendant must allege specifically which portions of the warrant affidavit are claimed to be false; (2) the defendant must contend that the false statements or omissions were deliberately or recklessly made; (3) a detailed offer of proof, including affidavits, must accompany the allegations; (4) the veracity of only the affiant must be challenged; and (5) the challenged statements must be necessary to find probable cause." *United States v. DiCesare*, 765 F.2d 890, 894–895 (9th Cir. 1985).

The Magistrate Judge's found a *Franks* hearing was not warranted because Defendant failed to make a substantial showing that Detective Gatus and Special Agent Mollica made false or misleading statements or omissions that were material to the finding of probable cause. (R&R 22:22–27:22).  Defendant's Objection advances several purported omissions made by Detective Gatus and Special Agent Mollica he contends show a *Franks* hearing is warranted. First, Defendant argues Detective Gatus omitted the "origin of her involvement in the investigation of the Facebook accounts." (Obj. 14:20–22).  Next, Defendant maintains Detective Gatus "misrepresented her involvement in the initial investigation and how [she] obtained screenshots of the private Facebook messages." (*Id.* 14:22–25).  Defendant further

avers that Special Agent Mollica's affidavit contained these same omissions because it "merely" "piggy-back[ed]" on the allegations in Detective Gatus's allegations. (*Id.* 15:3–6). Defendant additionally argues that Special Agent Mollica omitted the length of Detective Gatus's meeting with CC1 and CC2, and "intentionally overstated [Detective] Gatus's *potential* identification of [Defendant]," into a "*positive identification*." (*Id.* 15:8–12) (emphasis in original). The Court examines each alleged misstatement or omission in turn.

Defendant's first alleged omission asserts that Detective Gatus failed to include that TC was the person who advised her about the Facebook accounts seen by CC2. (*Id.* 14:20–22). Defendant fails to proffer evidence, however, in support of his position. *See, e.g., United States v. Chavez–Miranda*, 306 F.3d 973, 979 (9th Cir. 2002) (upholding the denial of a *Franks* hearing where the defendant asserted that the supporting affidavit contained misleading omissions but failed to support such assertions with evidence). Moreover, "even if [TC] were the initial tipster, it is irrelevant to the assessment of probable cause." (R&R 16:9–10). Regardless of who told Detective Gatus to meet with CC1 and CC2, the basis for probable cause was derived from "the of the screenshots and the observations made by [CC2]." (*Id.* 16:11–12).

Defendant next repeats his contention that Detective Gatus misrepresented how she obtained the screenshots because CC2 allegedly told Jeffries she never took screenshots of the accounts. (Obj. 14:23–27). The Court again notes the Jeffries affidavit lacks sufficient indicia of reliability, and that the record squarely contradicts Defendant's contention. The screenshots were taken by CC2 before Detective Gatus arrived by CC2's residence, and CC2 later sent the screenshots to Detective Gatus in an email.[11] (CC2 Identified Screenshots at 2, 14, 25, 34, 38,

---

[11] To the extent Defendant argues that Detective Gatus "minimizes the extent of her own warrantless search of the Facebook messages" based on the assertion in the Jeffries affidavit that Detective Gatus "t[ook] control of" CC2's laptop and independently "scroll[ed] through the Facebook messages on the Facebook account," the Court disagrees. (Jeffries Aff. ¶¶ 11–12, Ex. I to Mot. Suppress). Defendant's argument is conclusory and is not accompanied by an offer of proof. Even if it was, however, the record shows that at a minimum, CC2 took the

Ex. 3 to Gov. Resp.); (CC2 Emails at 2, Ex. 11 to Gov. Resp.).  In short, Defendant has not made a substantial showing that Detective Gatus made material misrepresentations and omissions that would cast doubt on the existence of probable cause.[12]

Finally, Defendant argues that Special Agent Mollica "intentionally overstated [Detective] Gatus's *potential* identification of [Defendant]" in his search warrant affidavit, converting Detective Gatus's "*belief* regarding [Defendant's] identity into a *positive* identification." (Obj. 15:11–14) (emphasis in original).  But if any difference can be ascribed to these phrases, it is "semantic, not substantive."[13] (R&R 17:16–17).  Both phrases concern identification, namely that Defendant was the male depicted in the Facebook pictures.  Even if the federal search warrant affidavits were modified to reflect this changed language, the probable cause determination would not be affected. *See United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000) (explaining that no *Franks* hearing is required if the misstatement or omission would not have affected the probable cause determination).  In sum, Defendant has failed to offer evidence demonstrating any misstatements or omissions were made, and even if he did, Defendant's identified misstatements or omissions would not have cast doubt on the existence of probable cause.  Accordingly, Defendant is not entitled to a *Franks* hearing.

### F.  The Inevitable Discovery Doctrine Applies

"The inevitable discovery doctrine is an exception to the exclusionary rule." *United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir. 1986).  "The doctrine permits the government to rely on evidence that ultimately would have been discovered absent a constitutional

---

screenshots of the Facebook accounts.  Detective Gatus's search warrant affidavit was permissibly based on these screenshots, and the alleged omission identified by Defendant would thereby have no effect on the probable cause determination.

[12] Because the Court finds Defendant has not made a substantial showing as to Detective Gatus's affidavit, Defendant's claim that Special Agent Mollica committed the same errors in his affidavit because he "piggy-back[ed]" on Detective Gatus's affidavit also fails. (Obj. 15:3–6).

[13] Defendant has also not shown Special Agent Mollica deliberately or recklessly intended to deceive the Court through this difference.

violation." *United States v. Ruckes*, 586 F.3d 713, 718 (9th Cir. 2009).  "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale [for the exclusionary rule] has so little basis that the evidence should be received." *Nix v. Williams*, 467 U.S. 431, 444 (1984).  "[I]nevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Id.* at 444 n.5.

Here, the Court finds that the Government has met its burden on this ground.  In December 2017, Victim 12 reported to NLVMPD that Defendant sexually assaulted her. (NLVMPD Dec. 2017 Arrest Report at 2, Ex. 18 to Gov. Resp.).  "Victim 12 described the Facebook account, the sexually explicit messages [Defendant] sent to her, the sexual pictures [Defendant] coerced her to take and send to him, the offer of money for sexual encounters, and how [Defendant] persuaded Victim 12 to meet in person – all of which occurred on [Defendant's] personal Facebook account." (R&R 19:13–16).  When Defendant was arrested for the sexual assault of Victim 12, he was in his Lexus and had his cell phone on him. (NLVMPD Dec. 2017 Arrest Report at 2–3, Ex. 18 to Gov. Resp.).  Considering this, even without the initial screenshots taken by CC2, investigators had probable cause to obtain, and would have obtained, a search warrant for Defendant's Facebook accounts, cell phone, and car when they investigated the sexual assault reported by Victim 12.  Accordingly, the inevitable discovery doctrine applies.

///

///

///

///

///

///

## IV.    <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that the Magistrate Judge's Report and Recommendation, (ECF No. 269), is **ADOPTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress, (ECF No. 261), is **DENIED**, and his Objection, (ECF No. 271), is **OVERRULED**.

**DATED** this ___19___ day of December, 2023.

_____
Gloria M. Navarro, District Judge
United States District Court