LISA A. RASMUSSEN, ESQ.
Nevada Bar No. 7491
**MCLETCHIE LAW**
602 South Tenth Street
Las Vegas, NV 89101
Telephone: (702) 728-5300; Facsimile: (702) 425-8220
Email: Lisa@nvlitigation.com; efile@nvlitigation.com

KAREN A. CONNOLLY, ESQ.
**KAREN A. CONNOLLY, LTD.**
Nevada Bar No. 4240
6600 W. Charleston Blvd., Suite 124
Las Vegas, NV 89146
Telephone:  (702) 678-6700; Facsimile: (702) 678-6767
Email:  Advocate@kconnollylawyers.com; executiveassistant@kconnollylaweyers.com

*Attorneys for Defendant JACQUES LANIER*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:19-CR-327 RFB-DJA |
| Plaintiff, | |
| vs. | **MOTION TO DISQUALIFY "FIRST ASSISTANT UNITED STATES ATTORNEY" SIGAL CHATTAH; REQUEST FOR EVIDENTIARY HEARING; AND TO ENFORCE PLEA NEGOTIATION** |
| JACQUES LANIER, | |
| Defendant. | |

MCLETCHIE LAW
ATTORNEYS AT LAW
602 SOUTH TENTH STREET
LAS VEGAS, NV 89101
(702)728-5300 (T) / (702)425-8220 (F)
WWW.NVLITIGATION.COM

COMES NOW the Defendant, Jacques Lanier, by and through his counsel, Lisa Rasmussen, Esq. of the law firm McLetchie Law, and Karen A. Connolly of Karen A. Connolly, Ltd. and hereby respectfully requests that this Court disqualify "First Assistant United States Attorney" Sigal Chattah from participating in this case in any manner, including supervising the attorneys involved in this case, that a hearing be held on the same, and for specific performance to permit Mr. Lanier to enter the plea offered by the government prior to Ms. Chattah demanding that it be withdrawn.  This Motion is made and based upon the attached Memorandum of Points and Authorities, the papers and pleadings on file in this case and any argument that may be made at the time set for hearing in this matter.

DATED this 10th of February, 2026.

*/s/ Lisa A. Rasmussen*
LISA A. RASMUSSEN, Nevada Bar No. 7491
**MCLETCHIE LAW**
*Attorney for Defendant Jacques Lanier*

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      INTRODUCTION

Despite an order disqualifying Sigal Chattah from participating in a number of other cases, and despite assurances that she was not supervising this case, Ms. Chattah took it upon herself late Friday night to demand that the prosecutor who is validly handling this case withdraw the plea that had been extended to Mr. Lanier days earlier.

Ms. Chattah should be disqualified from participating in Mr. Lanier's case in any way and Mr. Lanier seeks to enter the plea that was extended to him by the prosecutors in this case, a plea that was also approved by the supervising criminal chief attorney.

## II.    THE PLEA NEGOTIATION AND ITS WITHDRAWAL AT THE DIRECTION OF SIGAL CHATTAH

As this Court is well aware, Mr. Lanier's case has a lengthy and sometimes difficult history procedurally.  The undersigned have worked hard to provide him with a robust defense and have litigated several meritorious issues during their tenure as counsel on his case.  This has included continually discussing potential resolution of this case with the government and both parties have continued to discuss different resolution options, all of which have been discussed with Mr. Lanier.  The latest iteration of that occurred on Wednesday, February 4, 2026 when the government extended an offer that the undersigned believed Mr. Lanier would likely accept based on the undersigned's prior conversations with Mr. Lanier.  Several emails were exchanged between the undersigned and the government on February 4, 2026 regarding some specific details of the plea and decisions were made as to what the language would include.  The government indicated that it had or would obtain approval from Ms. Susan Cushman, the current supervising attorney of the criminal division in the District of Nevada and that as soon as that was finalized, a final plea agreement would be sent to the undersigned for review.

Because calendar call is set for February 12, 2026 in this matter, the undersigned immediately requested a contact visit with Mr. Lanier at the Nevada Southern Detention Center for the first opportunity they would have to meet with Mr. Lanier to have him review, approve and sign the plea agreement.  That first available date was Monday February 9, 2026 because both counsel were unavailable on Friday February 6, 2026:  Ms. Connolly was out of town and Ms. Rasmussen was in an all-day settlement mediation in a civil case involving several counsel from out of state.  The visit request, which is attached hereto as **Exhibit A**, was sent to NSDC on February 4, 2026 and it plainly addresses the urgency of the need for a contact visit on February 9, 2026.

On February 5, 2026, the government emailed the plea agreement to the undersigned. See **Exhibit B.** The email states that the final plea "directed by Susan [Cushman]" was attached and it asks the undersigned to discuss it with Mr. Lanier and return a signed plea for forwarding to the Court so that we could jointly ask that the calendar call hearing be converted to a change of plea hearing. (Id.)

On February 5, 2026, the undersigned spoke with Mr. Lanier via phone when he called and were able to convey the general terms of the plea agreement with him and he indicated that he would likely accept these terms but would need to see the plea agreement. See **Declaration of Lisa Rasmussen.** We explained that we were waiting for confirmation of our requested visit on Monday and would go over the plea with him then. (Id.) An email was sent to the government conveying that message as well on Thursday afternoon, February 5, 2026. See **Exhibit C.**

On Friday February 6, 2026, NSDC confirmed our visit for Monday, February 9, 2026. See **Exhibit D**. Friday night, February 6, 2026 at 10:06 p.m., the prosecutor on this case emailed the undersigned to stated that he had received "instruction from Sigal [Chattah] this evening directing me to withdraw the plea offer for Mr. Lanier." See **Exhibit E.** He stated he would make himself available to discuss the matter over the weekend if we wanted to discuss. Ms. Rasmussen emailed back later Friday evening requesting to speak to Mr. Rose on Saturday. See **Rasmussen Decl**. Ms. Rasmussen spoke to Mr. Rose on Saturday, February 7, 2026, and he confirmed that the plea offer was being withdrawn at the express direction of Sigal Chattah and that it was not because of anything Mr. Lanier had done. (Id.)

The undersigned met with Mr. Lanier on Monday, February 9, 2026 at NSDC. The situation that unfolded over the weekend was explained to Mr. Lanier and the plea agreement extended to Mr. Lanier on February 5, 2026 was reviewed in detail with Mr. Lanier. Mr. Lanier has signed, approved and accepted the plea

agreement as have the undersigned.   See **Exhibit F**.   The only person who does not approve this plea agreement is Sigal Chattah.

### III.   THE ORDER DISQUALIFYING SIGAL CHATTAH AND THE PENDING APPEAL

As this Court is well aware, several defendants in the District of Nevada challenged Ms. Chattah's authority to indict them and to continue serving as the "acting U.S. Attorney, " or in any other capacity for this district under 5 U.S.C. §3345.   See case numbers 2:25-CR-240  GMN, 2:25-CR-227  JAD, 2:25-CR-0026 MMD and 2:25-CR-230  RFB.   The same motion challenging Ms. Chattah's authority was filed in each of those cases and the matters were referred out to Judge David Campbell, a district court judge in the District of Arizona.  Despite the government's position that Ms. Chattah was validly serving the role of United States Attorney with supervisory authority in this district, Judge Campbell entered an Order on September 30, 2025 disqualifying her from those cases.  See **Exhibit G**, attached hereto.   The order states that the defendants' motions are granted to the extent that they seek disqualification of Ms. Chattah from supervising their criminal prosecutions or the attorneys handling them and it directs the attorneys supervising the cases to certify that Ms. Chattah is not involved or to amend the certifications if that changes.  (Id., page 32.)  The order declines to dismiss the indictments. (Id.) Notably, the disqualification analysis made by Judge Campbell would be applicable to any defendant being actively prosecuted in this district, despite the order being entered in the above-referenced four cases. The indictment dismissal logic would not apply to Mr. Lanier's case because Mr. Lanier was indicted on December 31, 2019, well before Ms. Chattah's presence as a government attorney in this District.

Notably, the government also seemed to understand this because following Judge Campbell's order, filings made by the government in this case did not

5

contain Ms. Chattah's name and only contained Sue Fahami's name as "Executive Assistant U.S. Attorney."   See ECF 445 filed on October 21, 2025, in this case. Compare this to a filing made on September 19, 2025, that contains Ms. Chattah's name and title of "Acting U.S. Attorney," made at ECF 434.   Then, however, on November 19, 2025, the government made a filing in this case that listed Todd Blanche as "Deputy Attorney General of the United States," at the top, followed by Sigal Chattah as "First Assistant United States Attorney," underneath Blanche. See ECF 453.   After this filing came out, the undersigned contacted the prosecutor in this case to ask why Ms. Chattah was continuing to appear in this case given Judge Campbell's order and was told that (a) the government's position was that the order was stayed pending appeal and that she could appear in that capacity and (b) Sigal Chattah as a practical matter was not supervising the prosecutors in this case anyway, they were being supervised by Ms. Cushman or others.   *See* **Rasmussen Decl.**   Given those representations, and further research and inquiry, it did not seem necessary to file a separate motion to disqualify Ms. Chattah in this case. (Id.)

IV.   **THE ORDER STAYING THE DISQUALIFICATION AND THE GOVERNMENT'S CERTIFICATIONS THAT SHE IS NOT "SUPERVISING" CASES**

On October 3, 2025, the government filed a motion asking that Judge Campbell's order be stayed pending appeal.   See **Exhibit H.** The government argued four factors, (1) whether the applicant has made a strong showing that it is likely to succeed on appeal, (2) whether the applicant would be irreparably harmed absent a stay, (3) whether issuance of a stay will substantially injure the other parties and (4) where the public interest lies, citing to *Nken v. Holder*, 556 U.S. 418, 425-26 (2009) and *American Fed. Of Gov't Employees, AFL-CIO v. Trump*, 148 F.4th 648, 654 (9th Cir. 2025).   (Id.)   As to the first two factors, the government

MCLETCHIE LAW
ATTORNEYS AT LAW
602 SOUTH TENTH STREET
LAS VEGAS, NV 89101
(702)728-5300 (T) / (702)425-8220 (F)
WWW.NVLITIGATION.COM

6

merely relitigated its losing position in the opposition to the motion to disqualify her. Importantly, as to the third factor, the government noted that disqualifying her district wide has "profound implications for the enforcement of federal law throughout the district," indicating that the government believed the order to apply to all prosecutions, not just the four cases at issue in Judge Campbell's order. See Id, page 5. The government also argued that the defendants had not identified how they would be harmed with Ms. Chattah "remains at her post during the pendency of the appeal." (Id, page 6.) The government also filed certifications confirming that Ms. Chattah was not supervising the attorneys on those cases. See **Exhibit I**, attached hereto.

Judge Campbell's order granting the motion to stay was entered on October 23, 2025. See **Exhibit J**. He noted that the cases were likely to be supervised by the "assigned line prosecutors" and that the stay was going to be "short-lived given the Ninth Circuit's expedited schedule for deciding the appeal." (Id, page 3.)

The Ninth Circuit litigation consists of the following case numbers: 25-6214, 25-6470, 25-6223, 25-6475, 25-6224, 25-6465, 25-6229 and 25-6468, which represents each of the four cases and their respective cross-appeals. Oral argument is scheduled for Thursday, February 12, 2026. Five other courts have determined that these types of appointments are invalid. *See In re Grand Jury Subpoenas*, ___ F.Supp.3d ___ 2026 WL 60793 at *4 (N.D.N.Y. Jan. 8, 2026), citing to *United States v. Giraud*, 795 F.Supp.3d 560, 606 (D.N.J. 2025) (Disqualifying Alina Habba from prosecuting criminal defendants), affirmed on appeal, 160 F.4th 390 (3rd Cir. 2025); *United States v. Ramirez,* ___ F.Supp.3d ___, ___ , 2025 WL 3019248, at *20 (C.D. Cal. Oct. 28, 2025); *United States v. Comey*, ___ F.Supp.3d ___, ___, 2025 WL 3266932, at 6 (E.D. Va, Nov. 24, 2025); *United States v. James*, ___ F.Supp.3d ___, ___, 2025 WL 3266931, at 5 (E.D. Va. Nov. 24, 2025). Then there are the four cases in the District of Nevada.

## V.  MS. CHATTAH SHOULD BE DISQULIFIED FROM SUPERVISING THIS CASE OR MAKING ANY DECISIONS ON THIS CASE, PARTICULARLY HER DEMAND THAT THE PLEA BE WITHDRAWN

Dressing Ms. Chattah as a First Assistant United States Attorney does not change the fact that she is not validly serving a leadership role in the District of Nevada.  In the pending appeals before the Ninth Circuit, the government appears to have argued for the first time that it never had to satisfy the Federal Vacancies Requirement Act (FVRA) because it could simply allocate all relevant United States Attorney responsibilities into the first assistant U.S. Attorney role that Ms. Chattah now holds.  The government relies primarily on *United States v. Ramirez*,  2026 WL 113431, at *10-17 (D.N.M. Jan. 14, 2026) for the proposition that serving as a FAUSA is okay because a FAUSA can perform functions and duties of that position as "validly delegated" by the Attorney General, and because the delegated authority did not result from duties that only the United States Attorney could have performed.  Id, at *31.

Here, however, the only person directing that the plea be withdrawn is Sigal Chattah, not the supervising criminal chief or the AUSA handling this matter. Ms. Chattah has essentially fashioned herself de facto acting United States Attorney, parading as a FAUSA.  This runs afoul of the FVRA which prevents the creation of a de facto acting officer outside of the statute's strictures.

A brief recap of the underlying litigation is set forth in detail in Judge Campbell's order entered on September 30, 2025.  (**Exhibit G**.)    United States Attorney for the District of Nevada Jason Frierson resigned from office on January 17, 2025.  Under procedures established by Congress in the Federal Vacancies Reform Act of 1998 (FVRA) and 5 U.S.C. §3345(a)(1), First Assistant U.S. Attorney Sue Fahami automatically became Acting U.S. Attorney.  On or about March 28, 2025, the Attorney General of the United States appointed Sigal Chattah to be the

MCLETCHIE LAW

ATTORNEYS AT LAW
602 SOUTH TENTH STREET
LAS VEGAS, NV 89101
(702)728-5300 (T) / (702)425-8220 (F)
WWW.NVLITIGATION.COM

MCLETCHIE LAW
ATTORNEYS AT LAW
602 SOUTH TENTH STREET
LAS VEGAS, NV 89101
(702) 728-5300 (T) / (702) 425-8220 (F)
WWW.NVLITIGATION.COM

interim U.S. Attorney under 28 U.S.C. §546(a).  The appointment was made effective April 1, 2025 and Ms. Chattah's service was limited to 120 days.  If a permanent U.S. Attorney was not nominated by the President and confirmed by the Senate within that 120 day period, the judges of the Nevada District Court can appoint an interim U.S. Attorney to serve until a vacancy is filled by the President, confirmed by the Senate.  28 U.S.C. §546(c)(2)-(d).  (**Exhibit G**, pages 1-2.)

Instead of following that procedure, Ms. Chattah resigned from her position as interim U.S. Attorney and the Attorney General appointed Ms. Chattah to serve as a Special Attorney in the Department of Justice and then designated her as "First Assistant U.S. Attorney" effective upon her resignation.  (Id, page 2; see also **Exhibit K**,)   Ms. Fahami was redesignated to "First Assistant to Executive U.S. Attorney so that Ms. Chattah could be the First Assistant U.S. Attorney (FAUSA) and then become the acting U.S. Attorney.  (Exhibit F, page 2.)  To date, the President has not nominated Ms. Chattah, or anyone else to serve as the permanent U.S. Attorney for the District of Nevada.

Judge Campbell's order sets forth the option of what can happen and what cannot happen:

> Some may ask what happens if Chattah cannot serve under the FVRA.  There are several possibilities. The President (and only the President) could appoint a temporary Acting U.S. Attorney who satisfies the strict requirements of §3345(a)(2) or (a)(3).  The judges of the District of Nevada could choose to exercise their power under 28 U.S.C. §546(d) and appoint an Acting U.S. Attorney until the position is filled.  Or the President could nominate a U.S. Attorney and seek quick confirmation by the Senate.  But the text and history of the FVRA make clear what cannot happen:  the Attorney General cannot designate Ms. Chattah as first assistant and thereby make her Acting U.S. Attorney.

(Id., pages 24-25.)    And Judge Campbell's Order also makes clear that Assistant United States Attorneys "are themselves representatives of the government

because they are appointed directly by the Attorney General, *see* 28 U.S.C. §542, their ability to act does not hinge on the authority of the local United States Attorney, but derives from the Attorney General's plenary power over litigation to which the United States is a party. ."  Citing to *United States v. Hilario*, 218 F.3d 19, 22 (1st Cir. 2000.)  It is this notion that led to the conclusion in Judge Campbell's order that while the prosecutions could continue lawfully under the direction of an AUSA, Ms. Chattah's "involvement in these cases would be unlawful."  Id, page 31, citing to *United States v. Giraud,* ___ F.Supp. 3d ___, 2025 WL 2416737 (D.N.J. August 21, 2025.)

On appeal in the District of Nevada cases, the government appears to have argued that the role of FAUSA permits Ms. Chattah to act as a an "acting U.S. Attorney," but the government mistakes the role of a FAUSA for a statutory office and then later conceded in a Reply that:  "First Assistant U.S. Attorney" is a designation, not a statutory office.  See 28 C.F.R. Section0.137(b).  (See Ninth Circuit Case No. 25-6214, Government's Response and Reply Brief, page 42, FN 5.)

However, as the defendant parties to that pending appeal point out, "While properly serving U.S. Attorneys may sometimes delegate their first assistants supervisory responsibilities, no source of law lets a standalone first assistant U.S. Attorney exercise the full suite of a U.S. Attorney's responsibilities.  (Ninth Circuit Case No. 25-6214, Replacement Updated Principal and Response Brief by Jackson, et al, page 76.)  In essence, if the government could simply give a FAUSA all of the powers of a U.S. Attorney the senate confirmation requirements for the U.S Attorney position would be rendered meaningless.  That is not what congress intended, as noted by several other courts and Judge Campbell in the cases in this district.  Ms. Chattah calling herself a FAUSA does not give her the powers of a U.S. Attorney.  For each of these reasons, she lacks authority to make decisions in this case and should be immediately disqualified from exercising any supervisory

authority or directives over the resolution or lack thereof of Mr. Lanier's pending case.

**VI.    MR. LANIER SEEKS TO ENFORCE THE PLEA OFFER THAT WAS EXTENDED TO HIM PRIOR TO MS. CHATTAH ABRUPTLY DEMANDED THAT IT BE WITHDRAWN**

In this case, a plea was extended to Mr. Lanier by the AUSAs prosecuting this case and the plea agreement was approved by their supervisor, Ms. Susan Cushman.  Mr. Lanier has accepted the terms of the plea agreement and has signed it.  The impediment to the negotiation of the parties is an unlawfully appointed FAUSA, Sigal Chattah, who directed that it be withdrawn.  For this reason, Mr. Lanier requests that Ms. Chattah be disqualified from supervising any of the attorneys handling his case or making decisions on his case.  Her participation in Mr. Lanier's case, in any fashion, has created a direct harm to Mr. Lanier, violating his due process rights under the United States Constitution.

While it is true that a plea agreement is generally not considered binding until it is approved by the Court, there can be exceptions.  Most cases address whether or not a plea agreement is binding on a defendant, some cases have analyzed whether a plea agreement is binding on the government prior to the trial court's acceptance of the plea agreement under Rule 11 of the Federal Rules of Criminal Procedure.  For example, in *united States v. Savage*, 978 F.2d 1136, 1138 (1992), the Circuit noted that the general rule is that plea bargaining is governed by Rule 11 and under that rule, the trial court retains discretion in rejecting or accepting plea bargains and until that happens, a defendant is free to renege on a promise to so plead.  In *Savage*, the Circuit determined that neither the government nor the defendant are bound by a plea agreement until it is approved by the court, but that there are exceptions for detrimental reliance.  (Id.)  The issue in *Savage* was that when he entered the courtroom to enter the plea, he assaulted a federal officer,

then ran from the courtroom. The government withdrew its offer, Savage sought to enforce it.  (Id, at 1136.)

While other courts have generally agreed with the outcome of Savage, there are cases where the wisdom of this has been questioned.  For example, in *State v. Crockett*, 110 Nev. 838 (1994), the state court offered the following when a defendant sought to enforce a plea that had been offered, but had not yet entered into the record:

I guess what I have to decide is whether or not to rule on technicality or fairness.

Unlike the civil system, the entire criminal system runs on the word of opposing counsel.  The system requires complete integrity on behalf of the D.A. and all members of the criminal bar.

If every deal needs to be memorized [sic] in writing and put on the record before a deal is a deal, then I think our system of criminal justice would come to a screeching halt, especially in light of the fact that 97 percent of all cases are negotiated.

I think that plea bargaining is an essential component of the administration of the criminal justice system in America. . .

. . . By attempting to back out now after you have received more information, and I understand why you are doing it, this information should have been known at the time you made the deal.  It violates the spirit of negotiations, and it misconstrues all of the negotiations in the criminal justice cases.

Id, at 841.  The issue in Crockett was that the D.A. learned after it had extended the offer that the defendant was more of a kingpin.  Here, however, the government has not withdrawn its plea offer because of anything Mr. Lanier has done, and it is clear that the prosecutors in this case do not choose to withdraw the

MCLETCHIE LAW
ATTORNEYS AT LAW
602 SOUTH TENTH STREET
LAS VEGAS, NV 89101
(702)728-5300 (T) / (702)425-8220 (F)
WWW.NVLITIGATION.COM

offer, rather, they are forced to do so at the sole direction of Sigal Chattah, who should be disqualified from supervising them as set forth above.

In Crockett, the Nevada Supreme Court did reverse the lower court and did hold that plea agreements are not binding on either party until accepted by a court. Id, at 842-843, citing to *Mabry v. Johnson,* 467 U.S. 504 (1984), *United States v. Savage,* 978 F.2d at 1138, *United States v. Ocanos*, 628 F.2d 353, 358 (5th Cir. 1980), cert denied 451 U.S. 984 (1981).   But the Nevada Supreme Court also noted that plea agreements are subject to contract law interpretation and a detrimental reliance exception, even if not finalized by a court.  *Crockett,* at 843, citing to *Savage* at 1138, *McKenzie v. Risley,* 801 F.2d 1519, 1527 (9th Cir. 1986), vacated in part on other grounds, 842 F.2d 1525.  And there are courts that have found that once a state enters into a plea bargain agreement, it may not repudiate the agreement with impunity, though this authority is obviously not binding on this Court.  *See Burns v. State*, 455 So.2d 113 (Ala. 1984).

Detrimental reliance in this case is that we are approaching trial, we switched gears and put team members on hold on Wednesday, February 4, 2026 when there was a plea offer that we believed Mr. Lanier would likely accept, we have now had to spend time and effort on this motion instead of simply planning a change of plea hearing and all of this takes away from time that we would otherwise spend preparing for trial, which is set to commence on March 2, 2026. This is a complex case, and it is not easy to simply switch gears, practically or emotionally.

The issue is one of both fairness and practicality.  The Nevada lower court was right; plea negotiations constitute a substantial part of the criminal justice system and that system depends on the ability of both counsel for the government and counsel for the government to fairly enter into negotiations.  Here, Mr. Lanier has not done anything in between the time the plea was offered and the time it was withdrawn to cause the government to withdraw the plea.   Nor has the

13

government learned new information that it did not previously know about Mr. Lanier's case that caused it to withdraw the plea. It was withdrawn at the direction of a FAUSA who is not lawfully fulfilling the role of supervisor or U.S. Attorney.

For each of these reasons, this Court should disqualify Ms. Chattah from supervising the attorneys handling Mr. Lanier's case and schedule a change of plea hearing.

## VII.    CONCLUSION

Mr. Lanier respectfully requests that this Court conduct a hearing for the purpose of disqualifying Ms. Chattah from this case and that it schedule a change of plea hearing for Mr. Lanier based upon the negotiated plea agreement in this case and attached hereto as **Exhibit E**.   In this case there is an actual harm by virtue of her participation.  Trial is scheduled for March 2, 2026.  The Ninth Circuit is scheduled to hear oral argument on the order disqualifying Ms. Chattah on Thursday, February 10, 2026.  It is not likely that a decision will be made prior to the start of the trial date.  If Mr. Lanier is unable to enter the plea offered by the government, he will be forced to go to trial when this case could otherwise be resolved absent Ms. Chattah's unauthorized interference that led to her disqualification in this district.  The issue before the circuit is not whether she should be disqualified from those four cases, it is whether she is validly serving in any capacity at all and it impacts all cases in the District of Nevada, including Mr. Lanier's case.

Dated this 10th day of February, 2026.

**McLetchie Law,**

/s/ Lisa A. Rasmussen
LISA A. RASMUSSEN, ESQ.
Nevada Bar No. 7491

**Karen A. Connolly, Ltd.**

14

/s/ Karen A. Connolly
KAREN A. CONNOLLY, ESQ.
Nevada Bar No. 7491

*Counsel for Jacques Lanier*

## DECLARATION OF LISA A. RASMUSSEN

I, LISA A. RASMUSSEN, hereby declare, under penalty of perjury of the laws of the United States as follows:

1.      I am an attorney licensed to practice in all courts in the State of Nevada and am admitted to this Court.

2.      I, along with Karen Connolly, are CJA counsel representing Mr. Jacques Lanier.

3.      One or both of us have been representing Mr. Lanier for approximately two years.  During that time, we have had multiple discussions with the government and our client about potential plea resolution in this case, which is our obligation.

4.      In late January, we conveyed an offer to the government that our client had indicated he would accept.

5.      On February 4, 2026, government counsel, AUSA Steven Rose contacted me to discuss the offer we had proposed and indicated that he believed he had approval for a plea agreement with those terms.

6.      I sent a few emails to Mr. Rose hashing out some of the details of that offer and addressing some collateral terms that I believed ought to be specified and included in any written plea agreement.

15

7.      I had discussions with Ms. Connolly about the conversations with Mr. Rose and Ms. Connolly was included in my emails to him on the details to address in the plea agreement.

8.      Mr. Rose indicated he would try to get the written plea agreement to me as soon as possible and we discussed timing and that we would need to request a visit with Mr. Lanier as soon as possible.

9.      On the same day, I sent a visit request to the Nevada Southern Detention Center requesting a contact visit with Mr. Lanier for Monday, February 9, 2026.  This was the only day that Ms. Connolly and I could do the visit together, we were both unavailable on Friday, February 6th, she was out of town, and I was in an all-day mediation.

10.      **Exhibit A** is a copy of the visit request to NSDC.

11.      On February 5, 2026, Mr. Rose sent the written plea agreement to Ms. Connolly and me.  **Exhibit B** is a copy of that email.

12.      On February 5, 2026 Mr. Lanier contacted me and I was able to get Ms. Connolly on the phone so that the three of us could talk.  We let Mr. Lanier know about the agreement, its contours and terms and that we were awaiting confirmation of a visit on Monday to have him review the plea and sign it.

13.      Mr. Lanier's response was favorable, and he was happy to hear about the plea offer and looked forward to our visit on Monday.

14.      I emailed the government after we spoke to Mr. Lanier to let them know that our conversation with Mr. Lanier went well.  **Exhibit C** is a copy of that email.

15.      On Friday, February 6, 2026, we got confirmation of the visit with Mr. Lanier at NSDC, scheduled for 10:00 a.m. Monday, February 9, 2026.  **Exhibit D** is a copy of that email.

16.      On Friday night, February 6, 2026, after 10:00 p.m., Ms. Connolly and I received an email from Mr. Rose advising that he had been directed by Sigal

16

(Chattah) to withdraw Mr. Lanier's plea, apologizing for the late hour and offering to discuss if we wished.   **Exhibit E** is a copy of that email.

17.     I emailed Mr. Rose back and asked him to call me on Saturday afternoon.   Ms. Connolly was out of town.

18.     I spoke to Mr. Rose on Saturday, February 7, 2026.  I asked if our client had done something to cause the government to withdraw the plea and Mr. Rose said no, that he had been directed by Sigal Chattah to withdraw it and that he himself did not receive this demand/order from Ms. Chattah until late Friday night and that he emailed us right after he was directed to do so.

19.     Ms. Connolly and I met with Mr. Lanier on Monday, February 9, 2026 and explained the situation and reviewed the plea with Mr. Lanier.  The three of us have signed the plea and it is attached as **Exhibit F**.

20.     I reviewed Judge Campbell's Order that was filed in four cases in this district on September 30, 2026 and was aware that Sigal Chattah had been disqualified from those cases and that it was possible to request she be disqualified from any other case as well.  The order is attached as **Exhibit G**.

21.     Shortly after Judge Campbell's order came out disqualifying Ms. Chattah, I noticed that we received filings that had Sue Fahami's name on them and that seemed consistent with the order, though she appeared to be using some odd title like Executive Assistant.  They did not have Sigal Chattah's name on them, so I assumed she was not involved in our case.

22.     On November 21, 2025, we received a filing by the government that no longer had Ms. Fahami's name on it and instead it had Todd Blanche's name at the top and under it, Sigal Chattah as "First Assistant U.S. Attorney."  This is ECF 453 in this case.

23.     I called Steven Rose to ask him about it and was told that because there was a stay order, Ms. Chattah believed she could use this title.  He was not certain why Todd Blanche was on the pleadings.  I inquired as to whether Ms.

17

Chattah was supervising Mr. Rose or any other AUSA on Mr. Lanier's case and was told no, that they were supervised by Ms. Susan Cushman. Based on these representations I did not believe it necessary to file a motion to disqualify Ms. Chattah from this case.

24.    I had not seen the government's motion to stay the order disqualifying Ms. Chattah, but I pulled it for the purpose of this Motion, and it is attached hereto as **Exhibit H**.

25.    Judge Campbell apparently entered an order granting the motion to stay the Chattah disqualification order in late October, 2025, but I had not seen that either, hence my confusion. I pulled it for the purpose of this Motion, and it is attached hereto as **Exhibit J**.

26.    I also noticed that the government filed certifications in the four cases that were the subject of the order disqualifying Chattah, certifying that she was not involved in those cases. I had not seen these previously either and pulled them for this motion. They are attached hereto as **Exhibit I**.

27.    **Exhibit K** is Pam Bondi's "certification" declaring Sigal Chattah a FAUSA.

Executed on this 10th day of February, 2026, at Las Vegas, Nevada.

/s/ Lisa A. Rasmussen

_____

LISA A. RASMUSSEN, ESQ.
Nevada Bar No. 7491

**CERTIFICATE OF SERVICE**

I certify that I served a copy of the foregoing:

**MOTION TO DISQUALIFY "FIRST ASSISTANT UNITED STATES ATTORNEY" SIGAL CHATTAH; REQUEST FOR EVIDENTIARY HEARING; and FOR SPECIFIC PERFORMANCE ON PLEA NEGOTATION**

upon all persons receiving service pursuant to this Court's CM/ECF electronic filing service, including, but not limited to:

Mr. Steven Rose, AUSA

Ms. Lauren Ibanez, AUSA

Ms. Karen Connolly,  Esq.

Date:  2/10/26                              /s/ Lisa A. Rasmussen

                                                  An Employee of McLetchie Law

19

# EXHIBIT A

# EXHIBIT A

# NSDC Visitation Scheduling Form

**Instructions:**
Submit completed form to the NSDC Attorney Visitation Office @ **NSDCattorneyschedule@corecivic.com** for review and confirmation. If this is your first time visiting with the client please include a completed visitation application in addition to this form for approval from the USMS, a copy will be sent with this form for future reference. Please fill in all fields under section 1 & 2.

## Section I    Disclaimer

| | | |
|---|---|---|
| Attorney Of Record: Lisa Rasmussen | Date: February 4, 2026 | **Status** |
| Law Firm: McLetchie Law | | CJA ✓ |
| Contact Information: Email: Lisa@nvlitigation.com | Phone #: 702-728-5300 | AFPD |
| Client/Detainee: | | Private Retained |
| Client/Detainee #: Detainee #: 25408-048 | or SSN: | NON-Federal |
| Client/Detainee Facility: NSDC | | |

I here by confirm that I am the attorney of record for my client who is a current U.S. Marshals detainee. I am requesting for a visit of my client mentioned above and that the below mentioned professionals be granted access for this visit in order to assist with the legal representation.

## Section II    Scheduling Information

### List of All Visitors:

| | Name (Last, First) | Position | Professional ID # | State of License | Email | Direct Contact #: | Employed By: | | Type of Visit |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Lisa Rasmussen | Atty | 7491 | NV | lisa@nvlitigation.com | 702-728-5300 | McLetchie Law | | Video |
| 2 | Karen Connolly | Atty | 4240 | NV | advocate@kconnollylaw | 702-678-7800 | K. Connolly, Ltd. | | Contact ✓ |
| 3 | | | | | | | | | Telephonic |
| 4 | | | | | | | | | |
| 5 | | | | | | | | | |
| 6 | | | | | | | | | |

### Required Documents to be attached to this document:

- [ ] Copy of professional License with registration # (First time form fill out only)
- [ ] Proof of representation (first time visits, state attorney of record, and Private retained attorneys only)
- [ ] Copy of State Issued ID (first time form submit ion only)
- [ ] List of all equipment needed for visit (if needed)
- [ ] Completed Facility Visitation Form (For first time visits per client, See Information guide attached)
- [ ] Letter from Federal attorney of record confirming no-conflict of interest (if capable, otherwise please fill out the facility visitation application for Marshal Approval)

### Proposed Visit Dates and Times:

| | Date | Time Frames | Time per client |
|---|---|---|---|
| 1 | 2/9/2026 | 10 am - 4pm | 1.5 |
| 2 | | | |
| 3 | | | |

### Items Requested for Visit

| | |
|---|---|
| Laptop | [ ] |
| Laptop power cord | [ ] |
| Flash-Drive w/ discovery | [ ] |
| For more items - Continue on the Item Continuation Sheet | [ ] |

## Section III    Facility Review and Confirmation

### Notes:

We are able to come whenever you can squeeze us in for a visit on Monday.  We need to present a plea offer to our client and timing is critical so that we can present the plea offer to him and have him review it on Monday.

# EXHIBIT B

# EXHIBIT B

| | |
|---|---|
| **From:** | Rose, Steven (USANV) |
| **To:** | Lisa Rasmussen; Karen A. Connolly |
| **Cc:** | Ibanez, Lauren (USANV) |
| **Subject:** | Lanier Plea |
| **Date:** | Thursday, February 5, 2026 1:41:50 PM |
| **Attachments:** | Lanier Plea Agreement - Final.pdf |

Lisa,

Pursuant to our discussion yesterday and my subsequent discussions with Susan, please find attached the plea agreement Susan has directed. When you get a chance, please discuss with your client, and if he is agreeable, send me the signed page and I will send it to Darci and can ask her to convert the Calendar Call into a change of plea. Let me know if you have any questions.

Thank you,

Steven Rose
Assistant United States Attorney
UNITED STATES ATTORNEY'S OFFICE | DISTRICT OF NEVADA
P: 702.388.6206

# Exhibit C

# Exhibit C

| | |
|---|---|
| **From:** | Lisa Rasmussen |
| **To:** | "Rose, Steven (USANV)"; Karen A. Connolly |
| **Cc:** | Ibanez, Lauren (USANV) |
| **Subject:** | RE: Lanier Plea |
| **Date:** | Thursday, February 5, 2026 3:12:00 PM |

FYI, we spoke to him today and it went well, so far so good.

Lisa

**From:** Rose, Steven (USANV) <Steven.Rose@usdoj.gov>
**Sent:** Thursday, February 5, 2026 1:42 PM
**To:** Lisa Rasmussen <Lisa@nvlitigation.com>; Karen A. Connolly <advocate@kconnollylawyers.com>
**Cc:** Ibanez, Lauren (USANV) <Lauren.Ibanez@usdoj.gov>
**Subject:** Lanier Plea

Lisa,

Pursuant to our discussion yesterday and my subsequent discussions with Susan, please find attached the plea agreement Susan has directed. When you get a chance, please discuss with your client, and if he is agreeable, send me the signed page and I will send it to Darci and can ask her to convert the Calendar Call into a change of plea. Let me know if you have any questions.

Thank you,

Steven Rose
Assistant United States Attorney
United States Attorney's Office | District of Nevada
P: 702.388.6206

# Exhibit D

# Exhibit D

| From: | Nevada Southern Attorney Schedule |
|---|---|
| To: | Lisa Rasmussen; Nevada Southern Attorney Schedule; Executive Assistant |
| Cc: | Karen A. Connolly |
| Subject: | Re: Visit Request - Jacques Lanier |
| Date: | Friday, February 6, 2026 12:40:37 PM |
| Attachments: | image001.png |
| | image002.png |
| | Outlook-g0zegjlm.png |

Yes that's corrected contact

Best Regards,

:)

 CoreCivic

Attorney Visit Officer Gonzalez
Nevada Southern Detention Center
775-751-7958/7959
attorneyschedule@corecivic.com
PILB License #2135B

**From:** Lisa Rasmussen <Lisa@nvlitigation.com>
**Sent:** Friday, February 6, 2026 12:16 PM
**To:** Nevada Southern Attorney Schedule <NSDCAttorneySchedule@corecivic.com>; Executive Assistant <executiveassistant@kconnollylawyers.com>
**Cc:** Karen A. Connolly <advocate@kconnollylawyers.com>
**Subject:** RE: Visit Request - Jacques Lanier

**CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

It is contact visit right?

Lisa Rasmussen

**From:** Nevada Southern Attorney Schedule <NSDCAttorneySchedule@corecivic.com>
**Sent:** Friday, February 6, 2026 12:11 PM
**To:** Executive Assistant <executiveassistant@kconnollylawyers.com>; Nevada Southern Attorney Schedule <NSDCAttorneySchedule@corecivic.com>
**Cc:** Karen A. Connolly <advocate@kconnollylawyers.com>; Lisa Rasmussen <Lisa@nvlitigation.com>
**Subject:** Re: Visit Request - Jacques Lanier

SET 02/09 @ 1000-1100PST
RE:Access code and password

Best Regards,

:)



Attorney Visit Officer Gonzalez
Nevada Southern Detention Center
775-751-7958/7959
attorneyschedule@corecivic.com
PILB License #2135B

---

**From:** Executive Assistant <executiveassistant@kconnollylawyers.com>
**Sent:** Friday, February 6, 2026 11:24 AM
**To:** Nevada Southern Attorney Schedule <NSDCAttorneySchedule@corecivic.com>
**Cc:** Karen A. Connolly <advocate@kconnollylawyers.com>; Lisa Rasmussen <Lisa@nvlitigation.com>
**Subject:** RE: Visit Request - Jacques Lanier

> **CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

Hello:

      I am following-up regarding the attached urgent request for Monday.  This needs to be a contact visit.  Please advise.  Thank you.

Regards,

# Shaeley Foster

Pronouns: She/Her

Executive Assistant | KAREN A. CONNOLLY, LTD.

6600 W. Charleston Blvd., #124

Las Vegas, NV 89146

Telephone: (702) 678-6700 | Facsimile:  (702) 678-6767  | Text Message:  (702) 718-5890

**From:** Lisa Rasmussen <Lisa@nvlitigation.com>
**Sent:** Wednesday, February 4, 2026 4:56 PM
**To:** Nevada Southern Attorney Schedule <NSDCAttorneySchedule@corecivic.com>
**Cc:** Karen A. Connolly <advocate@kconnollylawyers.com>
**Subject:** Visit Request - Jacques Lanier

Dear NSDC,

Please see the attached visit request for Jacques Lanier, for Monday 2/4/26.  This needs to be a contact visit.

Thank you,

Lisa

## Lisa Rasmussen

### Attorney



602 S 10th St

Las Vegas, NV 89101

(702) 728-5300 (T) / (702) 425-8220 (F)

www.nvlitigation.com

**IMPORTANT NOTICE**: Privileged and/or confidential information, including attorney-client communication and/or attorney work product may be contained in this message. This message is intended only for the individual or individuals to whom it is directed. If you are not an intended recipient of this message (or responsible for delivery of this message to such person), any dissemination, distribution or copying of this communication is strictly prohibited and may be a crime. No confidentiality or privilege is waived or lost by any misdirection of this message. If you received this message in error, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender by return e-

# Exhibit E

# Exhibit E

| | |
|---|---|
| **From:** | Rose, Steven (USANV) |
| **To:** | Lisa Rasmussen; Karen A. Connolly; Ibanez, Lauren (USANV) |
| **Subject:** | Lanier |
| **Date:** | Friday, February 6, 2026 10:06:13 PM |

Lisa, Karen,

I apologize for the late email and the abrupt change of directions, I received instruction from Sigal this evening directing me to withdraw the plea offer for Mr. Lanier. I recognize this is a change in position, but I wanted you let you know as soon as I heard. I am available later this weekend if you want to discuss.


Thank you,


Steven Rose

# Exhibit F

# Exhibit F

TODD BLANCHE
Deputy Attorney General of the United States
SIGAL CHATTAH
First Assistant United States Attorney
Nevada Bar No. 8264
STEVEN J. ROSE
Nevada Bar Number 13575
Assistant United States Attorneys
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
Steven.Rose@usdoj.gov
Lauren.Ibanez@usdoj.gov
*Attorneys for the United States of America*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:19-cr-00327-RFB-MDC |
| Plaintiff, | |
| v. | **Plea Agreement for Defendant Jacques Anton Lanier Pursuant to Fed. R. Crim. P. 11(c)(1)(A) and (B)** |
| JACQUES ANTON LANIER, aka "John Dupree" | |
| Defendant. | |

This plea agreement between Jacques Anton Lanier ("defendant") and the United States Attorney's Office for the District of Nevada (the "USAO") sets forth the parties' agreement regarding the criminal charges referenced herein and the applicable sentences, fines, restitution, and forfeiture in the above-captioned case. This agreement binds only defendant and the USAO and does not bind the district court, the U.S. Probation Office, or any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities. This agreement does not prohibit the USAO or any agency or third party from seeking any other civil or administrative remedies, including administrative forfeiture or civil forfeiture *in rem* actions, directly or indirectly against defendant or defendant's property.

This agreement becomes effective upon signature by defendant, defendant's counsel, and an Assistant United States Attorney.

## I. DEFENDANT'S OBLIGATIONS

1.      Defendant agrees to:

a.      At the earliest opportunity requested by the USAO and provided by the district court, appear and plead guilty to Counts One, and Six of the superseding indictment in this case, which charges defendant with coercion and enticement, in violation of 18 U.S.C. § 2422(b) (Count One); and sex trafficking of children, in violation of 18 U.S.C. § 1591(a) and (b)(2) (Count Six);

b.      Stipulate to the facts agreed to in this agreement;

c.      Abide by all agreements regarding sentencing contained in this agreement;

d.      Not seek to withdraw defendant's guilty pleas once they are entered;

e.      Not request release or seek to modify the existing pre-trial order of detention;

f.      Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter;

g.      Not commit any federal, state, or local crime;

h.      Be truthful at all times with the U.S. Probation and Pretrial Services Offices and the Court;

i.      Before and after sentencing, upon request by the Court, the USAO, or the Probation Office, provide accurate and complete financial information, submit sworn statements, and/or give depositions under oath concerning defendant's assets and defendant's ability to pay. As part of the required disclosure, defendant agrees to provide any and all financial information and authorizations requested by the Probation Office for preparation of the

Presentence Report. Defendant further agrees that, upon filing of this agreement, the USAO is authorized to obtain defendant's credit report. Defendant will also complete a financial form provided by the USAO, to include all supporting documentation, and return it to the USAO within ten (10) days from entry of the plea. Defendant agrees that the district court may enter any order necessary to effectuate or facilitate disclosure of defendant's financial information.

j.      The forfeiture of the property and the imposition of the forfeiture of the property as set forth in this plea agreement and the Forfeiture Allegations of the Superseding Criminal Indictment.

k.      The USAO and defendant stipulate and agree that for purposes of restitution, allocution, and the propriety of victim impact statements, the victims in this case shall include any victims identified in any counts that are dismissed as part of these negotiations.

l.      Defendant agrees that restitution shall be ordered due and payable in full immediately after the judgment is entered, and that the full amount of any restitution ordered is subject to immediate enforcement and collection by the USAO or defendant's victims, or both. Defendant agrees that any schedule of payments entered by the district court is a schedule of the minimum payment due and does not prohibit or limit the methods by which the USAO may immediately enforce and collect the judgment in full. Defendant acknowledges that restitution may not be discharged, in whole or in part, in any present or future bankruptcy proceeding.

**II. THE USAO'S OBLIGATIONS**

2.    The USAO agrees to:

a.      Stipulate to facts agreed to in this agreement;

b.      Abide by all agreements regarding sentencing contained in this agreement;

3

c.      At sentencing, provided that defendant demonstrates an acceptance of responsibility for the offenses up to and including the time of sentencing, recommend a two-level reduction in the applicable sentencing guidelines offense level, pursuant to USSG § 3E1.1;

d.      At sentencing, move to dismiss the remaining counts of the indictment as against defendant. Defendant agrees, however, that the district court may consider any dismissed charges in determining the applicable sentencing guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed; and

e.      Not bring any additional charges against defendant arising out of the investigation in the District of Nevada which culminated in this agreement and based on conduct known to the USAO. However, the USAO reserves the right to prosecute defendant for (a) any crime of violence as defined by 18 U.S.C. § 16; and (b) any criminal tax violations (including conspiracy to commit such violations chargeable under 18 U.S.C. § 371). Defendant agrees that the district court at sentencing may consider any uncharged conduct in determining the applicable sentencing guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed after consideration of the sentencing guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

**III. ELEMENTS OF THE OFFENSES**

3.      <u>Count One</u>: The elements of coercion and enticement under 18 U.S.C. § 2422(b) are as follows:

<u>First</u>:       That between the dates alleged in the Indictment, the defendant used the Internet, which is a means or facility of interstate or foreign commerce, to knowingly persuade, induce, entice, or coerce an individual to engage in sexual activity;

4

Second:      The individual was under the age of 18 and the defendant knew the person was under the age of 18; and

Third:      That if the sexual activity had occurred and based upon the sexual activity that occurred, any person could have been charged with a criminal offense under the laws of the United States and/or the State of Nevada.

*See* Ninth Circuit Model Criminal Jury Instruction 20.29 (2023 ed.).

4.      Count Six: The elements of sex trafficking of children under 18 U.S.C. § 1591(a) and (b)(2) are as follows:

First:      The defendant knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized or solicited a person;

Second:      The defendant knew and was in reckless disregard of the fact that the person had not attained the age of 18 years and would be caused to engage in a commercial sex act; and

Third:      The defendant's acts were in or affecting interstate or foreign commerce.

*See* Ninth Circuit Model Criminal Jury Instruction 20.25 (2023 ed.).

## IV. CONSEQUENCES OF CONVICTION

5.      Maximum and Minimum Statutory Penalties:

a.      Defendant understands that the statutory maximum sentence the district court can impose for each violation of 18 U.S.C. § 2422(b) as charged in Count One is: life imprisonment; a lifetime supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offenses, whichever is greatest; and a mandatory special assessment of $100. Defendant understands the mandatory minimum sentence the district court must impose for each violation of 18 U.S.C. § 2422(b) as charged in Count One, is: 10 years imprisonment.

5

b.    Defendant understands that the statutory maximum sentence the district court can impose for each violation of 18 U.S.C. § 1591(a) and (b)(2) as charged in Count Six, is: life imprisonment; a lifetime supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offenses, whichever is greatest; and a mandatory special assessment of $100. Defendant understands the mandatory minimum sentence the district court must impose for each violation of § 1591(a) and (b)(2) as charged in Count Six, is: 10 years imprisonment.

c.    Defendant understands, therefore, that the total maximum sentence for all offenses to which defendant is pleading guilty is: life imprisonment; a lifetime period of supervised release; a fine of $500,000 or twice the gross gain or gross loss resulting from the offenses, whichever is greatest; and a mandatory special assessment of $200.

6.    <u>Mandatory Restitution Pursuant to 18 U.S.C. § 2259</u>: Defendant understands that defendant will be required to pay full restitution to the victims of the offenses to which defendant is pleading guilty. Defendant agrees that, in return for the USAO's compliance with its obligations under this agreement, the Court may order restitution to persons other than the victims of the offense to which defendant is pleading guilty and in amounts greater than those alleged in the count to which defendant is pleading guilty. In particular, defendant agrees that the Court may order restitution to any victim for any losses suffered by that victim as a result of any relevant conduct, as defined in USSG § 1B1.3, in connection with the offense to which defendant is pleading guilty.

7.    <u>SORNA</u>: Defendant understands and agrees that under the Sex Offender Registration and Notification Act ("SORNA"), 34 U.S.C. § 20901 et. seq., defendant must register as a sex offender and keep the registration current in each of the following jurisdictions: (1) where defendant resides; (2) where defendant is an employee; and (3) where defendant is a

6

student. Defendant understands that he must comply with all the registration requirements contained in SORNA. 34 U.S.C. § 20901 et. seq. Defendant further understands that the requirements for registration include, but are not limited to, providing defendant's name, residence address, and the names and addresses of any places where defendant is or will be an employee or a student.

Defendant further understands that the requirement to keep the registration current includes, but is not limited to, informing at least one jurisdiction in which defendant resides, is an employee, or is a student no later than three business days after any change of defendant's name, residence, employment, or student status. Defendant has been advised, and understands, that failure to comply with these obligations subjects defendant to an additional prosecution for failure to register as a sex offender under 18 U.S.C. § 2250(a).

8.    Criminal Forfeiture: Defendant understands that the district court will impose the forfeiture of the property.

9.    Parole Abolished: Defendant acknowledges that defendant's prison sentence cannot be shortened by early release on parole because parole has been abolished.

10.    Supervised Release: Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements. Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offenses that resulted in the term of supervised release.

11.    Factors under 18 U.S.C. § 3553: Defendant understands that the district court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining defendant's sentence.

7

However, the statutory maximum sentence and any statutory minimum sentence limit the district court's discretion in determining defendant's sentence.

12.    Potential Collateral Consequences of Conviction: Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that once the district court accepts defendant's guilty pleas it will be a federal felony for defendant to possess a firearm or ammunition. Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license. Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty pleas.

13.    Potential Removal/Deportation Consequences of Conviction: Defendant understands that, if defendant is not a United States citizen, the felony conviction in this case may subject defendant to removal, also known as deportation, which may, under some circumstances, be mandatory; denial of citizenship; and denial of admission to the United States in the future. The district court cannot advise defendant fully regarding the immigration consequences of the felony conviction in this case, but defendant's attorney has advised him about the deportation risks of his guilty plea. Defendant understands that unexpected immigration consequences will not serve as grounds to withdraw defendant's guilty pleas.

## V. FACTUAL BASIS

14.    Defendant admits that defendant is, in fact, guilty of the offenses to which defendant is agreeing to plead guilty. Defendant acknowledges that if defendant elected to go to trial instead of pleading guilty, the USAO could prove defendant's guilt beyond a reasonable

8

doubt and establish its right to forfeit the specified property by preponderance of the evidence. Defendant further acknowledges that defendant's admissions and declarations of fact set forth below satisfy every element of the charged offenses. Defendant waives any potential future claim that the facts defendant admitted below are insufficient to satisfy the elements of the charged offenses. Defendant admits and declares under penalty of perjury that the facts set forth below are true and correct:

Count One: Coercion and Enticement as to Victim 2

Victim 2 was 16 years old in April of 2017. From approximately on or about April 14, 2017, to on or about September 5, 2017, defendant and Victim 2 exchanged numerous communications over Facebook. Defendant persuaded Victim 2 to engage in sex acts for money. Defendant knew Victim 2 was under 18 years old and engaged in multiple sex acts with her.

Count Six: Sex Trafficking of Children as to Victim 5

Victim 5 was 15 years old in August 2017. From on or about August 5, 2017, to on or about October 16, 2017, defendant and Victim 5 exchanged numerous communications over Facebook in which he asked her to engage in commercial sex acts. Defendant used the name "John Dupree" and the picture of an unknown younger male. During this time, defendant paid Victim 5 to have sex knowing that Victim 5 was under 18 years old.

All of the foregoing occurred in the state and federal district of Nevada and elsewhere.

**VI. SENTENCING FACTORS**

15.     Discretionary Nature of Sentencing Guidelines: Defendant understands that in determining defendant's sentence, the district court is required to calculate the applicable sentencing guidelines range and to consider that range, possible departures under the sentencing guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a). Defendant understands that the sentencing guidelines are advisory only, that defendant cannot have any

9

expectation of receiving a sentence within the calculated sentencing guidelines range, and that after considering the sentencing guidelines and the other § 3553(a) factors, the district court will be free to exercise its discretion to impose any sentence it finds appropriate between the mandatory minimum and up to the maximum set by statute for the crimes of conviction.

16.    Offense Level Calculations: The parties jointly agree and stipulate that, in calculating defendant's advisory guidelines sentencing range, the Court should use the following base offense level and adjustments; acknowledge that these stipulations do not bind the district court;:

Count One: Coercion and Enticement as to Victim 2

|  |  |
|---|---|
| Base Offense Level USSG § 2G1.3(a)(3): | 28 |
| Use of a Computer USSG § 2G1.3(b)(3): | +2 |
| Adjusted Offense Level: | 30 |

Count Six: Sex Trafficking of Children as to Victim 5

|  |  |
|---|---|
| Base Offense Level USSG § 2G1.3(a)(2): | 30 |
| Use of a Computer USSG § 2G1.3(b)(3): | +2 |
| Adjusted Offense Level: | 32 |

Grouping of Multiple Counts: USSG § 3D

| Group | Counts | Offense Level | Units |
|---|---|---|---|
| A (Victim 2) | One | 30 | 1 |
| D (Victim 5) | Six | 32 | 1 |
| Total Units | | | 2 |
| Combined Offense level (32+2[1]) | | | 34 |

---

[1] Under §§ 3D1.1(a)(3) and 3D1.4, a 2-level increase is applied to the highest offense level because the total number of units is 2.

10

| | |
|---|---|
| Contingent Reduction for Acceptance of Responsibility USSG § 3E1.1(a) | -2 |
| Total Offense Level | 32 |

17.    Reduction for Acceptance of Responsibility: Under USSG § 3E1.1(a), the USAO will recommend that defendant receive a two-level downward adjustment for acceptance of responsibility unless defendant (a) fails to truthfully admit facts establishing a factual basis for the guilty pleas when defendant enters the pleas; (b) fails to truthfully admit facts establishing the amount of restitution owed when defendant enters the guilty pleas; (c) fails to truthfully admit facts establishing the forfeiture allegations when defendant enters the guilty pleas; (d) provides false or misleading information to the USAO, the Court, Pretrial Services, or the Probation Office; (e) denies involvement in the offenses or provides conflicting statements regarding defendant's involvement or falsely denies or frivolously contests conduct relevant to the offenses; (f) attempts to withdraw defendant's guilty pleas; (g) commits or attempts to commit any crime; (h) fails to appear in court; or (i) violates the conditions of pretrial release.

Defendant agrees and acknowledges that the USAO will not move for an additional one-level downward adjustment for acceptance of responsibility before sentencing USSG § 3E1.1(b), because defendant did not communicate defendant's decision to plead guilty in a timely manner that enabled the USAO to avoid preparing for trial and to efficiently allocate its resources.

18.    Criminal History Category: Defendant acknowledges that the district court may base defendant's sentence in part on defendant's criminal record or criminal history. The district court will determine defendant's criminal history category under the sentencing guidelines.

19.    Additional Sentencing Information: The stipulated sentencing guidelines calculations are based on information now known to the parties. Defendant understands that both defendant and the USAO are free to (a) supplement the facts in this agreement by supplying

11

relevant information to the U.S. Probation and Pretrial Services Offices and the district court regarding the nature, scope, and extent of defendant's criminal conduct and any aggravating or mitigating facts or circumstances; and (b) correct any and all factual misstatements relating to the district court's sentencing guidelines calculations and determination of sentence. While this paragraph permits both the USAO and defendant to submit full and complete factual information to the U.S. Probation and Pretrial Services Offices and the district court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement. Good faith efforts to provide truthful information or to correct factual misstatements shall not be grounds for defendant to withdraw defendant's guilty pleas.

Defendant acknowledges that the U.S. Probation Office may calculate the sentencing guidelines differently and may rely on additional information it obtains through its investigation. Defendant also acknowledges that the district court may rely on this and other additional information as it calculates the sentencing guidelines range and makes other sentencing determinations, and the district court's reliance on such information shall not be grounds for defendant to withdraw defendant's guilty pleas.

## VII. POSITIONS REGARDING SENTENCING

20.    The parties will jointly recommend the Court sentence defendant to 126-months imprisonment followed by a lifetime term of supervised release.

21.    Defendant may further request that this Court credit the time he was been in State custody—starting from December 21, 2017, until such time defendant entered primary federal custody—to the sentence imposed by the Court in the instant case.  Credit for time served must be accounted for under a variance, but in no event shall the variance decrease Defendant's sentence below the 10-year mandatory minimum terms of imprisonment. Defendant

12

acknowledges that the district court does not have to follow the recommendation of either party.

22.    Notwithstanding its agreement to recommend a sentence as described above, the USAO reserves its right to defend any lawfully imposed sentence on appeal or in any post-conviction litigation.

23.    If defendant commits any act that results in the Court finding that defendant is not entitled to a downward adjustment for acceptance of responsibility, the USAO is entitled to argue for any sentence it deems appropriate under 18 U.S.C. § 3553(a).  In any such event, Defendant remains bound by the provisions of this agreement and shall not have the right to withdraw defendant's guilty pleas.

<b>VIII. WAIVER OF CONSTITUTIONAL RIGHTS</b>

24.    Defendant understands that by pleading guilty, defendant gives up the following rights:

     a.    The right to persist in a plea of not guilty;

     b.    The right to a speedy and public trial by jury;

     c.    The right to be represented by counsel—and if necessary have the court appoint counsel—at trial. Defendant understands, however, that, defendant retains the right to be represented by counsel—and if necessary have the court appoint counsel—at every other stage of the proceeding;

     d.    The right to be presumed innocent and to have the burden of proof placed on the USAO to prove defendant guilty beyond a reasonable doubt;

     e.    The right to confront and cross-examine witnesses against defendant;

     f.    The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify;

13

g.    The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant; and

h.    The right to pursue any affirmative defenses; Fourth Amendment or Fifth Amendment claims; any other pretrial motions that have been or could have been filed; and challenges to any adverse pre-trial rulings (unless specifically reserved in the following section).

25.    Understanding that the investigating agency has in its possession digital devices and/or digital media seized from defendant, defendant waives any right to the return of digital data contained on those digital devices and/or digital media and agrees that if any of these digital devices and/or digital media are returned to defendant, the agency may delete all digital data from those digital devices and/or digital media before they are returned to defendant.

## IX. WAIVER OF APPELLATE RIGHTS

26.    Waiver of Appellate Rights: Defendant knowingly and expressly waives: (a) the right to appeal any sentence imposed within or below the applicable Sentencing Guideline range as determined by the district court; (b) the right to appeal the manner in which the district court determined that sentence on the grounds set forth in 18 U.S.C. § 3742; and (c) the right to appeal any other aspect of the conviction, including but not limited to the constitutionality of the statutes of conviction; any other aspect of the sentence, including but not limited to the constitutionality of any mandatory or standard conditions of supervised release; the denial of any motion for early termination of supervised release; and any order of restitution or forfeiture.

27.    Defendant reserves only the right to appeal any portion of the sentence that is an upward departure or variance from the applicable Sentencing Guideline range as determined by the district court.

28.    Waiver of Post-Conviction Rights: Defendant also knowingly and expressly waives all collateral challenges, including any claims under 28 U.S.C. § 2255, to defendant's

14

conviction, sentence, and the procedure by which the district court adjudicated guilt and imposed sentence, except non-waivable claims of ineffective assistance of counsel.

29.     Preservation of Evidence: Defendant acknowledges that the USAO and the agencies investigating this case are not obligated or required to preserve any evidence obtained in the investigation of this case.

## X. FORFEITURE

30.     Defendant knowingly and voluntarily:

a.     Agrees to the district court imposing the civil judicial forfeiture and the criminal forfeiture of:

i.   Samsung Galaxy S8 cellular phone, IMEI 355987083990480; and

ii.  Green Vibrator recovered from 1827 W. Gowan, #2148, North Las Vegas, Nevada, on December 21, 2017

(all of which constitutes property);

b.     Agrees to the civil judicial forfeiture and the criminal forfeiture of the property;

c.     Forfeits the property to the United States;

d.     Relinquishes all possessory rights, ownership rights, and all rights, titles, and interests in the property;

e.     Waives defendant's right to any civil judicial forfeiture proceedings and any criminal forfeiture proceedings of the property (proceedings);

f.     Waives service of process of any and all documents filed in this action and any proceedings concerning the forfeiture of the property arising from the facts and circumstances of this case;

15

g.      Waives any further notice to defendant, defendant's agents, and defendant's attorney regarding the forfeiture and disposition of the property;

h.      Agrees not to file any claim, answer, petition, and other documents in any proceedings concerning the property; agrees not to contest, and agrees not to assist any other person and entity to contest, the forfeiture; and agrees to withdraw immediately any claim, answer, petition, and other documents in any proceedings;

i.      Waives the statute of limitations, the CAFRA requirements, Fed. R. Crim. P. 7, 11, 32.2, and 43(a), including, but not limited to, forfeiture notice in the charging document, the court advising defendant of the forfeiture at the change of plea, the court having a forfeiture hearing, the court making factual findings regarding the forfeiture, the court announcing the forfeiture at the change of plea and sentencing, the court attaching the forfeiture order to the Judgment in a Criminal Case, and any and all constitutional, statutory, legal, equitable rights, defenses, and claims regarding the property in any proceedings, including, but not limited to, double jeopardy and due process under the Fifth Amendment to the United States Constitution;

j.      Waives all constitutional, statutory, legal, equitable rights, defenses, and claims regarding the property in any proceedings, including, but not limited to, a jury trial under the Sixth Amendment to the United States Constitution;

k.      Waives any and all constitutional, statutory, legal, equitable rights, defenses, and claims regarding the property in any proceedings, including, but not limited to, excessive fines clause and cruel and unusual punishments clause under the Eighth Amendment to the United States Constitution;

l.      Waives any and all constitutional, statutory, legal, equitable rights, defenses, and claims to the property in any proceedings under *Honeycutt v. United States*, 581 U.S.

16

443 (2017); *United States v. Thompson*, 990 F.3d 680 (9th Cir. 2021); and *United States v. Prasad*, 18 F.4th 313 (9th Cir. 2021);

m.    Agrees to the entry of an Order of Forfeiture of the property to the United States;

n.    Waives the right to appeal any Order of Forfeiture;

o.    Agrees the property is forfeited to the United States and can be taken into custody immediately by the USAO;

p.    Agrees and understands the civil administrative forfeiture, the civil judicial forfeiture, and the criminal forfeiture of the property shall not be treated as satisfaction of any assessment, fine, restitution, cost of imprisonment, and any other penalty the Court may impose upon defendant in addition to the forfeiture;

q.    Agrees and understands that on the government's motion, the court may at any time enter an order of forfeiture or amend an existing order of forfeiture to include subsequently located property or substitute property under Fed. R. Crim. P. 32.2(b)(2)(A) and (C) and 32.2(e);

r.    Acknowledges the amount of the forfeiture may differ from, and may be significantly greater than or less than, the amount of restitution;

s.    Agrees to take all steps as requested by the USAO to pass clear title of any forfeitable assets to the United States and to testify truthfully in any judicial forfeiture proceedings. Defendant understands and agrees that the property represents facilitating property of illegal conduct and is forfeitable; and

t.    Admits the property is (1) any property, real or personal, that was used or intended to be used to commit or to facilitate the commission of violations of 18 U.S.C. § 2422(b); (2) any property, real or personal, used or intended to be used to commit or to

17

facilitate the commission of any violation of 18 U.S.C. § 2422(b); (3) any property, real or personal, that was involved in, used, or intended to be used to commit or to facilitate the commission of 18 U.S.C. § 1591(a), and any property traceable to such property; (4) any property, real or personal, involved in, used, or intended to be used to commit or to facilitate the commission of 18 U.S.C. § 1591(a), and any property traceable to such property; (5) any visual depiction described in 18 U.S.C. § 2251, or any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction, which was produced, transported, mailed, shipped or received in violation of 18 U.S.C. § 2251(a); and (6) any property, real or personal, used or intended to be used to commit or to promote the commission of 18 U.S.C. § 2251(a) or any property traceable to such property and is subject to forfeiture under 18 U.S.C. § 2428(a)(1); 18 U.S.C. § 2428(b)(1)(A) with 28 U.S.C. § 2461(c); 18 U.S.C. § 1594(d)(1); 18 U.S.C. § 1594(e)(1)(A) with 28 U.S.C. § 2461(c); and 18 U.S.C. § 2253(a)(1) and 2253(a)(3).

## XI. RESULT OF WITHDRAWAL OF GUILTY PLEAS
## OR VACATUR/REVERSAL/SET-ASIDE OF CONVICTIONS

31.     Consequence of Withdrawal of Guilty Pleas: Defendant agrees that if, after entering guilty pleas pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty pleas on any basis other than a claim and finding that entry into this agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement and (b) should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, or that the government agreed to move to dismiss at sentencing as part of this agreement, or that the government agreed to move to dismiss at sentencing as part of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations,

18

any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

32. Consequence of Vacatur, Reversal, or Set-aside: Defendant agrees that if any count of conviction is vacated, reversed, or set aside, the USAO may: (a) ask the district court to resentence defendant on any remaining counts of conviction, with both the USAO and defendant being released from any stipulations regarding sentencing contained in this agreement; (b) ask the district court to void the entire plea agreement and vacate defendant's guilty pleas on any remaining counts of conviction, with both the USAO and defendant being released from all their obligations under this agreement; or (c) leave defendant's remaining convictions, sentence, and plea agreement intact. Defendant agrees that the choice among these three options rests in the exclusive discretion of the USAO, and that, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

## XII. BREACH OF AGREEMENT

33. Defendant agrees that if, at any time after this agreement becomes effective, defendant knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached. All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement

19

of the USAO in writing. If the USAO declares this agreement breached, and the district court finds such a breach to have occurred, then: (a) if defendant has previously entered guilty pleas pursuant to this agreement, defendant will remain bound by the provisions of this agreement and will not be able to withdraw the guilty pleas; and (b) the USAO will be relieved of all its obligations under this agreement.

34.    Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge contained in the indictment, or that was either dismissed or not filed as a result of this agreement, or that the government agreed to move to dismiss at sentencing as part of this agreement, then:

a.    Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.    Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c.    Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Federal Rule of Evidence 410, Federal Rule of Criminal Procedure 11(f), or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

20

## XIII. COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES OFFICE NOT PARTIES

35.    Defendant understands that the Court and the U.S. Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

36.    Defendant understands that both defendant and the USAO are free to argue on appeal and collateral review that the district court's sentencing guidelines calculations and the sentence it chooses to impose are not error.

37.    Defendant understands that even if the district court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to by the parties, or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty pleas, and defendant will remain bound to fulfill all defendant's obligations under this agreement. Defendant understands that no one—not the prosecutor, defendant's attorney, or the Court—can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

## XIV. ADDITIONAL ACKNOWLEDGMENTS

38.    Defendant acknowledges that:

a.    Defendant read this agreement and defendant understands its terms and conditions.

b.    Defendant had adequate time to discuss this case, the evidence, and this agreement with defendant's attorney.

c.    Defendant carefully and thoroughly discussed all terms of this agreement with defendant's attorney.

21

d.      Defendant understands the terms of this agreement and voluntarily agrees to those terms.

e.      Defendant has discussed with defendant's attorney the following: the evidence; defendant's rights; possible pretrial motions that might be filed; possible defenses that might be asserted either prior to or at trial; the sentencing factors set forth in 18 U.S.C. § 3553(a); the relevant sentencing guidelines provisions; and consequences of entering into this agreement.

f.      The representations contained in this agreement are true and correct, including the factual basis for defendant's offenses set forth in this agreement.

g.      Defendant was not under the influence of any alcohol, drug, or medicine that would impair defendant's ability to understand the agreement when defendant considered signing this agreement and when defendant signed it.

39.     Defendant understands that defendant alone decides whether to plead guilty or go to trial, and acknowledges that defendant has decided to enter defendant's guilty pleas knowing of the charges brought against defendant, defendant's possible defenses, and the benefits and possible detriments of proceeding to trial.

40.     Defendant understands that no promises, understandings, or agreements other than those set forth in this agreement have been made or implied by defendant, defendant's attorney, or the USAO, and no additional promises, agreements, or conditions shall have any force or effect unless set forth in writing and signed by all parties or confirmed on the record before the district court.

41.     Defendant acknowledges that defendant decided to plead guilty voluntarily and that no one threatened, coerced, or forced defendant to enter into this agreement.

42.     Defendant is satisfied with the representation of defendant's attorney, and defendant is pleading guilty because defendant is guilty of the charges and chooses to take

22

advantage of the promises set forth in this agreement and for no other reason.

## XV. PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

43.    The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE DISTRICT OF NEVADA

TODD BLANCHE
Deputy Attorney General of the United States

SIGAL CHATTAH
First Assistant United States Attorney

_____
STEVEN J. ROSE                                           Date
Assistant United States Attorney

_____            2-9-26
JACQUES ANTON LANIER                             Date
Defendant

_____            2-9-26
LISA RASMUSSEN                                        Date
Attorney for Defendant Jacques Anton Lanier

                                                              2 9 26

24

# Exhibit G

# Exhibit G

WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEVADA

United States of America,

Plaintiff,

v.

Shamar Tyrell Garcia; Giann Icob Salazar Del Real; Devonte Devon Jackson; and Jorge Enriquez, Jr.,

Defendants.

No. 2:25-cr-00230-DGC-BNW
No. 2:25-cr-00227-DGC-BNW
No. 2:25-cr-00240-DGC-BNW
No. 3:25-cr-00026-DGC-CLB

**ORDER**

Defendants Shamar Garcia, Giann Icob Salazar Del Real, Devonte Jackson, and Jorge Enriquez recently were indicted for felony offenses in the District of Nevada. They move to dismiss their indictments on the ground that Sigal Chattah is not validly serving as Acting United States Attorney. If their indictments are not dismissed, Defendants ask the Court to disqualify Ms. Chattah and any lawyers working under her direction from prosecuting their cases, and for the judges of the Nevada District Court to appoint a new U.S. Attorney under 28 U.S.C. § 546(d). The government opposes Defendants' motions. For reasons set forth below, the Court will grant the motions and disqualify Ms. Chattah from supervising these cases.

## I.    Factual Background.

On January 17, 2025, Jason Frierson resigned as the U.S. Attorney for the District of Nevada. Under procedures established by Congress in the Federal Vacancies Reform

1

Act of 1998, First Assistant U.S. Attorney Sue Fahami automatically became Acting U.S. Attorney.  *See* 5 U.S.C. § 3345(a)(1).

About two months later, on March 28, 2025, the Attorney General of the United States, Pam Bondi, appointed Sigal Chattah to be the interim U.S. Attorney under 28 U.S.C. § 546(a).  Ms. Chattah's appointment was made effective April 1, 2025, and § 546(c)(2) limited her service to 120 days.  If a permanent U.S. Attorney was not nominated by the President and confirmed by the Senate within that 120-day period, the statute provided that the judges of the Nevada District Court could appoint an interim U.S. Attorney to serve until the vacancy is filled by the President and Senate.  28 U.S.C. § 546(c)(2)-(d).

That procedure was not followed.  Instead, on July 28, 2025 – one day before Ms. Chattah's 120-day term expired – Ms. Chattah and Attorney General Bondi took several procedural steps: (1) Ms. Chattah resigned from her position as interim U.S. Attorney under § 546, but said in her resignation letter that "I look forward to continuing to lead the U.S. Attorney's Office for the District of Nevada" (Doc. 29-2 at 2);[1] (2) Attorney General Bondi appointed Ms. Chattah to be a Special Attorney in the Department of Justice ("DOJ") under general delegation statutes found in 28 U.S.C. §§ 509, 510, and 515 (Doc. 29-3 at 2); (3) Attorney General Bondi designated Ms. Chattah to be the First Assistant U.S. Attorney "effective upon her resignation" as interim U.S. Attorney (*id.*); (4) the Attorney General stated in her appointment document that Ms. Chattah, as First Assistant, would "have authority to serve as Acting United States Attorney . . . subject to the conditions and time limitations of the Federal Vacancies Reform Act of 1998" (*id.*); and (5) Attorney General Bondi changed the designation of Ms. Fahami from First Assistant to Executive U.S. Attorney, opening the way for Ms. Chattah to fill the First Assistant spot and become Acting U.S. Attorney (Doc. 29-4 at 2).

---

[1] Citations in this order are to briefs filed in the *Garcia* case, No. 2:25-cr-00230-DGC-BNW.  Briefing in all the cases is identical.  Citations are to page numbers affixed by the Court's electronic filing system at the top of each page.

2

These steps purported to foreclose the statutory power of the judges in the District of Nevada to appoint an interim U.S. Attorney at the end of Ms. Chattah's 120-day term, and, according to the government, granted Ms. Chattah several more months as Acting U.S. Attorney under the longer time limits of the Federal Vacancies Reform Act. *See* 5 U.S.C. §§ 3346, 3349a; Doc. 29 at 17. To date, the President has not nominated Ms. Chattah or anyone else to serve as the permanent U.S. Attorney for the District of Nevada.

The Nevada District Court Judges recused from hearing these motions to dismiss, presumably because the motions implicate their own power to appoint an Acting U.S. Attorney. *See* 28 U.S.C. § 546(d). Exercising her authority under 28 U.S.C. § 292(b), Ninth Circuit Chief Judge Mary Murguia designated the undersigned judge to hear and decide these motions. Doc. 21.

Defendants and the government have briefed the motions to dismiss, and the Court permitted the Nevada Attorneys for Criminal Justice to file an amicus brief, to which the government responded. Docs. 20, 29-30, 32, 36. The Court held a hearing on September 24, 2025, and took this matter under advisement. The Court now rules.

## II. Relevant Statutes.

The Appointments Clause of the Constitution addresses the President's power to appoint federal officers with the advice and consent of the Senate, U.S. Const. art. II, § 2, cl. 2, but that power applies only to principal officers of the United States. *Edmond v. United States*, 520 U.S. 651, 659 (1997). The Ninth Circuit has held that U.S. Attorneys are not principal officers. *United States v. Gantt*, 194 F.3d 987, 999 (9th Cir. 1999). As a result, the U.S. Attorney position at issue in this case, while tremendously important, need not be filled through presidential appointment and Senate confirmation under Article II of the Constitution.[2]

---

[2] Defendants ask the Court to find that the Ninth Circuit's decision in *Gantt* has been effectively overruled by a more recent Supreme Court decision (Doc. 20 at 49-50), but the Court concludes that it need not resolve this issue given the nature of the ruling below. The Court therefore treats *Gantt* as controlling law.

The Constitution grants Congress the power to control appointments of non-principal officers. U.S. Const. art. II, § 2, cl. 2 ("Congress may by Law vest the Appointment of such inferior Officers . . . in the President alone, in the Courts of Law, or in the Heads of Departments."). Congress has provided (even though the Constitution does not) that U.S. Attorneys must be nominated by the President and confirmed by the Senate. 28 U.S.C. § 541(a). It also has enacted several statutes that bear on the question of how a vacant U.S. Attorney position is filled temporarily until a new U.S. Attorney completes the nomination and confirmation process. Defendants' motions involve three sets of statutes: (1) the Federal Vacancies Reform Act of 1998, 5 U.S.C. §§ 3345-3349 ("FVRA"), (2) 28 U.S.C. § 546, which is a separate statute that addresses appointments of interim U.S. Attorneys, and (3) 28 U.S.C. §§ 509, 510, and 515, which are general delegation statutes that authorize the Attorney General to share her power with lower level attorneys. The Court begins by describing these statutes.

### A. The FVRA.

The FVRA is a general statutory scheme passed by Congress to regulate the temporary filling of vacant Executive Branch positions that require presidential appointment and Senate confirmation (commonly called "PAS" positions). The FVRA provides that if a PAS officer dies, resigns, or otherwise is unable to perform the functions of the office, "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity." 5 U.S.C. § 3345(a)(1). The Supreme Court has called subsection (a)(1) a "default rule" that requires no action by the President or Congress. *See N.L.R.B. v. SW Gen.*, 580 U.S. 288, 293 (2017). The "mandatory language of subsection (a)(1)" fills the vacancy "automatically" with the first assistant. *Id.* at 304-05.

The FVRA creates two additional methods for filling the vacancy. They are restricted to personal action by the President and are carefully confined. First, "the President (and only the President)" may temporarily fill the vacant position with an officer who has already been appointed by the President and confirmed by the Senate to another

4

PAS position.  5 U.S.C. § 3345(a)(2).  Second, "the President (and only the President)" may fill the position with an employee of the agency where the vacancy exists, provided the employee served in a senior position for at least 90 days during the year preceding the vacancy.  *Id.* § 3345(a)(3).[3]

A person who temporarily fills a PAS position under one of these FVRA provisions is referred to as an "[a]cting officer."  *Id.* § 3345.  To encourage the President to propose permanent nominees to the Senate and not merely rely on acting officers, the FVRA limits the duration of these temporary appointments.  An acting officer may serve for 210-days "beginning on the date the vacancy occurs."  *Id.* § 3346(a)(1).  If the vacancy exists during "the 60-day period beginning on a transitional inauguration day," the 210-day clock begins 90 days after the vacancy or inauguration day, whichever is later, effectively granting a 300-day term to the acting officer.  *Id.* § 3349a(b).  When the President nominates a person to fill the PAS position permanently, the acting officer can continue to serve during the pendency of the nomination.  *Id.* § 3346(a)(2).  If the nomination is "rejected . . . , withdrawn, or returned to the President" by the Senate, a new 210-day period is triggered.  *Id.* § 3346(b)(1).

**B.  28 U.S.C. § 546.**

In addition to the general vacancy-filling provisions of the FVRA, Congress has enacted a specific statute for temporarily filling U.S. Attorney vacancies.  Section 546 provides that the Attorney General can appoint a U.S. Attorney to serve until the earlier of a PAS appointment or the expiration of 120 days.  28 U.S.C. § 546(c)(1)-(2).  This was the basis for Ms. Chattah's initial appointment on March 28, 2025.  Docs. 29 at 8, 29-1 at 2.  If a permanent U.S. Attorney is not nominated and confirmed by the end of this 120-day period, § 546 provides that the judges of "the district court for such district may appoint a United States attorney to serve until the vacancy is filled."  28 U.S.C. § 546(d).  The

---

[3] The senior officer is identified as someone at a GS-15 level on the General Schedule, *id.* § 3345(a)(3)(B), which is the highest pay level for federal government employees.  *See General Schedule Overview*, U.S. Off. of Pers. Mgmt., https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/general-schedule/ (last visited Sept. 29, 2025).

5

Nevada judges did not have an opportunity to exercise this power because, on the 119th day of Ms. Chattah's term, the government purported to switch her appointment to the FVRA and its longer term of service. *See* Doc. 29 at 8.

The meaning of § 546 and its application in this case are not disputed. Everyone agrees the Attorney General had authority to appoint Ms. Chattah to her temporary position for 120 days. The Ninth Circuit has held, and the FVRA confirms, that § 546 and the FVRA are alternative methods from which the President can choose when filling a vacancy temporarily. *See Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 556 (9th Cir. 2016); 5 U.S.C. § 3347(a)(1). Defendants argue that the 120-time limit of § 546 should follow Ms. Chattah if the switch is permitted (Doc. 20 at 46), an issue the Court need not resolve given its ruling below.

**C.      General Delegation Statutes — 28 U.S.C. §§ 509, 510, and 515.**

Several statutory provisions grant the Attorney General power to delegate authority to U.S. Attorneys, Assistant U.S. Attorneys, and other lawyers working in the DOJ. Section 509 begins by providing that "[a]ll functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General," with a few exceptions not relevant here. 28 U.S.C. § 509. Section 510 then provides that "[t]he Attorney General may from time to time make such provisions as [she] considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General." *Id.* § 510. And § 515 provides that "[t]he Attorney General or any other officer of the Department of Justice, or any attorney specially appointed by the Attorney General under law, may, when specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal[.]" *Id.* § 515. If Ms. Chattah is not serving validly under the FVRA, the government contends she can continue supervising prosecutions in Nevada using authority delegated under these statutes. Doc. 29 at 18.

/ / /

/ / /

6

**D.     Issues to Be Resolved.**

The Court must decide several issues.  Is Ms. Chattah validly serving as Acting U.S. Attorney under § 3345(a)(1) of the FVRA?  If not, can Ms. Chattah nonetheless supervise criminal prosecutions in Nevada by using powers delegated to her under the general delegation statutes?  If Ms. Chattah is not serving validly under § 3345(a)(1) or the general delegation statutes, what remedies should Defendants receive?  Should their indictments be dismissed, with or without prejudice, or should Ms. Chattah be disqualified from supervising their criminal prosecutions?  The Court will address these issues in turn, along with other matters raised by the parties.

**III.     Ms. Chattah's Service Under the FVRA.**

The government contends that Ms. Chattah is validly serving as Acting U.S. Attorney because Attorney General Bondi designated her as first assistant on July 28, 2025, enabling her to become Acting U.S. Attorney under § 3345(a)(1) of the FVRA.  Doc. 29 at 11-12.  Defendants disagree, contending that subsection (a)(1) applies only to the first assistant in place when a vacancy in a PAS office initially arises – that it does not apply when, as in this case, a first assistant is designated months after the vacancy occurs.  Doc. 20 at 24-25.  To resolve this dispute, the Court begins with the text and structure of the statute.  *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999).

**A.     Text and Structure of the FVRA.**

The FVRA provision primarily at issue is found in 5 U.S.C. § 3345(a).  It specifies who may fill a PAS position temporarily.  There are three alternatives:

> If an officer of an Executive agency (including the Executive Office of the President, and other than the Government Accountability Office) whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office--
>
> (1) the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346;

7

(2) notwithstanding paragraph (1), the President (and only the President) may direct a person who serves in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate, to perform the functions and duties of the vacant office temporarily in an acting capacity subject to the time limitations of section 3346; or

(3) notwithstanding paragraph (1), the President (and only the President) may direct an officer or employee of such Executive agency to perform the functions and duties of the vacant office temporarily in an acting capacity, subject to the time limitations of section 3346, if--

(A) during the 365-day period preceding the date of death, resignation, or beginning of inability to serve of the applicable officer, the officer or employee served in a position in such agency for not less than 90 days; and

(B) the rate of pay for the position described under subparagraph (A) is equal to or greater than the minimum rate of pay payable for a position at GS-15 of the General Schedule.

5 U.S.C. § 3345(a)(1)-(3).

The primary focus of this case is subsection (a)(1), which provides, upon a vacancy, that "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346." *Id.* § 3345(a)(1). Defendants contend that the vacancy in this case arose when Mr. Frierson resigned on January 17, 2025. The language of subsection (a)(1) then directed that the first assistant, Ms. Fahami, "shall perform the functions and duties of the office temporarily in an acting capacity." *See id.* Defendants contend that (a)(1) operates as a simple if-then proposition: if the U.S. Attorney position becomes vacant, then the first assistant performs the duties of office. No provision is made for later-appointed first assistants. Defendants rely on a recent district court decision which held that the subsection (a)(1) vacancy-filling mechanism promotes only incumbent first assistants. *See United States v. Giraud*, -- F. Supp. 3d --, 2025 WL 2416737 (D.N.J. Aug. 21, 2025). The court in *Giraud* found "no textual indication that the President has any choice in invoking the

8

first assistant provision, nor that it is meant to trigger at any time other than the moment that the vacancy occurs." *Id.* at \*14.

Defendants argue that the only statutory alternatives to automatic promotion by subsection (a)(1) are the narrowly drawn provisions Congress placed in subsections (a)(2) and (a)(3): "the President (and only the President)" may select someone who has already been nominated by the President and confirmed by the Senate to another PAS position (5 U.S.C. § 3345(a)(2)), or the President may select someone who recently served for at least 90 days in a high-level position in the agency where the vacancy exists (*id.* § 3345(a)(3)).[4] These categories are closely controlled by Congress. They are limited to "officials with both experience and seniority," and "the President must take personal responsibility for the designation." *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 28 (D.D.C. 2020) (footnote omitted).

Defendants argue that the strict requirements in subsections (a)(2) and (a)(3) would be largely unused if subsection (a)(1) permitted the Attorney General to designate anyone she chooses, regardless of qualification, to become first assistant and fill the vacancy under subsection (a)(1). The Court agrees. There would be no need to satisfy the rigorous requirements of subsections (a)(2) and (a)(3) if the easy path followed by the government in this case was available. And a fundamental rule of statutory construction holds that statutes should not be construed to render any provisions entirely or largely superfluous. *Duncan v. Walker*, 533 U.S. 167, 174 (2001).

The government responds that its broad reading of subsection (a)(1) would still leave room for the operation of subsections (a)(2) and (a)(3) in some situations, such as where both the agency position and the first assistant position require presidential nomination and Senate confirmation, and both are vacant. Doc. 29 at 14-15. In that case, a new first assistant could not simply be appointed by the Executive because Senate confirmation would be required. Subsections (a)(2) and (a)(3) would be the only

---

[4] The statute specifies that the person in this second category must have served for at least 90 of the 365 days preceding the vacancy. *Id.* § 3345(a)(3)(A).

9

alternatives available for temporarily filling the vacancy. The government provides no indication of how often this hypothetical scenario might arise, but it seems likely to be rare. The Court should avoid a construction that makes subsections (a)(2) and (a)(3) largely insignificant. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (rejecting an interpretation that would result in the text of a statute lying "dormant in all but the most unlikely situations"); *Duncan*, 533 U.S. at 174 ("[N]o clause, sentence, or word shall be superfluous, void, or insignificant[.]" (quoting *Market Co. v. Hoffman*, 101 U.S. 112, 115 (1879))).[5]

Other courts have reached the same conclusion. After considering the "high bar" established by subsections (a)(2) and (a)(3) for presidential appointment of acting officials, the court in *Giraud* observed that "if the President may simply name anyone as the first assistant at any time and thereby vest them with acting powers, [the subsection (a)(2) and (a)(3)] limitations on acting service are rendered entirely irrelevant." 2025 WL 2416737, at *15. The President would be "free to select someone from outside the Government, with no experience in the relevant agency, and immediately imbue them with the functions and duties of a PAS office." *Id.*; *see also L.M.-M.*, 442 F. Supp. 3d at 28-29 (describing § 3345(a)'s three methods of appointing acting officers and reasoning that allowing agency heads to create new post-vacancy officers and designate them as first assistants to assume acting status "would decimate this carefully crafted framework").

Defendants' construction of the FVRA is further supported by the statute's language and structure. Subsection (a)(1) is best understood as a congressional directive that fills the PAS office automatically as soon as the vacancy occurs. It provides no room for Executive Branch involvement. It declares that the first assistant "shall perform" the functions and duties of the PAS office. 5 U.S.C. § 3345(a)(1). Reading the subsection as the government suggests would eliminate this congressional mandate, defeat the strict

---

[5] The same is true for the government's argument that subsections (a)(2) and (a)(3) would remain relevant because presidents might simply choose to use them for temporary appointments. Why would a president choose those restrained routes if easy appointment was available under the government's broad reading of subsection (a)(1)? Again, subsections (a)(2) and (a)(3) would be left largely dormant.

10

standards for Executive Branch appointments under alternative subsections (a)(2) and (a)(3), and render those subsections meaningless in all but the most unlikely situations.

The government argues that the language of subsection (a)(1) is present-tense, meaning that it can operate at any time during a vacancy, and that a vacancy clearly existed when Ms. Chattah became first assistant.[6]  "Accordingly," the government argues, "whoever is the first assistant to a vacant office, at any time during the period of the vacancy, automatically becomes the acting officer."  Doc. 29 at 13.

The Court is not persuaded.  Subsection (a)(1) is indeed written in the present tense, but it can be read differently than the government suggests.  It provides that "[i]f an officer . . . dies, resigns, or is otherwise unable to perform" the duties of a PAS office, "the first assistant . . . shall perform" those duties.  5 U.S.C. § 3345(a)(1).  Which first assistant?  "[T]he first assistant" when the officer dies, resigns, or is unable to perform.  *Id.*  The statute does not say "a first assistant shall perform."  The present tense does more to support Defendants' reading than the government's.

The government also points to § 3345(a)(3)(A), noting that it contains backward-looking language (the person chosen by the President must have been a senior officer in the U.S. Attorney's office for at least 90 of the 365 days that preceded the vacancy) that is not found in subsection (a)(1).  The government identifies similar rearview language in § 3345(b)(1)(A).  Doc. 29 at 14.  The government argues that "where Congress includes particular language in one section of a statute but omits it in another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Id.* at 13 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)) (citation modified).  By imposing no timing requirement in subsection (a)(1), the government contends, Congress indicated that a first assistant may qualify at any time during the vacancy.

---

[6] The vacancy existed, of course, only because Ms. Chattah had resigned from her position under § 546 moments earlier so she could step right back into the position as the newly designated first assistant.  That is not the type of vacancy described in subsection (a)(1), which applies only to departure of a PAS officer.

11

This argument would carry some weight if subsection (a)(1) was not a different kind of mechanism than subsections (a)(2) and (a)(3). Subsection (a)(1) is a command by Congress – the first assistant "shall perform" the functions of the PAS office. 5 U.S.C. § 3345(a)(1). It is automatic. The Executive plays no role in its operation. *See N.L.R.B.*, 580 U.S. at 304-05 (explaining the FVRA contains "mandatory language" for "first assistants who automatically assume acting duties under (a)(1)"). Subsections (a)(2) and (a)(3), by contrast, are not automatic. They are narrowly-cabined presidential appointment provisions. Their backward-looking language is included to limit the President's choices to "officials with both experience and seniority." *L.M.-M.*, 442 F. Supp. 3d at 28. Viewed from this perspective, the presence of backward-looking language in subsections (a)(2) and (a)(3) actually supports Defendants' reading of the FVRA. Subsection (a)(1) is not limited like (a)(2) and (a)(3) precisely because the President plays no role in its operation.

The government also argues that the prohibition in § 3345(b)(1)(A) expressly contemplates that a first assistant may serve as an acting official even if, like Ms. Chattah, she did not serve as first assistant before the vacancy. Doc. 29 at 14. Subsection (b)(1) reads:

> Notwithstanding subsection (a)(1), a person may not serve as an acting officer for an office under this section, if--
>
> (A) during the 365-day period preceding the date of the death, resignation, or beginning of inability to serve, such person--
>
> (i) did not serve in the position of first assistant to the office of such officer; or
>
> (ii) served in the position of first assistant to the office of such officer for less than 90 days; and
>
> (B) the President submits a nomination of such person to the Senate for appointment to such office."

5 U.S.C. § 3345(b)(1).

The government's argument can be stated in these terms: Subsection (b)(1) provides that a presidential nominee cannot serve as an acting officer if that person was not

12

a first assistant or was a first assistant for less than 90 days in the year preceding the vacancy. Why would Congress begin subsection (b)(1) with the words "Notwithstanding subsection (a)(1)" unless (a)(1) provided for something different – namely, that a person *could* serve as an acting officer even if that person had not previously been a first assistant, like Ms. Chattah?

Stated differently, the government argues that § 3345(b)(1) implies that subsection (a)(1) can include later-appointed first assistants. But the Supreme Court has cautioned that statutory implications must be viewed in context, *N.L.R.B.*, 580 U.S. at 302 (citation omitted), and the context of subsection (b)(1) does not support the government's reading, for several reasons.

First, although the word "notwithstanding" at the start of subsection (b)(1) expressly distinguishes it from (a)(1), there can be more than one reason Congress included this distinction. One possibility is the government's argument – that subsection (b)(1) imposes a condition of prior service that (a)(1) does not. Another possible reason is more general – that Congress wanted to make clear that subsection (a)(1)'s mandatory and automatic promotion of first assistants to acting officers does not control when the first assistant is also the President's nominee for the permanent position.

Second, the government's reading would mean that an Acting U.S. Attorney position could be filled by anyone the Attorney General chooses, at any time during the vacancy. This reading would give the Executive Branch a role in filling subsection (a)(1) positions that the language and structure of § 3345(a) do not. And, again, it would render subsections (a)(2) and (a)(3) largely superfluous.

Third, subsection (b)(1) is not an affirmative statement of who can fill vacancies. The affirmative provisions are found in subsection (a). Subsection (b)(1) imposes limitations on presidential nominees for the permanent office. It describes which nominees "may not serve as an acting officer." 5 U.S.C. § 3345(b)(1). Given its location in a subsection other than (a) and the fact that it is a statement of limitation on a specific class

13

of persons, the Court does not find it a persuasive basis for broadening the scope of subsection (a)(1).

The government next argues that specific words in subsection (a)(1) support its view. It notes that the subsection refers to "the first assistant to the office of such officer," not "the first assistant of such officer." Doc. 29 at 13 (quoting 5 U.S.C. § 3345(a)(1)). This shows, according to the government, that subsection (a)(1) is not limited to the person who was serving as first assistant to the departed PAS officer, but includes anyone who serves as first assistant to "the office," even if later appointed. *Id.* As Defendants note, however, this language can be read just as readily to ensure that the "assistant" covered by subsection (a)(1) is the first assistant to the office and not a personal assistant to the departed officer – an important distinction. Furthermore, this small variation in wording does not change the fact that subsection (a)(1) is an automatic mechanism established by Congress to fill the vacancy with no Executive Branch involvement, or the fact that when Congress did choose to give the President a role in filling vacancies under § 3345(a), it carefully limited and controlled his choices in subsections (a)(2) and (a)(3). Nor can this wording choice be reasonably viewed as evidence that Congress intended to grant the Attorney General broad power to choose whomever she wants whenever she wants. The other district court that has addressed this argument has also rejected it. *See Giraud*, 2025 WL 2416737, at *16 (relying in part on the legislative history of the FVRA).

Finally, the government supports its reading of the FVRA by citing Executive Branch opinions from the General Accounting Office ("GAO") and the DOJ Office of Legal Counsel ("OLC"), both of which opine that Acting U.S. Attorneys under subsection (a)(1) need not have been first assistants when the vacancy arose. Doc. 29 at 14. The Ninth Circuit has explained, however, that because neither the GAO nor OLC "is charged with administering the FVRA, . . . we give no deference" to them. *Hooks*, 816 F.3d at 564. And as Defendants note, the GAO and OLC have answered this question differently at different times, sometimes concluding that only incumbent first assistants may become the acting officer under subsection (a)(1). *Compare* 23 Op. O.L.C. 60, 64 (1999) (adopting

14

Defendants' interpretation), *with* 25 Op. O.L.C. 177, 179-80 (2001) (adopting the government's interpretation). Such inconsistency undermines the persuasiveness of agency opinions. *See Kisor v. Wilkie*, 588 U.S. 558, 579 (2019) (explaining that deference is "rarely" appropriate when an agency's current construction conflicts with a prior one). And in any event, the Supreme Court has recently emphasized that courts need not defer to agency interpretations of statutes. *Loper Bright Enters., Inc. v. Raimondo*, 603 U.S. 369 (2024).

There is another reason to conclude that subsection (a)(1) is meant to work only at the start of a vacancy. Congress passed the FVRA while "[p]erceiving a threat to the Senate's advice and consent power" from years of Executive Branch disregard of the predecessor statute. *N.L.R.B.*, 580 U.S. at 295 (citation omitted). The FVRA was "a reclamation of the Congress's Appointments Clause power." *SW Gen., Inc. v. N.L.R.B.*, 796 F.3d 67, 70 (D.C. Cir. 2015), *aff'd*, 580 U.S. 288 (2017) (citations omitted). "Congress was concerned, most notably, that the Attorney General and other department heads had made frequent use of organic vesting and delegation statutes to assign the duties of PAS offices to officers and employees, with little or no check from Congress." *L.M.-M.*, 442 F. Supp. 3d at 29 (citation omitted).

By choosing to make subsection (a)(1) an automatic default mechanism for filling vacancies temporarily, Congress exerted its constitutional power to specify how non-principal officers in the Executive Branch could be appointed. And by placing significant restrictions on the President's power to fill those vacancies under subsections (a)(2) and (a)(3), Congress largely controlled who could be appointed.

To reinforce its choices, Congress made the FVRA "the exclusive means for temporarily authorizing an acting official to perform the functions and duties" of a PAS office, unless Congress itself has created another agency-specific statute. 5 U.S.C. § 3347(a). The FVRA also makes clear that general delegation powers cannot be used to fill vacancies. *Id.* § 3347(b). And it provides that the acts of persons serving in violation of the FVRA are void. *Id.* § 3348(d).

15

In short, the FVRA is a carefully crafted assertion of Congress's power under Article II, section 2, clause 2 of the Constitution.  Its purpose would be defeated if the Executive Branch – the very branch Congress was trying to constrain – could choose whomever it wanted, whenever it wanted, and fill the vacancy simply by declaring that person to be first assistant.  The better reading of the text is that subsection (a)(1) operates only on first assistants in place when vacancies begin.  Only then does the statute realize Congress's purpose and avoid superfluous provisions.

Other cases reach the same conclusion.  *See, e.g.*, *Giraud*, 2025 WL 2416737, at *14 ("This statutory framework convincingly indicates that a 'first assistant' who may take office in an 'acting capacity' must be the first assistant at the time the vacancy occurs." (footnote omitted)); *L.M.-M.*, 442 F. Supp. 3d at 28-29 ("Defendants' reading of the FVRA would decimate this carefully crafted framework.  The President would be relieved of responsibility and accountability for selecting acting officials, and the universe of those eligible to serve in an acting capacity would be vastly expanded. . . . One is left to wonder, if Congress had intended – or even imagined – such a result, why would it have gone to the trouble of requiring that 'the President (and only the President)' act in order to overcome the default rule and why would it have limited the pool of potential presidential designees to PAS officials and senior officials who had served in the agency at issue for at least 90 days in the year before the vacancy arose?").

The Court recognizes, of course, that Congress did not explicitly say that the first assistant addressed in subsection (a)(1) must be serving when the vacancy arises.  Because the statute does not include such an unmistakable command, the Court will look to the FVRA's legislative history to confirm its interpretation.  *See Nat'l TPS All. v. Noem*, --- F.4th ----, 2025 WL 2487771, at *9-10 (9th Cir. Aug. 29, 2025) ("The legislative history of the TPS statute confirms our understanding that Congress intended to constrain the authority of the Executive, not to render all aspects of the TPS program unreviewable." (citation omitted)); *Murphy Co. v. Biden*, 65 F.4th 1122, 1135 (9th Cir. 2023) ("The O & C Act's legislative history confirms our reading of the statute's plain language.").

16

## B. FVRA's Legislative History.

Issues addressed by the FVRA are not new. "Since President Washington's first term, Congress has given the President limited authority to appoint acting officials to temporarily perform the functions of a vacant PAS office without first obtaining Senate approval." *N.L.R.B.*, 580 U.S. at 294. "The earliest statutes authorized the appointment of 'any person or persons' to fill specific vacancies in the Departments of State, Treasury, and War." *Id.* Congress initially allowed acting officers to serve until a successor was appointed, but soon began imposing time limits to reinforce the Senate's advice and consent powers. *Id.* (citation omitted).

As part of this ongoing effort, Congress passed the Vacancy Act in 1868. The Act expanded the number of covered agencies and imposed new constraints on how the Executive could fill PAS vacancies. "The authority to appoint 'any person or persons' as an acting officer gave way to a default rule that the 'first or sole assistant . . . shall' perform that function[.]" *Id.*

Today's version of the law arose from tensions between the Legislative and Executive Branches in the 1970s, 80s, and 90s. The DOJ took the position that heads of Executive agencies could temporarily fill vacant offices without following the Vacancies Act. Indeed, "[b]y 1998, approximately 20 percent of PAS offices in Executive agencies were occupied by 'temporary designees,'" most of whom were serving beyond the time limits imposed by Congress. *Id.* at 295 (citation omitted).

Congress responded by "replac[ing] the Vacancies Act with the FVRA." *Id.* It was a two-step process. First, on July 15, 1998, the Senate Governmental Affairs Committee reported out S. 2176, titled the "Federal Vacancies Reform Act." *See* Morton Rosenberg, Congressional Research Service Report for Congress, The New Vacancies Act: Congress Acts to Protect the Senate's Confirmation Prerogative 1-4 (1998) ("Rosenberg"). A Senate Report described the provisions and intent of the proposed law. *See* S. Rep. No. 105-250 (1998). When the Senate bill failed to survive a cloture vote, Congress moved to the second step of the FVRA's creation. "[A] period of intense negotiations between the Senate

17

sponsors and Administration officials followed and an agreement on a compromise measure was reached and included in the FY 1999 Omnibus Consolidated and Emergency Supplemental Appropriations Act." Rosenberg at 9.

The Court has consulted both the Congressional Research Service Report on the final enactment, by Rosenberg, and, where the final version of the FVRA does not differ significantly from S. 2176, the Senate Report on the legislation. Other cases rely on these same sources. *See, e.g.*, *N.L.R.B.*, 580 U.S. at 295 (citing Rosenberg), 325 (Sotomayor, J., dissenting) (citing S. Rep. No. 105-250); *Hooks*, 816 F.3d at 556 (citing S. Rep. No. 105-250); *SW Gen., Inc.*, 796 F.3d at 70 (citing Rosenberg and S. Rep. No. 105-250); *Giraud*, 2025 WL 2416737, at *17 nn.178-79 (citing S. Rep. No. 105-250).

The Senate version of § 3345(a)(1) provided for the automatic assumption of the vacant PAS office's duties by the first assistant. S. Rep. No. 105-250, at 19. It also included what is now subsection (a)(2), allowing "the President (and only the President)" to fill the vacancy temporarily with a confirmed PAS officer. *Id.* Subsection (a)(3), which allows the President to appoint a senior official in the agency, was added during the negotiations that led to the FVRA's enactment. *See* Rosenberg at 8. But it had actually been recommended in the Senate Report. *See* S. Rep. No. 105-250, at 31 (suggesting "a third category of individuals to temporarily fill positions, such as a qualified individuals who have worked within the agency in which the vacancy occurs for a minimum number of days and who are of a minimum grade level").

The intent and structure of the Senate bill was adopted in the final legislation: automatic elevation of the first assistant when the vacancy arose, presidential power to make alternative appointments under carefully limited criteria, and a statute that was the exclusive means for filling vacancies in PAS offices unless another statute specifically provided otherwise. *See id.* at 11-12.

The Senate Report includes this explanation for § 3345:

> When a vacancy arises, the bill provides *an exclusive set of procedures that may be followed. If the vacant officer has a first assistant, the first assistant performs the functions and duties of the office temporarily*

18

*in an acting capacity, subject to the time limitations of section 3346. . . .* The Vacancies Act provides for the *automatic performance* of the functions and duties of the vacant office by the first assistant because such person is often a career official with knowledge of the office or a Senate-confirmed individual[.]

*Id.* at 12 (emphasis added).  This explanation confirms not only that the § 3345 procedures were intended to be exclusive and that the existing first assistant was to become the acting official, but why – because the first assistant would have knowledge of the agency's functioning.  None of these objectives would be realized if the Attorney General could designate a person who has no experience with the agency to be the acting officer.  The Senate Report further confirms the mandatory and automatic nature of subsection (a)(1), saying that "if a first assistant exists, the President need not take any action for an acting official to serve." *Id.*  But if the President does decide to make the appointment, the FVRA grants him only "limited flexibility" as we have seen in the criteria of subsections (a)(2) and (a)(3).  *Id.* at 13.

The Senate also understood that the automatic designation of an acting official in subsection (a)(1) would apply to the first assistant in place when the vacancy arose:

An acting officer may die or resign.  In that event, the first assistant, if there is one, or a new presidential designee of a Senate-confirmed officer may become the acting officer, limited in service [to a specific period of time].  *No one else may serve as acting officer.  Once again, that means that if there is no first assistant, and no presidential designation, no one may serve as acting officer.*

*Id.* at 14 (emphasis added). While this statement does not include the subsection (a)(3) appointment provision adopted in the final FVRA, it underscores that if there is no first assistant when the vacancy arises, and if the President does not exercise his narrowly controlled power to appoint, then "[n]o one else may serve as acting officer." *Id.*  The Senate Report repeats this conclusion:  "If there is no first assistant, no one is permitted by law to become an acting officer until the President designates a Senate-confirmed individual to be the acting officer," or, after the final amendment, designates a senior

19

officer from the agency as allowed in subsection (a)(3). *Id.* at 13. The procedure used by the government to appoint Ms. Chattah was never intended by Congress.

The Congressional Research Service Report for the final legislation confirms this intent. It explains that the FVRA was enacted in response to the Executive Branch's repeated disregard of previous vacancy statutes. *See* Rosenberg at 3. It confirms that "the President's choices of action are strictly confined" under the statute. *Id.* at 1. And it directly rejects the DOJ position (asserted in this case and discussed more fully below) that vacancies could be filled through general delegation statutes: "The new Vacancies Act rejects the DOJ position on temporary appointments and makes it clear that the Act is the exclusive vehicle for temporarily filling vacant advice and consent positions unless Congress expressly provides otherwise." *Id.*

Thus, in response to the Executive Branch's repeated disregard of previous vacancy statutes, Congress took matters into its own hands, providing an automatic procedure for first assistants to become acting officers and giving only limited alternatives to the President. The Court cannot accept the government's assertion that the Attorney General has power to designate anyone she chooses as first assistant and have that person become the acting U.S. Attorney under § 3345(a)(1). The FVRA was enacted to put an end to precisely such Executive actions.

**IV.    The Government's General Delegation Argument.**

If Ms. Chattah is not validly serving under the FVRA, the government nonetheless argues she is authorized to supervise criminal prosecutions in Nevada. Doc. 29 at 18. This is because §§ 509, 510, and 515 empower the Attorney General to delegate power to prosecute federal crimes and supervise Assistant U.S. Attorneys in the discharge of their duties. The government contends the Attorney General delegated such power to Ms. Chattah on July 28, 2025.

This argument runs headlong into the exclusivity provisions of the FVRA. Section 3347(a) states that the FVRA is "the exclusive means for temporarily authorizing an acting official to perform the functions and duties" of a PAS office. 5 U.S.C. § 3347(a).

20

Subsection (a)(1) includes an exception to this exclusivity for "a statutory provision [that] expressly . . . authorizes the President, a court, or the head of an Executive department, to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." *Id.* § 3347(a)(1)(A).[7] Stated differently, the FVRA does not eclipse other statutes that create express methods for filling PAS offices temporarily, like § 546 in this case. *See* 28 U.S.C. § 546.

But this exception to the FVRA's exclusivity does not include general delegation statutes like those relied on by the government. Section 3347(b) makes this clear: "Any statutory provision providing general authority to the head of an Executive agency . . . to delegate duties statutorily vested in that agency head to . . . officers or employees of such Executive agency, is not a statutory provision to which subsection (a)(1) applies" – in other words, it does not fall within the exception to FVRA exclusivity. 5 U.S.C. § 3347(b). As a result, the DOJ cannot rely on §§ 509, 510, and 515 to temporarily fill the vacant U.S. Attorney position in Nevada.

The government argues that this language in § 3347(b) has a much narrower meaning. Doc. 29 at 19-21. It contends that § 3347(b) applies only to nondelegable authority and has no effect on general powers that can be delegated by the Attorney General. The government relies on three cases: *Gonzales & Gonzales Bonds & Ins. Agency Inc. v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064 (9th Cir. 2024); *Kajmowicz v. Whitaker*, 42 F.4th 138 (3d Cir. 2022); and *Arthrex, Inc. v. Smith & Nephew, Inc.*, 35 F.4th 1328 (Fed. Cir. 2022).

The most relevant of these decisions, of course, is the Ninth Circuit's ruling in *Gonzales*. It addressed the "ratification bar" found in § 3348(d)(2) of the FVRA. That provision states that the actions of a person serving improperly under § 3345 not only lack any force or effect, but also cannot be ratified later by a properly appointed officer. 5 U.S.C. § 3348(d)(1)-(2). *Gonzalez* held that this ratification bar is limited to exercises of

_____

[7] The exception includes other narrow categories that are not relevant here. *See* § 3347(a)(1)(B)-(a)(2).

21

nondelegable duties. 107 F.4th at 1067-68. It based this conclusion on the language of § 3348 – the section that includes the ratification bar – which defines "function or duty" to mean something that must be performed "by the applicable officer (and only that officer)." § 3348(a)(2)(A)(ii). *Gonzales* concluded that the phrase "and only that officer" refers to functions and duties that are nondelegable – that can be performed only by the officer in question. 107 F.4th at 1073-77.

Significantly, however, the nondelegability definition relied on by *Gonzales* is limited to § 3348. It reads: "*In this section*-- . . . the term 'function or duty' means any function or duty of the applicable office that . . . is required by statute to be performed by the applicable officer (and only that officer)." 5 U.S.C. § 3348(a)(2)(A)(ii) (emphasis added). The words "In this section" clearly limit § 3348(a)(2)(A)(ii)'s nondelegability definition to § 3348. The provision at issue here, § 3347(b), which prohibits reliance on general delegation statutes, is not found in § 3348.

The Supreme Court has confirmed that Congress was careful in its word selection in the FVRA. *See N.L.R.B.*, 580 U.S. at 300 ("When Congress wanted to refer only to a particular subsection or paragraph, it said so. *See, e.g.*, § 3346(a)(2) ('subsection (b)'); § 3346(b)(2) ('paragraph (1)'). But in (b)(1) Congress referred to the entire section – § 3345 – which subsumes all of the ways a person may become an acting officer."). The D.C. Circuit likewise has recognized that "the phrase 'this section' plainly refers to section 3345 in its entirety. Throughout the FVRA, the Congress was precise in its use of internal cross-references." *SW Gen.*, 796 F.3d at 74. The Court concludes that the words "[i]n this section" mean what they say – the nondelegability definition applies only in § 3348.

The government argues, nonetheless, that the narrow definition of "function or duty" found in § 3348 applies to all of the FVRA, including § 3347(d), and that the ban on using general delegation statutes therefore is limited to nondelegable duties. Because Ms. Chattah is not exercising nondelegable duties, the government argues, § 3347(b) does not apply. This argument is wrong for three reasons.

22

First, as already noted, the narrow definition of "function or duty" at issue in *Gonzales* is limited to § 3348 and has no application to § 3347(b). The Ninth Circuit expressly recognized this in *Gonzales*:

> [I]nterpreting "function or duty" in § 3348 to include only nondelegable duties does not alter § 3347(b)'s dictate regarding general vesting-and-delegation statutes. . . . That a department head cannot rely on a general vesting-and-delegation statute to designate the acting officer in the event of a vacancy, § 3347(b), answers a question wholly distinct from the consequences of violations of the FVRA under § 3348.

107 F.4th at 1078 (footnote omitted).[8]

Second, if we assume for a moment that § 3347(b) concerns only nondelegable powers, the subsection makes no sense. It applies to "[a]ny statutory provision providing general authority to the head of an Executive agency . . . to delegate duties statutorily vested in that agency head to . . . officers or employees of such Executive agency[.]" 5 U.S.C. § 3347(b). In other words, § 3347(b) concerns delegable duties – duties the agency head can delegate to subordinates. It would become meaningless, even nonsensical, if it were confined to nondelegable duties.

Third, even if § 3347(b) did not apply to the Attorney General's delegation powers in §§ 509, 510, and 515, the government's argument would fail. These general delegation provisions would still be subject to the FVRA's exclusivity. Section 3347(b) says only that the statutes it covers are not within the exception to exclusivity found in § 3347(a)(1). So, even if § 3347(b) did not apply to §§ 509, 510, and 515, those provisions would be

---

[8] The Third Circuit's decision in *Kajmowicz*, also cited by the government, is similar to *Gonzales*. It held that the ratification bar in § 3348 is limited to nondelegable duties, but said nothing about the meaning or scope of § 3347(b). *See Kajmowicz*, 42 F.4th at 138-56. The Federal Circuit's decision in *Arthrex*, on the other hand, concluded that every reference in the FVRA to "functions and duties" is limited to nondelegable duties as defined in § 3348. 35 F.4th at 1338. *Arthrex* candidly admitted that this reading "renders the FVRA's scope 'vanishingly small.'" *Id.* at 1337 (citation omitted). Significantly, however, *Arthrex* never even mentions the fact that the nondelegability definition on which it relies in § 3348(a) is expressly limited to "this section" – a significant omission in the opinion. The Court will follow the Ninth Circuit's correct conclusion that the limitation to nondelegable duties applies only in § 3348 and has no effect on § 3347(b) and its rejection of the government's reliance on general delegation statutes.

excepted from the FVRA's exclusivity only if they fall within the language of the exception – § 3347(a)(1). And yet that exception applies only to "a statutory provision [that] *expressly* . . . authorizes the President, a court, or the head of an Executive department, to designate an officer or employee to perform the functions and duties *of a specified office temporarily in an acting capacity*." § 3347(a)(1)(A) (emphasis added). Sections 509, 510, and 515 are not such statutes. They say nothing expressly about designating officers or employees to perform the functions and duties of a specified office temporarily. Therefore, even if § 3347(b) did not apply to them, these general delegation statutes would not fall within § 3347(a)(1)'s exception and would be foreclosed by the FVRA's exclusivity. They could not be used to appoint an Acting U.S. Attorney.

There is an even stronger reason the government's argument fails. The FVRA directly targeted the DOJ's reliance on §§ 509 and 510 to appoint temporary PAS officers. As *Gonzales* explains:

> § 3347(b) addresses a specific past practice of the executive branch. Until Congress enacted the FVRA, the Department of Justice maintained that its general "vesting-and-delegation authority . . . permit[ted] the Attorney General to reassign the duties of such Senate-confirmed positions to other officials of the Department, outside the limits of the Vacancies Act." The general delegation exclusion in § 3347(b) addresses this specific problem of agencies evading the requirements for designating acting officers.

107 F.4th at 1078 n.7.

> The legislative history of the FVRA is even clearer:

> The bill provides that any statutory provision providing general authority to the head of an executive agency to delegate or reassign duties within that executive agency is not a statutory provision that qualifies within the exception contained in section 3347(a)(2) for existing statutes that provide for the filling of a vacancy in a specific office. *This provision forecloses the argument raised by the Justice Department that sections 28 U.S.C. §§ 509 and 510, rather than the Vacancies Act, apply to vacancies in that department.*

S. Rep. No. 105-250, at 17 (emphasis added).

24

The Congressional Research Service Report makes the same point: "DOJ asserts that it has such authority under Section 509 of title 28 . . . and under Section 510[.]" Rosenberg at 3. "Section 3347(b) expressly negates the DOJ position[.]" *Id.* at 11. In other words, the argument now made by the government was expressly rejected by Congress in 1998.

One other point should be addressed. The government asserted at oral argument that it is not relying on the delegation statutes to make Ms. Chattah the Acting U.S. Attorney. Rather, the government appeared to argue that Ms. Chattah is only exercising *some* delegated powers and is not functioning as a full Acting U.S. Attorney. But when asked by the Court to identify a single power possessed by a U.S. Attorney that Ms. Chattah is not exercising, the government could name none. The U.S. Attorney's powers listed in 28 U.S.C. § 547 were reviewed, and it was evident that Ms. Chattah is exercising all of them. Indeed, the appointment document signed by Attorney General Bondi on July 28, 2025, specifically states that "Ms. Chattah will have authority to serve as Acting United States Attorney[.]" Doc. 29-3 at 2. And the government's brief states she is "fully authorized, by delegation, to supervise criminal prosecutions in Nevada." Doc. 29 at 18. The Court cannot conclude that Ms. Chattah's role is anything less than Acting U.S. Attorney, a position she cannot hold under § 3345(a) and cannot perform by delegated powers.[9]

Some may ask what happens if Ms. Chattah cannot serve under the FVRA. There are several possibilities. The President (and only the President) could appoint a temporary Acting U.S. Attorney who satisfies the strict requirements of § 3345(a)(2) or (a)(3). The judges of the District of Nevada could choose to exercise their power under 28 U.S.C. § 546(d) and appoint an Acting U.S. Attorney until the position is filled. Or the President could nominate a U.S. Attorney and seek quick confirmation by the Senate. But the text

---

[9] Having reached this conclusion, the Court need not address Defendants' argument that Ms. Chattah's term of service under the FVRA is limited to the 120 days allowed by § 546, nor Defendants' arguments that U.S. Attorneys and Acting U.S. Attorneys who serve for lengthy periods are subject to the Appointments Clause.

25

and history of the FVRA make clear what cannot happen: the Attorney General cannot designate Ms. Chattah as first assistant and thereby make her Acting U.S. Attorney.

## V.      Remedy.

### A.      Dismissal of the Indictment.

Defendants seek dismissal of their indictments because: (1) Ms. Chattah lacked authority to approve filing of the indictments, (2) invalid indictments implicate Defendants' constitutional right to procedural due process, and (3) the Court has inherent supervisory authority to dismiss indictments based on government misconduct.  Doc. 20 at 52-54.

### 1.      Ms. Chattah's Lack of Authority.

Defendants assert that U.S. Attorneys decide whether to authorize prosecutions within their districts.  *Id.* at 53 (citing 28 U.S.C. § 547; U.S. Dep't of Just., Just. Manual § 9-2.001).  Defendants contend that because Ms. Chattah had no power to authorize the indictments, they are invalid and must be dismissed.  *Id.*  In support, Defendants cite *United States v. Trump*, 740 F. Supp. 3d 1245, 1302-04 (S.D. Fla. 2024).  *Id.*

In *Trump*, the Attorney General appointed attorney Jack Smith to serve as Special Counsel for the DOJ.  740 F. Supp. 3d at 1255.  A grand jury issued an indictment, signed by the Special Counsel, charging former President Donald Trump with criminal offenses.  *Id.* at 1254.  Mr. Trump moved to dismiss the indictment based on the allegedly unlawful appointment and funding of the Special Counsel.  *Id.*  After finding that the Special Counsel's appointment violated the Appointments Clause, the district court concluded that dismissal of the indictment was required due to Special Counsel Smith's *ultra vires* exercise of prosecutorial power.  *Id.* at 1302-04.  The district court explained:

> Here, as in *Lucia*, the appropriate remedy is invalidation of the officer's *ultra vires* acts.  Since November 2022, Special Counsel Smith has been exercising power that he did not lawfully possess.  All actions that flowed from his defective appointment – including his seeking of the Superseding Indictment on which this proceeding currently hinges – were unlawful exercises of executive power.  Because Special Counsel Smith cannot wield executive power except as Article II provides, his attempts to do so are void and must

be unwound. Defendants advance this very argument: "any actions taken by Smith are *ultra vires* and the Superseding Indictment must be dismissed." And the Court sees no alternative course to cure the unconstitutional problem.

*Id.* at 1303 (citation modified).

The district court's decision in *Trump* is not controlling precedent, and the case is distinguishable for at least two reasons. First, unlike the indictments at issue here, which were signed by Assistant U.S. Attorneys, the indictment in *Trump* was signed only by Special Counsel Smith. *See id.* at 1254 (noting that the grand jury returned a superseding indictment signed by the Special Counsel); *see also Giraud*, 2025 WL 2196794, at *7 (distinguishing *Trump* for this reason). Second, the government in *Trump* "fail[ed] to propose any alternative form of relief or to respond on the substance of the remedial question." 740 F. Supp. 3d at 1302. Here, the government contends that Ms. Chattah was not involved in approving the challenged indictments, an assertion Defendants do not dispute, and that the Assistant U.S. Attorneys can continue to prosecute these cases pursuant to their authority delegated from the Attorney General. Doc. 29 at 23-24.

Defendants are correct that the U.S. Attorney has a duty to prosecute offenses against the United States within her district. *See* 28 U.S.C. § 547(1). But the power to prosecute is not exclusive to the U.S. Attorney. Assistant U.S. Attorneys also have the power to prosecute offenses against the United States, and their power derives not from the U.S. Attorney but from the Attorney General. *See* 28 U.S.C. § 542; *see also United States v. Hilario*, 218 F.3d 19, 22 (1st Cir. 2000) ("AUSAs are themselves representatives of the government. Because they are appointed directly by the Attorney General, *see* 28 U.S.C. § 542, their ability to act does not hinge on the authority of the local United States Attorney, but derives from the Attorney General's plenary power over litigation to which the United States is a party, *see id.* § 516.").

Defendants do not contend that the Assistant U.S. Attorneys who are handling their cases lack authority, nor do they challenge the validity of the indictments. Defendants do not dispute that they were charged by a properly constituted grand jury. *See Costello v.*

27

*United States*, 350 U.S. 359, 363 (1956) ("An indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charge on the merits."). Nor do Defendants identify defects in the indictments as ground for dismissal. *See* Fed. R. Crim. P. 12(b)(3)(b).

Under Federal Rule of Criminal Procedure 7, an indictment must contain "the essential facts constituting the offense charged and must be signed by an attorney for the government." Fed. R. Crim. P. 7(c)(1). An "attorney for the government" includes "an authorized assistant" of a U.S. Attorney or "any other attorney authorized by law to conduct proceedings under these rules as a prosecutor." Fed. R. Crim. P. 1(b)(1)(B), (D); *see also United States v. Tafoya*, 541 F. Supp. 2d 1181, 1184 (D.N.M. 2008).

Here, each indictment contains the essential facts constituting the offense charged. And each indictment is signed by an Assistant U.S. Attorney, not by Ms. Chattah. *See* Docs. 1 at 1-2 (Garcia), 1 at 1-4 (Salazar Del Real), 5 at 1-2 (Jackson), 17 at 1-2 (Enriquez); *see also United States v. Walls*, 577 F.2d 690, 696 (9th Cir. 1978) ("We hold . . . that the signature of the United States Attorney himself was not essential and that the signature of an Assistant United States Attorney was sufficient to indicate the necessary agreement [of the government] with the action taken by the grand jury.").[10]

What is more, the Ninth Circuit has made clear that an infirmity in a U.S. Attorney's appointment "would not affect the validity of indictments, . . . as indictments need only be signed by an 'attorney for the government.'" *Gantt*, 194 F.3d at 998 (citations omitted). Other courts agree. *See, e.g.*, *United States v. Baldwin*, 541 F. Supp. 2d 1184, 1214

_____

[10] Ms. Chattah's name appears on the signature block of each indictment with the title "Acting U.S. Attorney," but she did not sign the indictments, and the government asserts that she did not review or approve them because that task falls to the Criminal Chief or one of her deputies. Doc. 29 at 26 n.4 (offering to provide supporting documents for the Court's *in camera* review). The Court notes that "a defect in the government attorney's signature is 'nonjurisdictional' and subject to 'harmless error analysis.'" *Giraud*, 2025 WL 2416737, at *29 (citations omitted). The harmless error standard makes sense because "the grand jury 'is a constitutional fixture in its own right,' which 'belongs to no branch of the institutional Government.' Thus, to dismiss an indictment, a defendant generally must show that some kind of misconduct prejudiced him with regard to the grand jury proceeding." *Id.* (citations omitted).

(D.N.M. 2008) ("Assuming that the appointment of an interim U.S. Attorney, pursuant to § 546(d) violated the Constitution, indictments filed during the tenure of the appointee would still be valid if an authorized Assistant U.S. Attorney signed them.").

Defendants argue that the Ninth Circuit's statement in *Gantt*, that an invalid appointment does not render an indictment defective, is mere dicta. Docs. 20 at 54 n.45, 36 at 25-26. Even if true, the Court finds *Gantt*'s reasoning persuasive, as have courts in other jurisdictions. *See e.g.*, *Baldwin*, 541 F. Supp. 2d at 1214; *Tafoya*, 541 F. Supp. 2d at 1184; *United States v. Ruiz Rijo*, 87 F. Supp. 2d 69, 71-72 (D.P.R. 2000).

Defendants have not shown that Ms. Chattah's lack of authority to serve as Acting U.S. Attorney warrants dismissal of the indictments.[11]

### 2. Due Process.

Defendants contend that their constitutional rights to procedural due process are violated by the invalid indictments. Doc. 20 at 53-54. But Defendants have received all the process they are due – they have been charged by a properly constituted grand jury and their indictments have been signed by authorized attorneys for the government. *See Costello*, 350 U.S. at 363 (explaining that a facially valid "indictment returned by a legally constituted and unbiased grand jury . . . is enough to call for trial of the charge on the merits").

Nor have Defendants explained the connection between the appointment of Ms. Chattah and their due process rights to a fair trial. It is not enough merely to assert the U.S. Attorney is not validly appointed; Defendants must show that this fact somehow affects the fairness of the proceedings against them. They have not done so. *See United States v. Smith*, 962 F.3d 755, 765-66 (4th Cir. 2020) ("At bottom, Smith has cited no authority – nor could he – for his root-to-branch theory that as long as Whitaker's tenure as Acting Attorney General was unlawful, then the integrity of his federal prosecution in the Western District of North Carolina was *necessarily* marred. Rather, Smith must show that

---

[11] Because Defendants' request to dismiss the indictments is denied, the Court need not address their argument that any dismissal should be with prejudice. *See* Doc. 20 at 56.

Whitaker's tenure somehow affected his proceeding and prejudiced him in some way. Yet Smith can do no such thing." (citations omitted)). No procedural due process violation requires dismissal of the indictments.[12]

### 3. The Court's Supervisory Authority.

Defendants contend the Court should dismiss the indictments under its inherent supervisory authority to protect the integrity of the federal courts and deter future unlawful conduct. Docs. 20 at 54, 36 at 27. The sole case they cite is *United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020). *Id.* Dismissal was appropriate in *Bundy*, however, because government misconduct directly affected the fairness of the criminal prosecution. "[T]he government withheld key evidence favorable to the defense until after trial was underway – in clear violation of its duties under *Brady*[.]" *Bundy*, 968 F.3d at 1031. No such violation has occurred in these cases.

Additionally, *Bundy* made clear that a district court must "approach [the remedy of dismissal] with some caution and with a view toward balancing the interests involved," and must find there is "no lesser remedial action" available before dismissing an indictment. *Id.* (citations omitted). Here, a lesser remedy is available – disqualifying Ms. Chattah from participating in or supervising these prosecutions. The Court will not dismiss the indictments under its supervisory authority.[13]

---

[12] In their reply brief, Defendants assert that "the Due Process Clause should require the prosecution to be impartial and properly appointed." Doc. 36 at 26 (citing *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807, 809 n.21 (1987) (discussing the "requirement of a disinterested prosecutor"); *Erikson v. Pawnee Cnty. Bd. of Cnty. Comm'rs*, 263 F.3d 1151, 1154 (10th Cir. 2001) ("[T]he participation of a privately-retained attorney in a state criminal prosecution does not violate the defendant's right to due process under federal law unless the private attorney effectively controlled critical prosecutorial decisions.")). But Defendants present no evidence or legal authority suggesting that Ms. Chattah's improper appointment renders her partial, or that she has made any prosecutorial decisions in their cases. Nor have Defendants shown that Ms. Chattah has a financial interest in their prosecutions. *See* Doc. 36 at 26 (citing 18 U.S.C. § 208(a)) (prohibiting an Executive employee from "participat[ing] personally and substantially . . . in a judicial or other proceeding" in which such employee "has a financial interest").

[13] At oral argument, defense counsel identified certain risks from Ms. Chattah not validly serving as Acting U.S. Attorney – validity of the indictments, the judiciary's appointment power, and separation of powers. But none of these potential risks warrants dismissal of the indictments under the Court's supervisory authority if they have not affected the fairness of Defendants' prosecutions.

### B.    Ms. Chattah's Disqualification.

Defendants argue in the alternative that Ms. Chattah should be disqualified from participating in or supervising their cases. Doc. 20 at 56. The government does not address this argument other than opposing disqualification of the entire U.S. Attorney's Office for the District of Nevada. Doc. 29 at 7, 23-25.

Defendants do not seek complete disqualification, but instead request that the Court disqualify from their cases any attorney acting under Ms. Chattah's direction. Doc. 20 at 56. Disqualification of the entire U.S. Attorney's Office would not be proper. *See United States v. Williams*, 68 F.4th 564, 572 (9th Cir. 2023) ("We run an even greater risk of offending separation-of-powers principles when disqualifying an entire office of Executive branch attorneys. Such sweeping interference is seldom warranted. Indeed, every circuit court that has reviewed an officewide disqualification has reversed." (citations omitted)).

Given the Court's conclusion that Ms. Chattah is not validly serving as Acting U.S. Attorney, her involvement in these cases would be unlawful. *See Giraud*, 2025 WL 2196794, at *8-10. The Court will disqualify Ms. Chattah from participating in or supervising Defendants' prosecutions.[14]

### C.    Selection of an Interim U.S. Attorney.

Defendants request that the judges of the District of Nevada select an interim U.S. Attorney under 28 U.S.C. § 546(d). Doc. 20 at 57-58. This provision applies because 120 days have passed since the Attorney General appointed Ms. Chattah under § 546, and no U.S. Attorney has been nominated by the President and confirmed by the Senate under § 541. *See* 28 U.S.C. § 546(c). But the language of the statute is permissive: "the district court for such district *may* appoint a United States attorney to serve until the vacancy is

---

[14] The government contends that Defendants lack standing because other than supervising the response to the motions to dismiss, Ms. Chattah is not directing the litigation against Defendants. Doc. 29 at 26-27. But the government clearly argues that Ms. Chattah is validly serving as Acting U.S. Attorney and otherwise is authorized to supervise criminal prosecutions in the district. *Id.* at 11-23. Her purported supervision of the office includes supervision of the attorneys in the office. The Court concludes Defendants have standing to challenge Ms. Chattah's supervision of the very office that is prosecuting them.

31

filled." *Id.* § 546(d) (emphasis added). Whether to exercise this permissive power is a decision to be made by the Nevada judges.

**IT IS ORDERED:**

1. Defendants' motions are granted to the extent they seek disqualification of Ms. Chattah from supervising their criminal prosecutions. Ms. Chattah is disqualified from supervising these cases or any attorneys in the handling of these cases. The government attorneys handling these cases shall, within 7 days of this order, file statements in the docket that they are not being supervised by Ms. Chattah in their prosecution of these cases. They shall amend the filing if that changes at any time during the life of these cases.

2. Defendants' motions are denied to the extent they seek dismissal of their indictments.

3. These cases shall be reassigned to the District Judges in Nevada to whom they were originally assigned. The undersigned judge will remain available to handle similar motions filed in other Nevada cases, if warranted.

Dated this 30th day of September, 2025.

David G. Campbell
Senior United States District Judge

32

# Exhibit H

# Exhibit H

SUE FAHAMI
Executive Assistant
District of Nevada
Nevada Bar No. 5634
ADAM FLAKE
Appellate Division Chief and
Assistant United States Attorney
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
Adam.Flake@usdoj.gov
Attorneys for the United States

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:25-cr-00240-GMN-BNW |
| Plaintiff, | **GOVERNMENT'S MOTION FOR STAY PENDING APPEAL** |
| vs. | |
| DEVONTE DEVON JACKSON, | |
| Defendant. | |

**Certification: This motion is timely.**

On September 30, 2025, Judge David Campbell, sitting by designation in the District of Nevada, granted in part and denied in part Defendant Devonte Jackson's motion to dismiss. ECF No. 42. Specifically, the Court held: (1) Sigal Chattah is not validly serving as Acting U.S. Attorney for the District of Nevada, pursuant to the Federal Vacancies Reform Act of 1998 (FVRA), 5 U.S.C. § 3345 *et seq.*; (2) Ms. Chattah cannot participate in Jackson's prosecution pursuant to the Attorney General's delegation of prosecutorial and supervisory authority to Ms. Chattah in her capacity as Special Attorney and First Assistant U.S. Attorney for the District of Nevada; and (3) dismissal of the indictment and disqualification of the AUSAs prosecuting Jackson's case is not warranted. *Id.*

1

The government asks this Court to stay the order disqualifying Ms. Chattah from participating in Jackson's prosecution pending the resolution of any appellate proceedings[1] related to that order.[2] Such a stay would be consistent with the disposition of *United States v. Giraud*, 1:24-cr-768 (D.N.J.)—the only other district court decision to date involving these issues—in which the court stayed a similar disqualification order pending appeal. *See id.*, ECF No. 145. The government respectfully submits that the same result is appropriate here.

Courts consider four factors in deciding whether to grant a request for a stay pending appeal: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 425–26 (2009) (citation omitted); *see, e.g.*, *American Fed. of Gov't Employees, AFL-CIO v. Trump*, 148 F.4th 648, 654 (9th Cir. 2025) (same).

[1]    Pursuant to 28 C.F.R. § 0.20(b), the Solicitor General has authorized an appeal of this Court's decision.

[2]    The order is appealable under the collateral order doctrine, which permits appeal of a small class of interlocutory orders under § 1291 before a final judgment on the merits. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). Such orders must (1) conclusively determine the disputed question, (2) resolve an important issue that is completely separate from the merits of the dispute, and (3) be effectively unreviewable on appeal from a final judgment. *See United States v. Whittaker*, 268 F.3d 185, 191 (3d Cir. 2001).

In *United States v. Williams*, 68 F.4th 564 (9th Cir. 2023), the Ninth Circuit held that the disqualification of a U.S. Attorney's Office from litigating misconduct motions satisfied the collateral order doctrine. *Id.* at 570. Likewise, in *Whittaker*, the Third Circuit held that an order disqualifying a U.S. Attorney from participating in a prosecution is an immediately appealable collateral order. 268 F.3d at 191–93. Many other courts have reached a similar conclusion. *See United States v. Vlahos*, 33 F.3d 758, 761 (7th Cir. 1994); *In re Grand Jury Subpoena of Rochon*, 873 F.2d 170, 173 (7th Cir. 1989); *United States v. Caggiano*, 660 F.2d 184, 189-90 (6th Cir. 1981)); *United States v. Bolden*, 353 F.3d 870, 874–78 (10th Cir. 2003); *United States v. Under Seal*, 757 F.2d 600, 602 & n.1 (4th Cir. 1985). Accordingly, the government can appeal the order disqualifying Ms. Chattah.

The first two factors—likelihood of success and irreparable injury—are "the most critical" and "fall on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Mi Familia Vota v. Fontes*, 111 F.4th 976, 981 (9th Cir. 2024) (quotation marks omitted); *see Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020). The Ninth Circuit has recognized that to justify a stay, a moving party must show, at a minimum, that it has "substantial case on the merits" or that "serious legal questions are raised." *Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011).

The government stands by its position that (1) Ms. Chattah is validly serving as Acting U.S. Attorney under the FVRA, and (2) is authorized to supervise cases handled by the U.S. Attorney's Office pursuant to an express delegation of such authority by the Attorney General in any event. *See* ECF No. 36. The government respectfully disagree with the Court's decision to the contrary and submits that the government has a strong likelihood of success on appeal. At the very least, this case presents "serious legal questions" about the separation of powers, the scope of the FVRA, and the Attorney General's authority to delegate her authority to supervise criminal prosecutions on behalf of the United States.

As explained more fully in the government's opposition to Jackson's motion to dismiss, ECF No. 36, the plain text of 5 U.S.C. § 3345(a)(1) demonstrates that Ms. Chattah is validly serving as the Acting U.S. Attorney. The statute provides that "[i]f" an Executive Branch officer subject to Presidential appointment and Senate confirmation ("PAS") "dies, resigns, or *is* otherwise unable to perform" the functions of the office, then the first assistant "shall perform" those functions in an acting capacity. 5 U.S.C. § 3345(a)(1) (emphasis added). Ms. Chattah's appointment complies with the plain meaning of that provision: no PAS United States Attorney existed at the time Ms. Chattah was designated as First Assistant, nor has one existed at any time since, and thus Ms. Chattah "shall perform" the duties of the office of

United States Attorney on an acting basis (subject to statutory time limits) for as long as a PAS officer "is otherwise unable to perform" those functions. The FVRA does not limit acting service to only the individual (if any) who happened to be serving as the first assistant to the officer when the vacancy initially arose. Although the Court disagreed with those arguments, they present (at minimum) serious legal questions for appeal. Indeed, as explained more fully in the government's opposition, ECF No. 36 at 7–9, the Court's decision is at odds with the longstanding interpretation of the FVRA adopted by both the Government Accountability Office and the Office of Legal Counsel, and with decades of practice across the Executive Branch. Limiting subsection (a)(1) to require the first assistant to be an incumbent in order to serve as an acting PAS officer renders (a)(1) effectively unavailable during presidential transitions, when it is often most needed, as frequently both the PAS office and first assistant position are vacated before the transition. And as explained in the government's opposition, ECF No. 36 at 9–10, there are at least two significant circumstances where the President cannot rely on subsection (a)(1) to select an acting officer and thus subsections (a)(2) and (a)(3) play an important role. When the first assistant position is itself a PAS office, (a)(1) is unavailable because the Executive Branch cannot appoint a first assistant without Senate confirmation, and the President must use (a)(2) or (a)(3) instead. Subsections (a)(2) and (a)(3) also play a distinct role when the President wants to leave the current first assistant in place and appoint someone else to be the acting officer. Even if such circumstances were infrequent, that does not render the function of subsections (a)(2) and (a)(3) superfluous.

Moreover, as further explained in the government's opposition, ECF No. 36 at 13–16, the Attorney General has delegated to Ms. Chattah the authority to supervise Jackson's prosecution under 28 U.S.C. §§ 509, 510, and 515. The Court's decision rejecting that argument is at least in tension with the Attorney General's broad statutory authority to delegate her

4

powers—including powers otherwise exercised by U.S. Attorneys—to special attorneys and others acting on her behalf, and with decisions of the Ninth Circuit and other courts who have held that the FVRA does not invalidate the exercise of delegable duties. *See, e.g.*, *Arthrex, Inc. v. Smith & Nephew, Inc.*, 35 F.4th 1328, 1336 (Fed. Cir. 2022) (holding that the FVRA does not preclude a non-acting officer from exercising lawfully delegated duties of a vacant PAS office); *Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064, 1073 (9th Cir. 2024) (holding that the FVRA's remedial provisions do not prohibit ratification of an agency official's performance of lawfully delegated duties of a vacant PAS office). The government agrees that Section 3347 of the FVRA is the exclusive means of designating an *acting official* who can perform *all* of the duties of the office—both delegable and nondelegable. But a person does not need to be an acting official at all to perform the delegable duties of the office, since the Attorney General can, as she did here, delegate those duties to a *non*-acting official. Indeed, as the Court's decision recognized, Assistant U.S. Attorneys—which include senior attorneys who supervise line prosecutors—can continue to work on this prosecution pursuant to their authority delegated from the Attorney General. *See* ECF No. 42 at 27, 31-32. Ms. Chattah can likewise validly supervise Assistant U.S. Attorneys pursuant to delegated authority in her capacity as First Assistant U.S. Attorney and Special Attorney. The government has thus demonstrated, at a minimum, that this case raises serious legal questions, satisfying the first prong.

Second, the government will be seriously and irreparably harmed without a stay. Disqualifying the Acting U.S. Attorney for the District of Nevada has profound implications for the enforcement of federal law throughout that district. Absent a stay, the order will remove the Executive's choice to lead a critical Executive Branch component and will require senior leadership of the Department of Justice to oversee almost every function of the U.S. Attorney's

5

Office, including in this and other criminal cases. The improper judicial disruption of the executive chain of command is a serious and irreparable injury. As the Ninth Circuit recognized in *Williams*, "the effect of any attorney disqualification order is fairly irreversible because it materially changes" the party's position, and if the case is allowed to proceed under such circumstances, no remedy will be available. 68 F.4th at 570 (quotations and brackets omitted); *see id.* ("After a final judgment, it will be too late for our court to undo any improper encroachment on the Executive branch's prosecutorial prerogatives.").

Third, granting a stay will not cause Jackson substantial injury. Ms. Chattah has been Acting U.S. Attorney during the entire pendency of Jackson's case. A stay will merely preserve the status quo. *See Mi Familia Vota*, 111 F.4th at 984 ("A judicial stay is ordinarily a mechanism to preserve, not upset, the status quo pending appeal."). And Jackson does not—and cannot—identify any aspect of his prosecution that would likely be affected if Ms. Chattah remains at her post during the pendency of an appeal.

Fourth, the public interest favors a stay. In *Williams*, the Ninth Circuit explained that that "special solicitude" is "owed to Executive branch prerogatives under the separation of powers." 68 F.4th at 570. "Congress has vested in the Attorney General the power to conduct the criminal litigation of the United States Government" and "the power to appoint subordinate officers to assist [her] in the discharge of [her] duties." *United States v. Nixon*, 418 U.S. 683, 694 (1974). Recognizing that "the conduct of federal criminal litigation … is an executive function within the exclusive prerogative of the Attorney General," the Ninth Circuit has observed that "[t]he separation of powers mandates judicial respect for the prosecutor's independence" and emphasized the importance of preserving the Executive Branch's control over criminal prosecutions. *United States v. Gen. Dynamics Corp.*, 828 F.2d 1356,

6

1366 (9th Cir. 1987) (quotations and brackets omitted). The public interest in ensuring this principle is foundational.

## CONCLUSION

Based upon the above, this Court should grant a stay of the disqualification order pending appeal.

DATED: October 3, 2025

SUE FAHAMI
Executive Assistant

*/s/ Adam Flake*

_____
ADAM FLAKE
Appellate Division Chief and
Assistant United States Attorney

7

# Exhibit I

# Exhibit I

TODD BLANCHE
Deputy Attorney General of the United States
SUE FAHAMI
Executive Assistant United States Attorney
District of Nevada
Nevada Bar Number 5634
Tina Snellings
Assistant United States Attorney
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
Tina.Snellings@usdoj.gov
*Attorneys for the United States*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:25-cr-00240-GMN-BNW |
| Plaintiff, | |
| v. | **Certification of Supervision** |
| Devonte Devon Jackson, | |
| Defendant. | |

**Certification: This pleading is timely filed pursuant to the Court's Order [ECF No. 42].**

Pursuant to the Court's order dated September 30, 2025 [ECF No. 42], I certify for the purposes of this case that my immediate supervisor is Melanee Smith, Section Chief of General Crimes. She is supervised by Susan Cushman, Criminal Division Chief who, in turn, is supervised by Sue Fahami, Executive Assistant U.S. Attorney. For purposes of this case, Sue Fahami is supervised directly by Todd Blanche, Deputy Attorney General of the United States.

Sigal Chattah does not supervise this case or supervise me for purposes of this case.

Respectfully submitted this 6th day of October 2025.

TODD BLANCHE
Deputy Attorney General of the United States

/s/ Tina Snellings
TINA SNELLINGS
Assistant United States Attorney
*Attorney for the United States*

2

TODD BLANCHE
Deputy Attorney General of the United States
SUE FAHAMI
Executive Assistant United States Attorney
District of Nevada
Nevada Bar Number 5634
ADAM FLAKE
Appellate Chief and
Assistant United States Attorney
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
Adam.Flake@usdoj.gov
*Attorneys for the United States*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:25-cr-00240-GMN-BNW |
| Plaintiff, | |
| v. | **Certification** |
| DEVONTE DEVON JACKSON, | |
| Defendant. | |

**Certification: This pleading is timely.**

Pursuant to the Court's order dated September 30, 2025 (ECF No. 42), I certify for the purposes of this case that my immediate supervisor is Sue Fahami, Executive Assistant U.S. Attorney. For purposes of this case, Sue Fahami is supervised directly by Todd Blanche, Deputy Attorney General of the United States.

///

///

///

///

Sigal Chattah does not supervise this case or supervise me for purposes of this case.

Respectfully submitted this 6th day of October, 2025.

TODD BLANCHE
Deputy Attorney General of the United States

/s/ Adam Flake
Appellate Chief and
Assistant United States Attorney
*Attorneys for the United States*

2

# Exhibit J

# Exhibit J

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEVADA

United States of America,

Plaintiff,

v.

Shamar Tyrell Garcia; Giann Icob Salazar Del Real; Devonte Devon Jackson; and Jorge Enriquez, Jr.,

Defendants.

No. 2:25-cr-00230-RFB-BNW
No. 2:25-cr-00227-JAD-BNW
No. 2:25-cr-00240-GMN-BNW
No. 3:25-cr-00026-MMD-CLB

**ORDER**

The undersigned judge previously ruled that Acting U.S. Attorney Sigal Chattah was not legally appointed, and disqualified her from supervising these four cases. *United States v. Garcia*, 2025 WL 2784640 (D. Nev. Sept. 30, 2025), *appeal filed*, No. 25-6229 (9th Cir. Oct. 2, 2025). The government now asks the Court to stay its disqualification order until the Ninth Circuit resolves the existing appeal.[1]

Courts consider four factors when deciding whether to grant a stay pending appeal: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 425-26 (2009)

---

[1] *See Garcia*, Doc. 43; *Salazar Del Real*, Doc. 45; *Jackson*, Doc. 45; *Enriquez*, Doc. 47.

1

(citation omitted). The first two factors are the most important, and "fall on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Mi Familia Vota v. Fontes*, 111 F.4th 976, 981 (9th Cir. 2024) (citation modified). To justify a stay, a moving party must at least show that "serious legal questions are raised" by the appeal. *Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011) (citation omitted). The Court will address the four stay factors.

### 1. Serious Questions.

The Court stands by its previous ruling. For reasons already explained at length, the Court concludes that Ms. Chattah's appointment is not valid under the Federal Vacancies Reform Act (FVRA). *Garcia*, 2025 WL 2784640, at *4-11. The Court also concludes that the government's alternative argument – that the Attorney General can confer on Ms. Chattah all the powers of a U.S. Attorney by using general delegation statutes – is directly barred by § 3447(a) and (b) of the FVRA. *Id.* at *11-14. The government has not shown it is likely to prevail on its challenge to these conclusions.

The Court also recognizes, however, that the disqualification motions raise novel and important issues. Only one other court has addressed these issues. *See United States v. Giraud*, --- F.Supp.3d ----, 2025 WL 2416737 (D.N.J. Aug. 21, 2025). They present important questions of when and how the President or Attorney General can fill a vacancy in a U.S. Attorney position on an acting basis. These issues are sufficiently serious to satisfy the first stay requirement.

### 2. Irreparable Harm.

The harm at issue in this case is not like the harm encountered in typical civil litigation. The potential harm arises from the Constitution's division of federal powers and the deference and respect each of the three federal branches should afford each other. The concern, as the Ninth Circuit has noted, is "harm to the separation of powers." *United States v. Williams*, 68 F.4th 564, 570 (9th Cir. 2023). Such harm is particularly relevant in this case because "[t]he doctrine of separation of powers requires judicial respect for the independence of the prosecutor." *United States v. Simpson*, 927 F.2d 1088, 1091 (9th Cir.

1991).  The separation of powers calls for courts to show "special solicitude" for Executive Branch prerogatives.  *Nixon v. Fitzgerald*, 457 U.S. 731, 743 (1982).

The Court's earlier decision disqualifies an Acting U.S. Attorney, appointed by the Attorney General, from supervising prosecutions initiated by the Executive Branch.  While the Court is fully persuaded that its decision is correct as a matter of law, the decision nonetheless intrudes on Executive Branch prerogatives.  If the Court's decision is not correct, such an intrusion is improper.  Given the solemn respect our separate branches of government should have for each other, the mere possibility of an improper intrusion is sufficient in the Court's view to satisfy the irreparable harm prong of the stay inquiry.  And a separation-of-powers harm is great enough to offset the lower showing made by the government on the first prong – serious questions rather than a likelihood of success on the merits.

### 3.  Injury to Defendants.

Defendants express concern that staying the Court's earlier decision and allowing Ms. Chattah to supervise their prosecutions will injure them.  The Court is not persuaded.  Defendants' cases presumably will continue to be managed primarily by the assigned line prosecutors, and the stay imposed in this order likely will be short-lived given the Ninth Circuit's expedited schedule for deciding the appeal.

### 4.  Public Interest.

The public certainly has an interest in a government that turns square corners and complies with the statutory commands of the FVRA, but it also has an interest in avoiding unnecessary confrontations between the executive and judicial branches of government.  Given these contrasting and serious interests, this fourth factor does not persuade the Court to deny the stay request.

### 5.  Conclusion.

The Court still holds that Ms. Chattah has not been validly appointed.  But the Court also recognizes the deference and respect it should have for the Executive Branch, just as the Executive Branch should have deference and respect for the Judiciary.  To promote that

3

spirit of solicitude, and in light of the relatively fast schedule set by the Ninth Circuit for resolving these matters, the Court will grant the government's motion to stay. *See Giraud*, 2025 WL 2416737, at *30 (staying similar decision).

**IT IS ORDERED** that the motion to stay is granted. The Court's earlier decision, *United States v. Garcia*, 2025 WL 2784640 (D. Nev. Sept. 30, 2025), is stayed until completion of the Ninth Circuit's review.

Dated this 23rd day of October, 2025.

David G. Campbell
Senior United States District Judge

4

# Exhibit K

# Exhibit K



# Office of the Attorney General
## Washington, D. C. 20530

ORDER NO. 6346-2025

## APPOINTMENT OF SIGAL CHATTAH AS SPECIAL ATTORNEY AND DESIGNATION AS FIRST ASSISTANT UNITED STATES ATTORNEY FOR THE DISTRICT OF NEVADA

By virtue of the authority vested in the Attorney General by law, including 28 U.S.C. § 509, 510, and 515, I hereby appoint Sigal Chattah as a Special Attorney and designate her as First Assistant United States Attorney for the District of Nevada, effective upon her resignation as United States Attorney for the District of Nevada.  As First Assistant United States Attorney, Ms. Chattah will have authority to serve as Acting United States Attorney upon a vacancy in that office, subject to the conditions and time limitations of the Federal Vacancies Reform Act of 1998, 5 U.S.C. §§ 3345-3349d.

7/28/25
_____
Date

_____
Pamela Bondi
Attorney General

ER-187